**Docket No. 24-1036**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

VINOD SODHA; AMEE SODHA,

*Plaintiffs-Appellants,*

v.

ROBINHOOD MARKETS, INC., *et al.*,

*Defendants-Appellees.*

*Appeal from a Decision of the United States District Court for the Northern District of California, No. 3:21-cv-09767-EMC · Honorable Edward M. Chen*

# OPENING BRIEF OF APPELLANTS

DEBORAH CLARK-WEINTRAUB
THOMAS LIVEZEY LAUGHLIN IV
EMILIE B. KOKMANIAN
SCOTT & SCOTT
ATTORNEYS AT LAW, LLP
The Hemsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
(212) 223-6444

JOHN T. JASNOCH
SCOTT & SCOTT
ATTORNEYS AT LAW, LLP
600 West Broadway, Suite 3300
San Diego, California 92101
(619) 233-4565

*Counsel for Plaintiffs-Appellants*
*Vinod Sodha and Amee Sodha*

COUNSEL PRESS · (213) 680-2300 PRINTED ON RECYCLED PAPER

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. JURISDICTIONAL STATEMENT ..... 3

III. ISSUES PRESENTED ..... 3

IV. STATEMENT REGARDING STATUTORY ADDENDUM ..... 4

V. STATEMENT OF THE CASE ..... 4

A. Statement of Facts ..... 4

1. Background ..... 4

2. Robinhood's $2 Billion IPO ..... 6

3. Undisclosed Adverse Facts Existing at the Time of the IPO ..... 9

4. The Materially False and Misleading Offering Documents ..... 13

a. Materially False and Misleading Statements and Omissions Regarding Q12021 and Q22021 Results ..... 13

b. Materially False and Misleading Statements and Omissions Regarding KPIs ..... 18

c. Materially False and Misleading Risk Warnings ..... 19

B. Relevant Procedural History ..... 20

VI. STANDARD OF REVIEW ..... 27

VII. SUMMARY OF ARGUMENT ..... 28

VIII. ARGUMENT ..... 30

A. The SAC Alleges Violations of §§11 and 12(a)(2) of the 1933 Act ..... 30

1. The Significant Declines Robinhood Suffered in Multiple Financial Indicators Prior to the IPO Was Material Information a Reasonable Investor Would View as Significantly Altering the Total Mix of Information................32

2. The Material Omissions Rendered the Offering Documents Materially False and Misleading ...........................35

3. The Omitted Financial Data Warranted Disclosure Even Under the District Court's Erroneous "Extraordinary" Departure Standard ..................................................................38

4. The Offering Documents' Risk Disclosures Were Materially False and Misleading.............................................43

5. Defendants Had an Independent Duty to Disclose the Omitted Information Under Item 303 of Regulation S-K ........47

6. Defendants Failed to Disclose Material Factors that Made an Investment in Robinhood and the IPO Risky as Required by Item 105 of Regulation S-K ................................53

B. Plaintiffs Have Pled a Control Person Claim Under §15 of the 1933 Act ............................................................................................56

IX. CONCLUSION...........................................................................................56

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)....................30

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
19 F.4th 145 (2d Cir. 2021)....................34, 35

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)....................33

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................28

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)....................36, 43

*Boston Ret. Sys. v. Uber Techs., Inc.*,
No. 19-cv-06361, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020)....................40

*Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*,
No. 99 Civ. 12046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001)....................55

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
583 U.S. 416 (2018)....................30

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003)....................32

*Franchi v. SmileDirectClub, Inc.*,
633 F. Supp. 3d 1046 (M.D. Tenn. 2022)....................37, 42, 52

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................36

*Goldman v. Belden*,
754. F.2d 1059 (2d Cir. 1985)....................34

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)....................1

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ....................................................................30, 43

*In re Apple Inc. Sec. Litig.*,
No. 19-CV-02033, 2020 WL 2857397 (N.D. Cal. June 2, 2020) .....................37

*In re Facebook, Inc. IPO Sec. and Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) ........................................................50, 52

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) ..........................................................................44

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
618 F. Supp. 2d 311 (S.D.N.Y. 2009) ..............................................................33

*In re Nvidia Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ..................................................................29, 52

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ......................................................................55

*In re Restoration Robotics, Inc. Sec. Litig.*,
417 F. Supp. 3d 1242 (N.D. Cal. 2019)...........................................................33

*In re Shortel Inc., Sec. Litig.*,
No. C 08-00271, 2009 WL 248326 (N.D. Cal. Feb. 2, 2009)...........................28

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ..........................................................................45

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ...........................................................................37

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ..........................................................................46

*Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.*,
847 F.2d 186 (5th Cir. 1988) ..........................................................................42

*Kapps v. Torch Offshore, Inc.*,
379 F.3d 207 (5th Cir. 2004) ....................................................................*passim*

*Kokesh v. S.E.C.*,
581 U.S. 455 (2017)........................................................................................30

*Krim v. BancTexas Grp., Inc.*,
989 F.2d 1435 (5th Cir. 1993) ........................................................................39

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011) .....................................................................48, 50

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) ..........................................................................45

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ..........................................................................40

*Milman v. Box Hill Sys. Corp.*,
72 F. Supp. 2d 220 (S.D.N.Y. 1999) ...............................................................52

*Mingbo Cai v. Switch, Inc.*,
No. 2:18-cv-01471, 2019 WL 3065591 (D. Nev. July 12, 2019) ......................53

*N.M. State Inv. Council v. Ernst & Young LLP*,
641 F.3d 1089 (9th Cir. 2011) ...................................................................27, 28

*Nayani v. LifeStance Health Grp., Inc.*,
No. 22-cv-6833, 2023 WL 3260260 (S.D.N.Y. May 4, 2023)..........................32

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 Fed. App'x 10 (2d Cir. 2011) ....................................................................35

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
297 F.3d 1182 (11th Cir. 2002) .....................................................39, 40, 47, 51

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012) .....................................................................48, 52

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
No. 18 Civ. 9848, 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)......................56

*Pinter v. Dahl*,
486 U.S. 622 (1988)........................................................................................30

*Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) ....................................................35

*Retail Wholesale & Dep't Store Union Loc. 388 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) ....................................................35

*SEC v. Cap. Gains Research Bureau, Inc.*,
375 U.S. 180 (1963)....................................................30

*SEC v. Phan*,
500 F.3d 895 (9th Cir. 2007) ....................................................1, 33

*Shaw v. Digital Equip. Corp.*,
82 F.3d 1194 (1st Cir. 1996)....................................................31, 32, 41

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
707 F.3d 95 (1st Cir. 2013)....................................................*passim*

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009) ....................................................29, 33, 34

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ....................................................28

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) ....................................................47

*Sundaram v. Freshworks Inc.*,
No. 22-cv-06750, 2023 WL 6390622 (N.D. Cal. Sept. 28, 2023) .....................51

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)....................................................*passim*

*Wang v. Cloopen Grp. Holding Ltd.*,
661 F. Supp. 3d 208 (S.D.N.Y. 2023) ....................................................42

*Westley v. Oclaro, Inc.*,
897 F. Supp. 2d 902 (N.D. Cal. 2012)....................................................45

*Zell v. InterCap. Income Sec., Inc.*,
675 F.2d 1041 (9th Cir. 1982) ....................................................34

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ........................................................................28

**STATUTES, RULES, AND REGULATIONS**

Federal Rules of Civil Procedure
Rule 8 .......................................................................................28, 46
Rule 12(b)(6)..................................................................................27

15 U.S.C.
§77k........................................................................................1, 31, 47
§77l...............................................................................................1, 31
§77z...................................................................................................20

17 C.F.R.
§229.105.......................................................................................*passim*
§229.303..............................................................................4, 21, 31, 48

28 U.S.C.
§1291....................................................................................................3
§1331....................................................................................................3

**OTHER AUTHORITIES**

Management's Discussion and Analysis of Financial Condition,
Securities Act Release No. 6835,
1989 WL 1092885 (May 18, 1989) ..................................................47

FAST Act Modernization and Simplification of Regulation
S-K, Release No. 33-10618,
2019 WL 1437180 (Apr. 2, 2019) ....................................................54

## I. INTRODUCTION

The Securities Act of 1933 (the "1933 Act") imposes strict liability for any untrue statement of a material fact or omission of a material fact in a registration statement or prospectus. 15 U.S.C. §§77k(a), 77l(a). The pleading requirements for 1933 Act §§11 and 12(a)(2) claims are "relatively minimal." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). A plaintiff "need only show a material misstatement or omission to establish his prima facie case." *Id.* An omitted fact is material if there is "a substantial likelihood that [its] disclosure . . . would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available[,]" *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976), a determination that "should ordinarily be left to the trier of fact." *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007).

Plaintiffs' Second Amended Complaint (the "SAC") more than meets this minimal pleading standard. The SAC alleges that by the time of Robinhood's initial public offering ("IPO") on July 29, 2021, its business bore little resemblance to the one that had produced the exponential growth reflected in the historical financial data included in the registration statement and prospectus (the "Offering Documents"). An exodus of customers whose conventional trading in equities and options had fueled Robinhood's pre-IPO growth, and their replacement beginning in the first quarter of 2021 with an influx of speculative traders in meme stocks and

the cryptocurrency Dogecoin, fundamentally altered Robinhood's risk profile. Although Robinhood benefited from these fads during the two quarters prior to its IPO, by early May 2021 both events were over, and all key components of Robinhood's revenue – from equities, options, and cryptocurrency trading – were declining. Revenue from equities trading fell to a five-quarter low in the second quarter of 2021, the last completed quarter before the IPO, and equities trading volume on Robinhood's platform continued to decline in July 2021, the month in which the IPO occurred. At the same time, revenue from options trading fell 16.8% from the first to the second quarter of 2021, and cryptocurrency trading, which had accounted for 41% of total revenue in the second quarter of 2021, fell 90% from May through July 2021. Further, several Key Performance Indicators ("KPIs"), including Monthly Active Users ("MAU"), which Robinhood touted as positively correlated with revenue, and Average Revenue Per User ("ARPU") also declined. However, none of the foregoing facts were disclosed in the Offering Documents.

The District Court dismissed the SAC with prejudice, holding, as a matter of law, that the declines in Robinhood's financial metrics during this period were not "so extraordinary" as to warrant disclosure. However, because the omitted facts are not so obviously unimportant to an investor that "reasonable minds cannot differ on the question of materiality," *TSC*, 426 U.S. at 450, the judgment of the District Court should be reversed.

## II. JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this litigation pursuant to §22 of the 1933 Act, 15 U.S.C. §77v, and 28 U.S.C. §1331. On January 25, 2024, the District Court entered a final judgment of dismissal with prejudice as to all claims asserted in the pleadings. 1-ER-2. On February 21, 2024, Lead Plaintiffs Amee Sodha and Vinod Sodha ("Plaintiffs") filed a timely notice of appeal. 4-ER-677. This Court has jurisdiction under 28 U.S.C. §1291.

## III. ISSUES PRESENTED

A. Whether the District Court erred in dismissing Plaintiffs' claims for violations of §§11, 12(a)(2), and 15 of the 1933 Act with prejudice on the grounds that Plaintiffs had not alleged a material untrue statement or omission when the Offering Documents used to conduct Robinhood's IPO failed to disclose an exodus of customers from its platform and significant declines in multiple material financial indicators in the quarter preceding the IPO that continued into the quarter in which the IPO occurred.

B. Whether the District Court erred in holding, as a matter of law, that contingent risk warnings in the Offering Documents were not, themselves, materially false and misleading when it acknowledged that Robinhood was aware of some declines in its business metrics.

C. Whether the District Court erred in holding, as a matter of law, that Robinhood did not violate its affirmative disclosure duties under Item 105 of Regulation S-K, 17 C.F.R. §229.105, to disclose material factors that made an investment in Robinhood and the IPO speculative or risky, and under Item 303 of Regulation S-K, 17 C.F.R. §229.303, to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

D. Whether the District Court erred in dismissing Plaintiffs' control person claim under §15 of the 1933 Act on the grounds that primary violations under §§11 and 12 had not been alleged.

## IV. STATEMENT REGARDING STATUTORY ADDENDUM

The addendum includes excerpts of the relevant statutory provisions.

## V. STATEMENT OF THE CASE

### A. Statement of Facts

#### 1. Background

Robinhood is an online broker founded in 2013 with the mission to "democratize finance for all" by making access to the securities markets easy and affordable for small and non-traditional investors. 3-ER-491, ¶52; 2-ER-74, 93, 98. Its core product offering is its retail investing platform which provides its customers with commission-free trading of U.S. listed stocks and ETFs, ADRs, and, through a

subsidiary, cryptocurrencies. 3-ER-491, ¶53. At the time of the IPO, Robinhood also offered cash management services, including Robinhood-branded debit cards, and a subscription service called Robinhood Gold that provided premium features such as professional research and market data. 3-ER-491, ¶53. The Offering Documents described these product offerings along with Robinhood's platform as "the first step toward a comprehensive financial services platform" that would allow Robinhood to "grow with new and existing customers" as they "expand[ed] their relationship with [its] platform" enabling Robinhood "to continue to rapidly scale [its] customer base." 2-ER-93, 98, 101.

Robinhood earns "the significant majority" of its revenue by routing its customers' trades to market makers in return for fees. 3-ER-492, ¶54; 2-ER-93.[1] This transaction-based revenue is known as "payment for order flow" ("PFOF") for equities and options trading, and "Transaction Rebates" for cryptocurrency trades. 3-ER-492, ¶54. Prior to 2021, Robinhood's largest source of transaction-based revenue was fees earned on its customers' conventional trading of stocks and options, with PFOF from equities trading consistently accounting for approximately

[1] Transaction-based revenue accounted for 80.5% of Robinhood's "net" or total revenue for the quarter ended March 31, 2021. 2-ER-235. In addition to transaction-based revenue, Robinhood earns (i) net interest revenue from securities and margin lending and cash deposits, net of borrowing costs related to its revolving lines of credit, and (ii) subscription revenue from its Robinhood Gold product. 2-ER-220.

one-third of Robinhood's transaction-based revenue in each of the five quarters prior to the IPO (*i.e.*, Q12020-Q12021). 3-ER-479-80, ¶¶4-5.

### 2. Robinhood's $2 Billion IPO

Robinhood conducted its IPO pursuant to Offering Documents filed with the U.S. Securities and Exchange Commission ("SEC") on July 27, 2021, and declared effective the following day, offering 55 million shares for sale at a price of $38 per share and raising gross proceeds of over $2 billion. 3-ER-495-96, ¶¶67-69.[2]

The Offering Documents used to conduct the IPO emphasized Robinhood's exponential growth and its strategy to continue growing through both the addition of new customers and by deepening and expanding its relationship with existing customers through its array of product offerings. 3-ER-479, ¶3; 491, ¶53; 2-ER-93, 98, 100. Reams of historical financial performance data presented in multiple charts and tables and the Management's Discussion and Analysis of Financial Condition and Results of Operation (the "MD&A") highlighted Robinhood's virtually unbroken run of year-over-year and quarter-over-quarter growth in its customer base and revenue since its founding, including massive growth in all key financial metrics

---

[2] Of this amount, 52,375,000 shares were offered by Robinhood and 2,625,000 were offered by its founders and Chief Financial Officer. An additional 5,500,000 shares were available for purchase at the option of underwriters to cover over-allotments. 2-ER-72.

in the periods immediately preceding the IPO. *E.g.*, 3-ER-479, ¶3; 507-09, ¶¶110-15; 510-12, ¶¶119-21; 2-ER-220-22, 225, 228-29, 235-36, 241, 247.

For the year ended December 31, 2020, the Offering Documents reported that Robinhood's total revenue and transaction-based revenue grew 245% and 322%, respectively. 3-ER-507-09, ¶¶110, 112, 115; 2-ER-117, 235, 241, 265. For the quarter ended March 31, 2021, the last quarter for which reported quarterly results were available prior to the IPO, total revenue and transaction-based revenue grew 309% and 340%, respectively. 3-ER-507-09, ¶¶110, 113, 115; 2-ER-117, 235-36, 265. For the foregoing periods, the Offering Documents included a breakdown of transaction-based revenue by type of trading – *i.e.*, equities, options, and cryptocurrencies. 3-ER-509, ¶¶115; 2-ER-236, 241. In addition, because Q22021 had ended 28 days prior to the IPO, the Offering Documents presented certain estimated preliminary financial results for the quarter, indicating that Robinhood expected to report total revenue of $546 million to $574 million, representing 129% year-over-year growth at the midpoint of the range, although no estimate of transaction-based revenue or breakdown of such revenue by type of trading was disclosed. 3-ER-480, ¶6; 508, ¶114; 2-ER-122, 128. The Offering Documents also included a table of Robinhood's unaudited quarterly results for the period March 2019 through March 2021, showing that except for the quarter ended December 31,

2019, Robinhood's total revenue and transaction-based revenue had increased every quarter. 3-ER-507, ¶110; 2-ER-247.

The Offering Documents also highlighted four KPIs – (i) Net Cumulative Funded Accounts ("NCFA"), a measure of the size of Robinhood's customer base;[3] (ii) MAU, the number of users that engage with Robinhood's platform during a period;[4] (iii) Assets Under Custody ("AUC"), the sum of the fair value of all equities, options, cryptocurrency, and cash held by users in their accounts; and (iv) ARPU, total revenue for a period divided by the average NCFA for that period and the preceding period. 3-ER-493-95, ¶¶58-63. As with Robinhood's revenue, multiple charts and tables included in the Offering Documents showed virtually uninterrupted and continuing increases in these KPIs, including in the periods immediately prior to the IPO. 3-ER-510-12, ¶¶119-21; 2-ER-83, 119, 122, 220-22, 225-26, 228.

Specifically, the Offering Documents showed that from December 31, 2017, to March 31, 2021, (i) NCFA and MAU increased nearly tenfold from 1.9 million and 1.8 million to 18 million and 17.7 million, respectively; (ii) AUC rose from $4.5

---

[3] Robinhood defined NCFA as the total number of accounts into which a user makes an initial deposit or money transfer during the relevant period, excluding accounts with balances below zero for 45 consecutive days. 3-ER-494-95, ¶63; 2-ER-119, 225.

[4] A user need not have a funded account or engage with Robinhood's platform on a monthly or recurring basis to be included in MAU. 3-ER-494, ¶60; 2-ER-119, 226.

billion to $80.9 billion; and (iii) ARPU grew 270% from $37 to $137. 3-ER-511-12, ¶120; 2-ER-225. For the three months ended June 30, 2021, the Offering Documents stated that Robinhood expected to report NCFA of 22.5 million, MAU of 21.3 million, and AUC of $102 billion, year-over-year increases of 130%, 109%, and 205%, respectively, and all-time highs for each metric. 3-ER-511-12, ¶120; 2-ER-228-29. ARPU for Q22021 was not disclosed. 3-ER-505, ¶101; 2-ER-228.

#### 3. Undisclosed Adverse Facts Existing at the Time of the IPO

In stark contrast to the unbridled customer growth of pre-IPO periods highlighted in the Offering Documents, in the quarters immediately preceding the IPO, Robinhood experienced an exodus of customers due to poor customer service, platform outages, and security concerns. 3-ER-501-03, ¶¶87-97. Poorly trained customer service representatives struggled to respond to customer inquiries, creating a lengthy backlog of complaints that left customers irate and led them to close their accounts in the months leading to the IPO. 3-ER-503, ¶¶95-96. During the same period, security concerns over hacks and breaches on Robinhood's platform and limitations on trading implemented by Robinhood in early 2021 due to increased deposit requirements imposed by the National Securities Clearing Corporation also resulted in substantial customer attrition. 3-ER-501-03, ¶¶89-94. In the months before the IPO, the widespread customer dissatisfaction fueled by these issues was evident in Robinhood's performance data, including MAU, and in its declining Net

Promoter Score, a measure of how likely Robinhood's customers were to recommend its platform to others, which was viewed by management as an important indicator of Robinhood's ability to grow its customer base. 3-ER-501, ¶88.

By the time of the IPO, this exodus of customers combined with an influx of speculative traders in response to two market events had transformed Robinhood's business. Whereas prior to Q12021 over 90% of Robinhood's transaction-based revenue was generated by its customers' conventional trading in equities and options (3-ER-492-93, ¶56), beginning in Q12021, Robinhood's business became dominated by fad trading in meme stocks and the cryptocurrency Dogecoin. First, in Q12021, the so-called "meme stock event," during which the shares of GameStop and other financially troubled companies were bid up by retail investors in an effort to squeeze short-sellers (3-ER-496-98, ¶¶72-77), increased trading volume in equities on Robinhood's platform and helped drive PFOF from equities trading, options trading, and transaction-based revenue in Q12021 to all-time highs of $133.3 million, $197.9 million, and $420.4 million, respectively. 3-ER-499-500, ¶¶82-83; 507, ¶110. Then, in Q22021, a rally in the cryptocurrency Dogecoin (3-ER-499, ¶¶78-81) boosted cryptocurrency trading volume on Robinhood's platform and drove Transaction Rebates and Robinhood's revenue to new all-time highs. 3-ER-500, ¶84; 508, ¶114.

By the time of the IPO, however, both events had ended and the impact of the pre-IPO exodus of customers from Robinhood's platform became manifest. Once the meme stock event ended in February 2021, PFOF from equities trading fell dramatically from $133.3 million in Q12021 to just $52 million in Q22021, the last completed quarter before the IPO, a five-quarter low that could not be explained by the end of the meme stock event alone. 3-ER-498, ¶77; 499-500, ¶¶82-83. Moreover, this was no isolated occurrence. Trading volume in equities in July 2021, the first month of the quarter in which the IPO occurred, was one-third less than in June 2021 and 15% below the monthly average for Q22021, presaging the equally disappointing $50 million in revenue from equities trading that would be reported for Q32021 following the IPO. 3-ER-500, ¶83; 3-ER-475. Revenue from options trading also declined from $197.9 million in Q12021, to $164.6 million in Q22021, a decline of 16.8%. 3-ER-500, ¶83. Likewise, the Dogecoin rally, which began in April 2021, was over by May and cryptocurrency trading volume on Robinhood's platform plummeted 90% from May to July 2021, the two months prior to the IPO, portending Q32021's collapse in Transaction Rebates from cryptocurrency trading from $233 million in Q22021, to just $51 million. 3-ER-499, ¶¶80-81; 500-01, ¶¶84-85; 517, ¶134; 3-ER-475.

As a result of the foregoing, Robinhood's KPIs also declined prior to the IPO. MAU, which Robinhood touted as positively correlated with revenue, fell 19% from

May to July, a loss of 4.6 million users. 3-ER-480-81, ¶7; 503-04, ¶¶98-99. Importantly, Robinhood had rarely, if ever, experienced back-to-back months of declines of similar magnitude in MAU previously. 3-ER-510-11, ¶119. AUC fell 7%, from $102 billion in June 2021, to $94.7 billion in July 2021 (and remained at $95 million for Q32021). 3-ER-505-06, ¶¶103-05; 517, ¶134. Indeed, except for a one-time bump in June 2021, which Robinhood attributed to "exceptionally strong interest in trading, particularly in cryptocurrencies," AUC had been declining since April 2021, a decline that stood in stark contrast to the consistent increases in AUC that occurred in previous periods. 3-ER-505, ¶¶103-04. Likewise, ARPU plummeted from $137 as of the end of March 2021, to $111.70 as of June 30, 2021, an 18% drop, and had certainly declined in July as well, given the unprecedented declines in trading volumes Robinhood had experienced in June and July. 3-ER-504-05, ¶¶100-02. Indeed, by the end of Q32021, ARPU was just $65, a decline of approximately 42% from Q22021 and 52.5% since Q12021. 3-ER-505, ¶102.

These extreme, undisclosed downward trends during Q22021 and the beginning of Q32021 in the financial metrics that had been touted in the Offering Documents augured Robinhood's disappointing Q32021 results and KPIs, which were significantly below analysts' consensus estimates, leading JP Morgan to brand Robinhood "a growth company without the growth" and CNBC anchor Jim Cramer to call it "a fad." 3-ER-481, ¶¶8-9; 519, ¶¶139-40.

### 4. The Materially False and Misleading Offering Documents

In view of the foregoing, by the time of the IPO, Robinhood's ability to grow its revenue and customer base as it had in the past was at significant risk. Investors were none the wiser, however, because neither the significant customer attrition nor the ongoing declines in Robinhood's critical financial metrics were disclosed in the Offering Documents, leaving investors ignorant of Robinhood's true risk profile and completely unaware that the reported results in the Offering Document had little, if any, predictive value with respect to future periods.

#### a. Materially False and Misleading Statements and Omissions Regarding Q12021 and Q22021 Results

Although Q12021's meme stock event had significantly boosted Robinhood's financial results in the quarter obscuring ongoing customer defections, this was not evident from the disclosures in the Offering Documents. In fact, the Offering Documents' discussion of the factors and forces responsible for Q12021 results varied little from their discussion of FY2020 results. Most of the factors that were cited as contributing to Q12021's higher transaction-based revenue – "increased interest in personal finance and investing," "an unprecedented number of first-time retail investors" trading on Robinhood's platform, and "substantial growth" in Robinhood's "user base, engagement and trading activity" – were identical to the factors that had been cited as fueling revenue growth in FY2020, long before the meme stock event occurred. 3-ER-507-08, ¶¶112-13. Although interest in "several

high-profile securities and cryptocurrencies" was mentioned as an additional factor contributing to Q12021 revenue growth, it was given no more weight than any of the other factors that were mentioned, nor was the impact of trading activity in these "high-profile securities and cryptocurrencies" on revenue specifically disclosed. 3-ER-507-08, ¶¶112-13. Customer defections due to poor customer service, security concerns, and platform outages were not disclosed.

Regarding Q22021, the Offering Documents provided an estimated range of total revenue ($546 million to $574 million), but the usual breakdown of revenue by type of trading activity (*i.e.*, equities, options, cryptocurrency) was not provided, leaving investors in the dark with respect to the dramatic shift that had occurred in the fundamentals of Robinhood's business away from conventional equities and options trading and towards speculation prior to the IPO. 3-ER-480, ¶6; 508, ¶114. This was no immaterial omission as Q22021 revenue from equities trading, which historically had contributed one-third of Robinhood's revenue, had fallen to a five-quarter low of just $52 million in Q22021, less than every quarter since Q12020, a decline that could not be explained by the end of Q12021's meme stock event alone. 3-ER-509-10, ¶117. In addition, in describing the contribution of equities trading to Q22021 revenue, the Offering Documents misleadingly stated that equities trading ***activity*** was "relatively flat . . . relative to the three months ended June 30, 2020," a half-truth that left out the inconvenient fact that ***revenue from***

***equities trading in Q22021 was 26% lower than in Q22020***. 3-ER-508, ¶114; 509-10, ¶117; 3-ER-472. Also omitted was any mention that the downward slide in PFOF from equities trading had continued into Q32021, the quarter ongoing at the time of the IPO. As noted above, trading volume in equities in July 2021 was one-third less than in June 2021 and 15% below the monthly average for Q2 2021. 3-ER-500, ¶83.[5]

Although "increased trading activity related to . . . cryptocurrencies" was identified in the Offering Documents as a primary driver of Q22021 revenue, so too was "increased trading activity related to options," and neither options nor cryptocurrency trading was given more or less weight in this regard. 3-ER-508, ¶114. The fact that revenue from options trading had declined 16.8% from Q12021 to Q22021 was omitted. The enormous extent to which Robinhood's Q22021 revenue depended on cryptocurrency trading, and trading in Dogecoin in particular, was also omitted. Although the Offering Documents disclosed that 17% of Robinhood's total revenue and 34% of its cryptocurrency transaction-based revenue in Q12021 had been earned from cryptocurrency transactions and Dogecoin, respectively (3-ER-515-16, ¶129), the Offering Documents did not disclose that these percentages had soared in Q22021 to a stunning 41% and 62%, respectively,

[5] Given this inauspicious beginning, it was not at all surprising that PFOF from equities trading in Q32021 was just $50.4 million. 3-ER-475.

and that 52% of Robinhood's transaction-based revenue in the quarter was attributable to cryptocurrency trading, up from 21% in Q12021. 2-ER-236; 3-ER-472-73.

In addition, although the Offering Documents indicated that cryptocurrency trading activity had slowed in Q22021, neither the extent of the drop off nor what this meant for Robinhood, given the simultaneous cratering of PFOF from equities trading, was made clear. The Offering Documents stated only that cryptocurrency "[t]rading activity was particularly high during the first two months of [Q22021]" only to "return[] to levels more in line with prior periods during the last few weeks of the quarter ended June 30, 2021, and remained at similar levels into the early part of the third quarter." 3-ER-508, ¶114. If anything, this statement misleadingly suggested that the decline in cryptocurrency trading volume was more recent – "the last few weeks of the quarter" – than it had been. 3-ER-500-01, ¶¶84-85. In addition, the "prior periods" whose cryptocurrency trading levels were "more in line" with the level of trading in "the last few weeks" of Q22021 were not identified. This was a material omission as cryptocurrency trading revenue had varied significantly across the "prior periods" reported in the Offering Documents and was as high as $87.5 million in Q12021 before Q22021's Dogecoin rally. 3-ER-509, ¶115. By July 2021, however, cryptocurrency trading volume had fallen to $13 billion (3-ER-500, ¶84), below "the March 2021 (pre-Dogecoin spike) trading

volume of $16 billion." 1-ER-21. Moreover, although cryptocurrency trading volumes were down across the industry during these months due to a regulatory crackdown in China on bitcoin mining and lower volatility, the decline experienced by Robinhood was far greater than that of the industry as a whole. 3-ER-501, ¶86.[6]

As a result of the foregoing misleading statements and omissions, the Offering Documents' disclosure that Robinhood "expect[ed] [its] revenue for [Q3 2021] to be lower, as compared to [Q2 2021], as a result of decreased levels of trading activity relative to the record highs in trading activity, particularly in cryptocurrencies, during [Q2 2021], and expected seasonality" (3-ER-510, ¶118) left investors with no real understanding of the change in Robinhood's business fundamentals or the existing adverse trends that threatened to upend Robinhood's growth story immediately following the IPO. Moreover, the suggestion that Q32021 revenue would be lower due to "seasonality" rather than cratering PFOF from equities trading and plummeting cryptocurrency trading was completely unsupported. 3-ER-510, ¶118.

---

[6] Although the District Court stated that this allegation was added in the SAC, in fact, the same allegation was contained in the Amended Class Action Complaint ("FAC"). 4-ER-654, ¶166.

### b. Materially False and Misleading Statements and Omissions Regarding KPIs

As explained above, at the same time PFOF from equities trading and cryptocurrency trading volume were cratering, and in stark contrast to the historical data provided in the Offering Documents, in the months immediately preceding the IPO, KPIs that the Offering Documents touted as significant business metrics for Robinhood were also declining. 3-ER-503-06, ¶¶98-106. The Offering Documents made no mention of these declines, however. Instead, they misleadingly included multiple tables reflecting ***growing*** estimated NCFA, MAU, and AUC for Q22021 and attributed "[t]he increase in these Key Performance Metrics . . . primarily [to] an increase in new users joining [its] platform, driven by general market interest trading." 3-ER-511-12, ¶¶120-21; 2-ER-122-23, 228-29. Moreover, although the Offering Documents warned that Robinhood anticipate[d] "***the rate of growth*** in these [KPIs would] be lower for the period ended September 30, 2021, as compared to the three months ended June 30, 2021, due to the exceptionally strong interest in trading, particularly cryptocurrencies, [Robinhood] experienced in the three months ended June 30, 2021 ***and seasonality in overall trading activities***" (3-ER-512, ¶121), this warning was itself false and misleading for two reasons. First, as explained above (*see* Section V(A)(3), *supra*), KPIs were declining, not growing, when this warning was issued and, second, the reference to seasonality was baseless. The only mention of seasonality with respect to any of these metrics in the Offering

Documents was an expectation that Robinhood would see more new customers in the first calendar quarter. 3-ER-510, ¶118.[7] In fact, quarterly financial data for the prior two years included in the Offering Documents showed no seasonal decline in revenue from the second to the third quarter. 3-ER-507, ¶110. Finally, the Offering Documents omitted entirely an estimate of ARPU for Q22021, which had declined both quarter-over-quarter (from $137 in Q12021, to $111.7 in Q22021) and year-over-year (from $115 in Q22020, to $111.7 in Q22021). 3-ER-504-05, ¶¶100-01; 3-ER-470.

**c. Materially False and Misleading Risk Warnings**

In addition to the foregoing, the Offering Documents also contained a series of contingent risk warnings including, but not limited to, that (i) Robinhood "***may not***" continue to grow on pace with historical rates"; (ii) a reduction in trading volume in securities and cryptocurrencies "***may*** result in reduced revenues"; (iii) "changes in . . . trading volume of cryptocurrencies ***may*** adversely impact [Robinhood's] growth strategy and business"; (iv) "[i]f demand for transactions in Dogecoin declines and is not replaced by new demand for other cryptocurrencies available for trading on [Robinhood's] platform, [its] business, financial condition and results of operations ***could be*** adversely affected"; and (v) Robinhood's "business ***may*** be

7 The only other mention of seasonality in the Offering Documents concerned proxy rebate revenue, a minor revenue source. 3-ER-510, ¶118.

adversely affected, and growth in [its] net revenue earned from cryptocurrency transactions ***may slow or decline***, ***if*** the markets for Dogecoin deteriorate or ***if*** the price of Dogecoin declines." 3-ER-513-16, ¶¶123-29. These contingent risk warnings were materially false and misleading because, as explained above, by the time of the IPO, (i) conditions were such that Robinhood was not growing on pace with historical rates, (ii) trading volume in equities had cratered leading to reduced revenues, (iii) changes in trading volume of cryptocurrencies made Robinhood's revenue more volatile, adversely impacting Robinhood's growth strategy and business and making an investment in the IPO more risky; and (iv) demand for Dogecoin had collapsed prompting a precipitous decline in revenue from cryptocurrency trading. *See* Section V(A)(3), *supra*.

### B. Relevant Procedural History

The initial complaint in this matter was filed by Philip Golubowski on December 17, 2021. Docket ("Dkt.") 1. On February 15, 2022, Plaintiffs (Dkt. 45) and several other investors (Dkts. 32, 37, 40, 44) filed competing motions pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §77z-1(a)(3)(A)-(B), for appointment as lead plaintiffs and for approval of their selection of lead counsel. Following a hearing, on March 24, 2022, the District Court appointed Plaintiffs as lead plaintiffs and approved their selection of lead counsel. Dkt. 70.

Plaintiffs filed the FAC on June 20, 2022, asserting strict liability claims for violations of §§11, 12(a)(2), and 15 of the 1933 Act against Robinhood, the signatories to the registration statement, and the underwriters of the company's $2 billion IPO. 4-ER-609-76. The FAC alleged that statements in the Offering Documents concerning Robinhood's business strategy and its success in driving growth were materially false and misleading because the Offering Documents failed to disclose that in the months prior to the IPO, Robinhood's KPIs and the level of cryptocurrency trading on Robinhood's platform were plummeting as users left the platform due to an array of customer service, security, and other issues. *Id*. The FAC also alleged that the declines in KPIs and cryptocurrency trading volume were (i) "events, trends, or uncertainties" that, as of the IPO, "[had or were] reasonably [likely] to have a material . . . unfavorable impact on . . . revenues or income from continuing operations," and (ii) material factors that made an investment in Robinhood's IPO "speculative or risky" that were required to be disclosed pursuant to Items 303 and 105 of Regulation S-K, respectively, 17 C.F.R. §§229.303, 229.105. *Id*.

Defendants moved to dismiss the FAC on August 18, 2022, claiming that the Offering Documents were free of misstatements. Dkt. 78. The District Court held oral argument on January 26, 2023 (4-ER-559-608) and, on February 10, 2023, granted Defendants' Motion to Dismiss with leave to amend. The District Court

found the challenged statements concerning Robinhood's business strategy to be "generalized statements of corporate opinion and optimism" that were inactionable as a matter of law. 3-ER-553-56. In addition, the District Court dismissed the alleged misstatements and omissions concerning Robinhood's cryptocurrency trading volume and KPIs, reasoning, in principal part, that Plaintiffs had not "provide[d] contextual information that would show the declines [in KPIs and cryptocurrency trading levels] to be unusual and indicative of larger future trends" and "[w]ithout historical data to show that [the declines] were exceptional and out of line with past fluctuations, [the declines were] not so extraordinary as to mandate specific out-of-quarter disclosure" (the "February 10 Order"). 3-ER-548.

On March 13, 2023, Plaintiffs filed the SAC. 3-ER-477-536. The SAC again asserted claims for violations of §§11, 12(a)(2), and 15 of the 1933 Act against the same Defendants, and alleged that statements in the Offering Documents concerning Robinhood's pre-IPO growth and its financial results in the quarters prior to the IPO were materially false and misleading because they failed to disclose precipitous pre-IPO declines in multiple financial indicators and KPIs. The SAC included allegations intended to remedy the purported deficiencies in the FAC identified in the District Court's February 10 Order. In particular, as required by the District Court, the SAC included additional allegations contextualizing the pre-IPO declines in Robinhood's KPIs and other financial indicators to demonstrate that disclosure of

the substantial declines in these metrics was required by Items 105 and 303 and to make statements made in the Offering Documents concerning Robinhood's growth and financial results not misleading. *E.g.*, 3-ER-479-81, ¶¶5-7; 492-93, ¶¶54-57; 499-506, ¶¶82-106; 510-12, ¶¶119-20.

Defendants moved to dismiss, once again arguing that the Offering Documents did not contain any material untrue statements or omissions. Dkt. 97. The District Court held oral argument on November 21, 2023 (2-ER-36-68), and, on January 24, 2024, again granted Defendants' Motion to Dismiss, this time with prejudice. 1-ER-3-34.

The District Court held that disclosure of the pre-IPO declines in PFOF from equities and options trading, cryptocurrency trading volume, and KPIs was not required because this was "intra-quarter" or "out-of-quarter data" and, as such, disclosure was not required unless Plaintiffs showed "declines so extraordinary as to be unusual and indicative of larger future trends when viewed in context of the company's historical data," which the District Court held they failed to do. 1-ER-15. Although Q22021 was a completed quarter, the District Court considered declines in Robinhood's financial metrics during this quarter, including the shocking decline in PFOF from equities trading activity in Q22021, as "intra-quarter" or "out-of-quarter" data because "SEC regulations give companies 45 days after the end of a quarter to report quarterly results and do not generally require the disclosure of

interim quarterly results." 1-ER-15. In addition, the District Court, citing *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 219 (5th Cir. 2004), held that the "proper baseline" for assessing whether Plaintiffs had shown an extraordinary and persistent decline in the relevant financial indicators and KPIs was "the company's historical performance" prior to Q1 and Q22021 when Robinhood had been impacted by the meme stock event and Dogecoin rally. 1-ER-18-19.

With this standard in place, the District Court proceeded to determine whether it had been met with respect to each financial indicator and KPI individually. The District Court held that the decline in PFOF from equities trading to a five-quarter low of $52 million in Q22021 was not extraordinary because it "fell within the range of typical equities revenue for the company—which, beginning in 2020, spanned from $31.6 million [in Q1 2020] to—setting aside the meme stock event [in Q12021]—to a high of $80 million" in Q42020. 1-ER-19-20. As for the KPIs, the District Court held that because the declines in MAU and AUC in June and/or July "occurred immediately after a large spike in the company's business," they "reflect[ed] not an unprecedented declining trend warranting disclosure, but . . . a correction back to normal levels" and, consequently, did not have to be disclosed. 1-ER-20. Finally, the District Court held that the combined 90% decline in cryptocurrency trading volume in June and July 2021, "as substantial as [it was], fell in line with [Robinhood's] historical metrics" and "appear[ed] to represent . . .

fluctuations back to the mean," noting that "the low in July 2021 of $13 billion in trading volume was within the normal range of trading when compared to the March 2021 (pre-Dogecoin spike) trading volume of $16 billion" and subsequent cryptocurrency trading volume following the IPO, which rose to $22 billion in August 2021 before falling back down to $16 billion in September 2021. 1-ER-21. Plaintiffs argued that the premise of the District Court's reasoning – that the market understood the disclosures in the Offering Documents as warning of a "correction" back to 2020 levels of revenue and trading volume – was contradicted by analysts' consensus estimates for Robinhood's Q32021 revenue, which were well above 2020 levels. 2-ER-39-42.[8] However, the District Court disagreed, stating that "[u]nfulfilled predictions of analysts alone do not retrospectively establish historically extraordinary information that mandates out-of-the ordinary disclosures." 1-ER-26.

In addition to its conclusion that the declines in financial metrics and KPIs "[did] not show a historically extraordinary decline warranting out-of-quarter disclosures," the District Court also found that Robinhood "properly disclosed future risks and downward trends of the metrics." 1-ER-22. In support of this conclusion,

[8] As alleged in the SAC, the Refinitiv estimate for Robinhood's Q32021 total revenue was $431.5 million. 3-ER-518-19, ¶138. In contrast, the highest Robinhood's total revenue reached in any quarter during 2020 was $317.5 million. 3-ER-507, ¶110.

the District Court cited, among others, the following risk warnings: (i) "our recent revenue growth rate and financial performance should not be considered indicative of our future performance"; (ii) "we expect the growth rates in revenue, MAU, AUC and [NCFA] to decline in future periods, and such declines could be significant"; (iii) "we anticipate the rate of growth in [KPIs] will be lower [in Q32021], as compared to [Q22201] . . . due to the exceptionally strong interest in trading, particularly cryptocurrencies, we experienced in [Q22021] and seasonality in overall trading activities"; and (iv) "cryptocurrencies are extremely volatile" and Robinhood's business might be adversely affected if the markets for Dogecoin deteriorate or the price of Dogecoin declines. 1-ER-22-23. The District Court also held that the challenged risk warnings were "not actionable in and of themselves for failure to predict with exact certainty the level of downturns the company would face under the bespeaks caution doctrine," and had "served to put investors on notice that Robinhood's trading revenues would be substantially lower in the second and third quarters of 2021 than in the first quarter of 2021." 1-ER-24.

Further, since it found that the inquiry to discern if disclosure was warranted under Item 303 "is akin to the inquiry under Section 11 generally in determining whether out-of-quarter disclosures were extraordinary enough to require disclosure[,]" the District Court held there was no duty to disclose the omitted financial metrics and KPIs under Item 303. 1-ER-24-27. The District Court also

held that Item 105, which requires disclosure of "the material factors that make an investment in the registrant or offering speculative or risky," 17 C.F.R. §229.105(a), did not require Robinhood to disclose a breakdown of its revenue by type of trading because the meme stock event and Dogecoin rally were well-known public events and the disclosure of Q12021's revenue mix in the Offering Documents already indicated that "Robinhood's model had begun to shift to rely more heavily on non-traditional trading by Q1 2021." 1-ER-32. As a result, the District Court concluded that "it [was] difficult to see how a reasonable investor would be unaware of the potential risk for Robinhood's business caused by a decline in cryptocurrency trading, and specifically Dogecoin, given the disclosures made [in Q12021]" concerning "the significance of cryptocurrency trading [and Dogecoin] to its business and risks associated with the declining trading volumes." 1-ER-29.

Plaintiffs' claim for control person liability under §15 of the 1933 Act was dismissed for failure to plead an underlying primary violation. 1-ER-33.

## VI. STANDARD OF REVIEW

This Court reviews "*de novo* challenges to a dismissal for failure to state a claim under Federal Civil Rule 12(b)(6)." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011).[9] In that review, this Court "accept[s] the plaintiffs' allegations as true and construe[s] them in the light most favorable to

[9] Unless otherwise noted, all emphasis is added and citations are omitted.

plaintiffs[.]" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal is "inappropriate unless the plaintiffs' complaint fails to 'state a claim to relief that is plausible on its face.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (quoting *Twombly*, 550 U.S. at 570).

As the SAC asserts only strict liability and negligence claims, it is subject to Fed. R. Civ. P. 8 notice pleading standards. *See In re Shortel Inc., Sec. Litig.*, No. C 08-00271, 2009 WL 248326, at *1-2 (N.D. Cal. Feb. 2, 2009). "Rule 8(a) 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations." *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011) (emphasis omitted).

## VII. SUMMARY OF ARGUMENT

The District Court applied the wrong standard in deciding, as a matter of law, that the SAC failed to allege materially false and misleading statements and omissions. The applicable standard for whether information is required to be disclosed under §§11(a) and 12(a)(2) of the 1933 Act is simply the standard for materiality: Is there a substantial likelihood that the disclosure of the omitted information would have been viewed by a reasonable investor as having significantly altered the total mix of information made available? *TSC*, 426 U.S. at 449. In addition, Item 303 of Regulation S-K "specifies its own standard for

disclosure—*i.e.*, reasonably likely to have a material effect." *See In re Nvidia Corp. Sec. Litig.*, 768 F.3d 1046, 1055 (9th Cir. 2014). Instead of applying these well-settled standards to determine whether disclosure of the omitted facts identified by Plaintiffs was warranted, the District Court applied its own standard – whether undisclosed financial indicators represented an "extraordinary" departure from historical results.

In addition to using the wrong standard, the District Court engaged in improper fact-finding. Materiality is a fact-intensive inquiry that is generally for the trier of fact and is appropriately resolved as a matter of law in defendants' favor only when the omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009). The omitted information here – significant declines in multiple financial indicators in the last completed, but unreported, quarter before the IPO that continued into the quarter in which the IPO occurred – is not so obviously unimportant to an investor, that reasonable minds cannot differ on the question of materiality. For the same reason, even assuming *arguendo* that "extraordinary" departure from historical results was the appropriate standard, reasonable minds can differ on whether the declines in Robinhood's financial metrics were extraordinary, and the action should not have been dismissed. Further, the SAC plausibly alleges an Item 303 violation given that the declining financial indicators

were known to Defendants, which the District Court conceded, and were having a material effect on Robinhood's results of operations at the time of the IPO and were reasonably likely to continue doing so going forward.

The District Court also ignored multiple decisions of this Court in holding that contingent risk warnings in the Offering Documents were not themselves materially false and misleading even though the warned of risks had come to pass, *see, e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021), and in determining that Defendants had complied with Item 105 of Regulation S-K.

Accordingly, the judgment should be reversed.

## VIII. ARGUMENT

### A. The SAC Alleges Violations of §§11 and 12(a)(2) of the 1933 Act

"After rampant abuses in the securities industry led to the 1929 stock market crash and the Great Depression, Congress enacted a series of laws," including the 1933 Act, "to ensure that 'the highest ethical standards prevail in every facet of the securities industry.'" *Kokesh v. S.E.C.*, 581 U.S. 455, 457-58 (2017) (quoting *SEC v. Cap. Gains Research Bureau, Inc.*, 375 U.S. 180, 186-87 (1963)). Together, these legislative enactments "embrace a 'fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*.'" *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972); *see Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 421 (2018) (quoting *Pinter v. Dahl*, 486 U.S.

622, 646 (1988) ("The 1933 Act required companies offering securities to the public to make 'full and fair disclosure' of relevant information.")). As the First Circuit explained in *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996):

> The disclosure of accurate firm-specific information enables investors to compare the prospects of investing in one firm versus another, and enables capital to flow to its most valuable uses. . . . The availability of reliable firm-specific information is also essential to the market's ability to align stock price with a security's "fundamental value."
>
> The need for issuers to disclose material information is crucial in the context of a public offering, where investors typically must rely (unless the offering is "at the market") on an offering price determined by the issuer and/or the underwriters of the offering. . . . Accordingly, the disclosure requirements associated with a stock offering are more stringent than, for example, the regular periodic disclosures called for in the company's annual Form 10-K or quarterly Form 10-Q filings under the Exchange Act.

*Id*. at 1207-08.

The Offering Documents in this case fell well short of the "full and fair disclosure" required by the 1933 Act. They omitted multiple material facts that were required to be stated (i) to make statements made in the Offering Documents not misleading, 15 U.S.C. §§77(k)(a), 77l(a)(2), and (ii) to comply with Robinhood's affirmative disclosure obligations under Items 303 and 105 of Regulation S-K. 17 C.F.R. §§229.303, 229.105(a).

### 1. The Significant Declines Robinhood Suffered in Multiple Financial Indicators Prior to the IPO Was Material Information a Reasonable Investor Would View as Significantly Altering the Total Mix of Information

The District Court held that because they involved intra-quarter data or periods for which Robinhood was not required to include financial statements in the Offering Documents, the substantial pre-IPO declines in PFOF from equities and options trading, cryptocurrency and equities trading volume, and Robinhood's KPIs prior to the IPO were not required to be disclosed because they were not "so extraordinary as to be unusual and indicative of larger future trends when viewed in context of the company's historical data." 1-ER-15. The District Court's use of this standard to determine whether the omitted facts warranted disclosure under §§11(a) and 12(a)(2) of the 1933 Act was erroneous.

"[I]n evaluating whether defendants were under a duty to disclose interim financial information in the prospectus, [a court] must determine whether the . . . information was material in light of the financial information already disclosed to investors." *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003); *see also Shaw*, 82 F.3d at 1210 ("[T]he question is whether the nondisclosure of interim facts rendered the prospectus materially incomplete."); *Nayani v. LifeStance Health Grp., Inc.*, No. 22-cv-6833, 2023 WL 3260260, at *4 (S.D.N.Y. May 4, 2023) ("The applicable standard for whether interim results must be disclosed is simply the standard for materiality."). An omitted fact is material if there is "a substantial

likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC*, 426 U.S. at 449. In making this determination, "[s]tatements in [Offering Documents] . . . must 'be read in the context of the whole document.'" *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1257 (N.D. Cal. 2019) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 320 (S.D.N.Y. 2009)). "Accordingly, the issue is not whether the statements, taken separately, were 'literally true.'" *Id.* at 1258. "The issue is whether defendants' statements 'taken [together] and in context, would have [misled] a reasonable investor about the nature of the [investment].'" *Id.* (second alteration in original).

Importantly, this Court has observed that there is no "bright-line rule to determine materiality because '[t]he determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him.'" *Siracusano*, 585 F.3d at 1178 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 236 (1988)) (alterations in original). "Instead, courts should engage in a 'fact-specific inquiry' in assessing materiality." *Id.* (quoting *Basic*, 485 U.S. at 240). For this reason, "'[d]etermining materiality in securities fraud cases should ordinarily be left to the trier of fact,'" *id.* (quoting *Phan*, 500 F.3d at 908), and "the ultimate issue of materiality [is]

appropriately resolved 'as a matter of law'" in the defendants' favor only where the omissions are so obviously unimportant to an investor "'that reasonable minds cannot differ on the question of materiality.'" *Id*. (quoting *TSC*, 426 U.S. at 450); *see also Zell v. InterCap. Income Sec., Inc.*, 675 F.2d 1041, 1049 (9th Cir. 1982) (If "it cannot be said that the omitted information was so obviously unimportant" that no reasonable investor would consider it of actual significance in making an investment decision, it cannot be said that the omitted information "was immaterial as a matter of law."); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 151 (2d Cir. 2021) (quoting *Goldman v. Belden*, 754. F.2d 1059, 1067 (2d Cir. 1985) ("[A] complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance[]") (ellipsis in original)).

Here, it is impossible to say that the omitted pre-IPO declines in multiple financial metrics touted in the Offering Documents were so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality. The omitted data was at odds with the Offering Documents' portrayal of Robinhood's rapid and continuing growth. All components of Robinhood's transaction-based revenue and three of its KPIs were declining significantly at the time of the IPO. *See* Section V(A)(3), *supra*. Moreover, these declines spanned the already completed

(but not officially reported) Q22021 and the first month of Q32021. *Id*. As such, the omitted information in this case is the very definition of information a reasonable investor would view as having significantly altered the "total mix" of information made available and important in deciding whether to purchase shares in Robinhood's IPO. The District Court's failure to consider the declines in these multiple financial indicators together and in context, and to use *TSC's* materiality standard in assessing Defendants' duty to disclose them in the Offering Documents, was erroneous.[10]

### 2. The Material Omissions Rendered the Offering Documents Materially False and Misleading

By failing to disclose the ongoing significant declines in PFOF from equities and options trading, equities and cryptocurrency trading volumes, and KPIs, the Offering Documents "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Retail Wholesale & Dep't Store Union Loc. 388 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (internal quotations omitted). The Offering Documents contained reams of financial data showing quarter after quarter of enormous, and

[10] The materiality of the omitted facts is also evidenced by the steep decline in Robinhood's stock price when the truth was eventually disclosed. *See. e.g.*, *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 16 (2d Cir. 2011) (citing "precipitous decrease" in share price that occurred after disclosure as evidence of materiality); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) ("[S]ignificant stock drop further supports an inference of materiality.").

practically uninterrupted, growth over a period of years through the last quarter completed prior to the IPO. Although it was not required to include a quarterly report for Q22021 in the Offering Documents (1-ER-15), Robinhood chose to include positive aspects of its Q22021 results in the Offering Documents, specifically, that it expected to report revenue of $546 million to $574 million for the quarter, representing 129% year-over-year growth at the midpoint of the range, as well as enormous year-over-year growth in MAU, NCFA and AUC. *See* Section V(A)(2), *supra*. However, once Robinhood chose to speak with respect to Q22021 results, it was "obligated to speak truthfully and to make such additional disclosures as [were] necessary to avoid rendering the statements made misleading." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179-80 (S.D.N.Y. 2010); *see Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("[O]nce defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors").

Thus, having chosen to report record Q22021 top-line revenue and substantial year-over-year growth in KPIs in the quarter, Robinhood was not free to omit negative aspects of its Q22021 results including that equities trading revenue had plummeted to a five-quarter low, and that cryptocurrency trading volume, ARPU, and MAU had fallen by more than 76%, 18%, and 11.6%, respectively, in the last month of the quarter (3-ER-500-01, ¶¶83-85; 503-04, ¶¶98-100), especially given

that all of these metrics continued to decline into the first month of Q32021 when the IPO occurred.[11] *See In re Apple Inc. Sec. Litig.*, No. 19-CV-02033, 2020 WL 2857397, at *11 (N.D. Cal. June 2, 2020) ("[A] party may be obligated to disclose additional 'adverse information that cuts against the positive information' if it chooses to tout the positive data."); *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1071 (M.D. Tenn. 2022) (Fact that trend in three financial metrics had reversed in the quarter ongoing at the time of the offering was data "a reasonable investor would consider . . . to be important to the overall financial picture such that the prospectus was 'materially incomplete' without the inclusion of the quarter-in-progress data."). It is black letter law that an issuer may not speak in half-truths. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016). Moreover, the misleading impression of Robinhood's business created by these material omissions was furthered by the Offering Documents' material untrue statements regarding the factors that contributed to Q1 and Q22021 results and materially misleading risk warnings. *See* Section V(A)(4), *supra*.

---

[11] Trading volume in equities in July 2021 was one-third less than in June 2021 and 15% below the monthly average for Q2 2021. 3-ER-500, ¶83. In addition, cryptocurrency trading volume fell 56.67% from June to July 2021, from $30 billion to just $13 billion, while MAU slid an additional 8.45% and AUC fell 7.1% from $102 billion to $94.7 billion. 3-ER-500-01, ¶¶84-85; 503-04, ¶¶98-99; 505, ¶¶103-04.

### 3. The Omitted Financial Data Warranted Disclosure Even Under the District Court's Erroneous "Extraordinary" Departure Standard

Even assuming *arguendo* that an "extraordinary" departure from historical results was the appropriate standard to use in determining whether the ongoing declines in revenue from equities and options trading, cryptocurrency trading volume, and Robinhood's KPIs warranted disclosure, the SAC alleges sufficient facts to demonstrate that the declines were individually and collectively "extraordinary." *See* Section V(A)(3), *supra*. In holding otherwise, the District Court misinterpreted the legal authority it relied upon and made improper factual findings.

As an initial matter, in determining whether the declines in the financial metrics here were "so extraordinary" as to warrant disclosure, the District Court held that since Robinhood had experienced substantial increases in trading volume in Q1 and Q22021 due to the meme stock event and Dogecoin rally, "the proper question [was] not how financials leading up to the IPO compare[d] to the financial metrics during the immediately preceding fad-trading spike, but how they compare[d] to the company's historical performance." 1-ER-19. As support for this conclusion, the District Court cited *Kapps*, 379 F.3d at 207, a case involving an alleged failure to disclose a pre-offering decline in natural gas prices, which were closely tied to the issuer's revenue. According to the District Court, *Kapps* "held that a 60% drop in

the price of natural gas in the months leading up to the IPO was not so extraordinary as to require out-of-quarter disclosures" because "before the drop in [the] price [of natural gas] . . ., there was a sharp increase in prices" and "[w]hen the decline was viewed in context of the preceding sharp increase, the decline was better seen as a correction to the previous spike and not a downturn in the business." 1-ER-19.

However, this misstates the holding of *Kapps*. In fact, *Kapps* held that the prospectus' omission of the decline in natural gas prices was not misleading because natural gas prices were "in the readily available public domain," published in the *Wall Street Journal* and other public sources, and, therefore, were already part of the mix of information available to investors before the offering. *Kapps*, 379 F.3d at 214-16. As a result, the Fifth Circuit held that "there [was] no substantial likelihood that including the fact that the price of natural gas had declined since December 27, 2000 would have significantly altered a reasonable investor's perception of the 'total mix of information available in the prospectus as a whole.'" *Id*. (quoting *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993)).

Thus, *Kapps* neither applied the District Court's "extraordinary" departure standard nor held that declines in financial indicators following a "spike" in growth should be viewed as a "correction" rather than a "downturn" in the issuer's business. To the contrary, *Kapps* recognized that the disclosure inquiry is context-specific. Thus, as the Eleventh Circuit observed in *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297

F.3d 1182 (11th Cir. 2002), when, as here, "booming . . . sales [due to an event] had carried [an issuer] for the previous several reported quarters but suddenly and significantly declined, a potential investor could be [misled] by those reported results" and, therefore, disclosure of the declining metrics would be required. *Id*. at 1192.

Moreover, although the District Court analogized the spike in natural gas prices in *Kapps* to the meme stock event and Dogecoin rally in this case, the analogy is inapt. While investors contemplating an investment in Robinhood's IPO may have been aware of these events and when they began and ended, unlike the natural gas prices in *Kapps*, the omitted facts in this case – the declines in virtually all of Robinhood's financial metrics touted in the Offering Documents – were not public information already part of the total mix of information.[12] Therefore, unlike in *Kapps*, in this case, it cannot be said, as a matter of law, that there is no substantial

[12] Although the existence of the meme stock event and Dogecoin rally was part of the mix of information available to investors before the IPO (1-ER-27), this does not mean that the omitted facts were not material and that Defendants could not have violated §§11 and 12(a)(2). *Kapps*, 379 F.3d at 213. "[I]nvestors are not generally required to look beyond a given document to discover what is true and what is not." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008). At best, news of the meme stock and Dogecoin events is simply part of the materiality calculus, a "mixed question of law and fact" and a matter for proof at trial. *Boston Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020) ("The volume of the judicially noticed articles might demonstrate that the alleged misstatements and omissions were known to the market, or it might demonstrate that investors . . . would have had to follow all press coverage about [Robinhood] quite closely to be on notice of all the alleged facts.").

likelihood that including the omitted facts in the Offering Documents would have significantly altered a reasonable investor's perception of the total mix of information available in the Offering Documents as a whole.

When viewed together and in context, as they must be, it cannot be said, as a matter of law, that the undisclosed declines in Robinhood's financial indicators were not "so extraordinary" as to warrant disclosure. After four consecutive quarters of growth, equities trading revenue in Q22021 had fallen substantially below the level Robinhood had earned not only in Q12021 when the meme stock event occurred, but also the levels reported in Q22020-Q42020.[13] Equities trading revenue in Q22021 ($52 million) was 61% below Q12021 ($133 million), 35% below Q42020 ($80 million), 24.4% below Q32020 ($68.8 million), and 26% below Q22020 ($70.6 million). 3-ER-479-80, ¶5; 500, ¶83; 509, ¶115; 3-ER-472; 3-ER-475; 1-ER-20. At the same time, cryptocurrency trading volume had cratered, falling 90% in the two months prior to the IPO, which far exceeded the decline in the industry as a whole, a fact that the District Court found was plausibly alleged. 3-ER-480, ¶6; 500-01, ¶¶84-86; 1-ER-21. In addition, MAU fell 19% from May to July, ARPU dropped 18% from Q1 to Q22021, and AUC declined 7%. 3-ER-503-05, ¶¶98-104. Courts

---

[13] This alone supports Plaintiffs' contention that the decline in equities trading revenue was necessary. *See Shaw*, 82 F.3d at 1211 (holding that district court erred in determining, as a matter of law, that issuer was not required to disclose a substantial increase in its net loss in the quarter in which its offering occurred following five quarters of improvement in this metric).

have found similar or even smaller percentage changes in far fewer metrics so extraordinary as to warrant disclosure. *See, e.g.*, *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 228 (S.D.N.Y. 2023) (decline of 30% in a single metric during quarter ongoing at the time of the IPO was a material omission that rendered other statements on that topic incomplete and misleading); *Franchi*, 633 F. Supp. 3d at 1071 (holding that quarter-over-quarter declines of 8% in revenue and 13% in gross profit were "an extreme departure from previous trends").[14]

As explained above, the District Court's conclusion that the foregoing declines were not required to be disclosed as a matter of law was predicated on at least two critical errors – first, its improper reading of *Kapps*, which led it to disregard Robinhood's Q1 and Q22021 results in assessing whether the declines were sufficiently "extraordinary" to warrant disclosure, and second, its improper fact finding, which led the District Court to ignore other well-pled allegations in the SAC, including the pre-IPO exodus of customers from Robinhood's platform and the outsized decline in cryptocurrency trading volume on Robinhood's platform compared to the industry as a whole. These errors were critical to the District

[14] The District Court also held that the omission of a preliminary estimate of ARPU for Q22021 was not misleading because "ARPU is calculated from quarterly revenue and NCFA . . . which were each disclosed for Q2 in the Offering Documents[.]" 1-ER-20 n.3. However, burying the facts, or giving them less than significant emphasis, can deprive investors of the full and fair disclosure mandated by the 1933 Act. *See, e.g.*, *Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 203 (5th Cir. 1988).

Court's conclusion that the declines in financial metrics merely represented "fluctuations back to the mean" after the meme stock and Dogecoin events rather than a reaction to the impact of other forces. 1-ER-20-22.

#### 4. The Offering Documents' Risk Disclosures Were Materially False and Misleading

The SAC alleges that there were many false and misleading contingent risk warnings in the Offering Documents concerning the consequences of reduced trading volume in securities and cryptocurrencies, including Dogecoin. *See* Section V(A)(4)(c), *supra*. These warnings were materially false and misleading because by the time of the IPO, trading volume in equities and cryptocurrencies, especially Dogecoin, had plummeted, *i.e.*, the warned of risks had already come to fruition. This Court has repeatedly held that contingent "[r]isk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *Alphabet*, 1 F.4th at 703 (quoting *Berson*, 527 F.3d at 985-87) (alterations in original).

Although the District Court acknowledged that "Robinhood was aware of some declines in its business metrics," it held that the challenged risk warnings in the Offering Documents were not misleading because Robinhood "did not know whether the declines would persist into the future" since they "were not so historically extraordinary as to be indicative of larger future trends." 1-ER-33.

However, it is the fact of the declining metrics themselves, rather than whether they would persist in the future, "that caused anticipatory statements to be materially misleading." *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 950 (9th Cir. 2023) ("Facebook 'knew a risk had come to fruition' and 'chose to bury it.'").

Alternatively, the District Court deemed the contingent risk warnings not actionable as a matter of law because it found that other disclosures in the Offering Documents "put investors on notice that Robinhood's trading revenues would be substantially lower in the second and third quarters of 2021 than in the first quarter of 2021." 1-ER-24 & n.6. However, the very disclosures cited by the District Court as having "put investors on notice" were themselves false and misleading. For example, the statement that "[t]he circumstances that have accelerated the growth of our business ***may*** not continue in the future" and that Robinhood expected "***growth rates*** in revenue, MAU, AUC and [NCFA] to decline in future periods" (1-ER-22) were themselves false and misleading because, at the time of the IPO, equities trading revenue and Robinhood's KPIs were declining, not growing. *See* Section V(A)(3), *supra*. The statement that Robinhood "anticipate[d] ***the rate of growth*** in [MAU, AUC and NCFA] will be lower for the period ended September 30, 2021, as

compared to the three months ended June 30, 2021" (1-ER-22-23) was false and misleading for the same reason.[15]

The risk warnings related to cryptocurrency trading cited by the District Court were also misleading. 1-ER-23. As the District Court noted, these statements only "warned of the possibility" of declines in cryptocurrency trading revenue and volume when, in fact, cryptocurrency trading volume had declined 90% in the two months prior to the IPO. 1-ER-23. Moreover, even the risk warning regarding Q12021's dependence on cryptocurrency transactions and Dogecoin in particular (1-ER-23) was materially false and misleading because by the end of Q22021, that dependence had nearly doubled, and at a time when revenue from equities trading had fallen precipitously. *See* Section V(A)(3), *supra*. In Q12021, 17% of Robinhood's total revenue was derived from transaction-based revenues earned from cryptocurrency transactions and 34% of cryptocurrency transaction-based

---

15 The District Court also held that this statement was forward-looking and protected by the bespeaks caution doctrine. 1-ER-32. However, "dismissal on the pleadings under the bespeaks caution doctrine . . . requires a stringent showing: There must be sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading.'" *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996)) (alteration in original). The bespeaks caution doctrine is inapplicable to the above statement because (i) statements regarding ongoing growth are not forward-looking, and (ii) Robinhood did not include meaningful cautionary language informing investors of the massive declines in these metrics that had already occurred. *See Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 917-19 (N.D. Cal. 2012).

revenue was attributable to transactions in Dogecoin. 3-ER-515-16, ¶129. By the end of Q22021, those percentages had soared and stood at 41% and 62%, respectively, and 52% of Robinhood's transaction-based revenue in the quarter was attributable to cryptocurrency trading, up from 21% in Q12021. 2-ER-236; 3-ER-472-73.

Although the District Court cited this Court's decision in *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1418-19 (9th Cir. 1994), as support for its conclusion that the risk warnings were not misleading, the facts of *Worlds of Wonder* are not analogous to those in this case. Here, the declines in Robinhood's financial indicators occurred in Q22021, a completed quarter, and continued into the quarter in which the IPO occurred. *See* Section V(A)(3), *supra*. *Worlds of Wonder* did not involve a completed quarter, and was decided in a very different procedural posture – a motion for summary judgment after full discovery, not a pleading motion subject to Fed. R. Civ. P. 8(a) pleading standards. After full discovery, this Court agreed with the district court that the *Worlds of Wonder* defendants had said enough to communicate that the company's net loss would "constitute a 'greater proportion' of net revenue" than during the prior year's quarter. *Worlds of Wonder*, 35 F.3d at 1419.

### 5. Defendants Had an Independent Duty to Disclose the Omitted Information Under Item 303 of Regulation S-K

Section 11(a) prohibits any registration statement that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k(a). As Form S-1, which Robinhood used to register the shares issued in the IPO, requires the registrant to follow Item 303 of Regulation S-K, "any omission of facts 'required to be stated' under Item 303 will produce liability under Section 11." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

Item 303 imposes upon registrants of securities a series of disclosure duties "intended to give the investor an opportunity to look at the company through the eyes of management," so that they may "assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future." Management's Discussion and Analysis of Financial Condition, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989) (the "1989 Release"). As the court explained in *Oxford Asset Mgmt.*, 297 F.3d at 1191-92:

> Item 303(a)(3)(ii) essentially says to a registrant: If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus. The obvious focus is on preventing the latest reported results from misleading potential investors, thereby promoting a more accurate picture of the registrant's future prospects.

For this purpose, Item 303 requires companies to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii). "A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both . . . presently known to management and . . . reasonably likely to have material effects on the registrant's financial condition or results of operation." 1989 Release, at *4. Absent a determination by management that it is not likely to come to fruition or that a material effect on the company's financial condition or results is not reasonably likely to occur, disclosure of a "known trend, demand, commitment, event or uncertainty" and its effects, "quantified to the extent reasonably practicable," is required. *Id.*, at *6; *see also Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718-19 (2d Cir. 2011) (An issuer has a duty to disclose "whether, and to what extent," a known trend, event, or uncertainty "might reasonably be expected to materially impact . . . future revenues.")).

Thus, to plausibly plead an omission of facts "required to be stated" under Item 303, a complaint must allege (1) that a registrant knew about a trend or uncertainty before an offering; (2) that the known trend or uncertainty was "reasonably likely to have material effects on the registrant's financial condition or

results of operation"; and (3) that the offering documents failed to disclose the known trend or uncertainty. *See Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013). The SAC plausibly alleges each of the foregoing requirements of an Item 303 violation.

First, Defendants' awareness of Robinhood's declining financial indicators is plausibly alleged given, *inter alia*, the Offering Documents' reporting of final or estimated financial results for the periods in question and statements concerning declining cryptocurrency trading volumes during Q22021 and the initial weeks of Q32021. *See* Section V(A)(3), (4)(a), *supra*. Second, the SAC also plausibly alleges that the declining financial indicators were having, and were reasonably likely to have, a material adverse impact on Robinhood's results of operations based on the Offering Documents' disclosures that (i) a "reduction in trading volume in securities, derivatives and cryptocurrency markets, may result in reduced revenues and would have an adverse effect on [Robinhood's] business, financial condition and results of operations"; (ii) Robinhood "expect[ed] [its] revenue for [Q3 2021] to be lower, as compared to [Q2 2021], as a result of decreased levels of trading activity relative to the record highs in trading activity, particularly in cryptocurrencies, during [Q2 2021]"; and (iii) Robinhood "anticipate[d] the rate of growth in" its KPIs "will be lower for the period ended September 30, 2021." 3-ER-508, ¶114; 514-15, ¶¶125, 127.

Although the District Court cited the foregoing statements as sufficient to satisfy Robinhood's disclosure duty under Item 303, they were not. Even assuming *arguendo* that the foregoing statements could be read as disclosing a "trend" (they cannot), "Item 303 requires more than the mere identification of trends that were occurring in the defendant's business." *See In re Facebook, Inc. IPO Sec. and Deriv. Litig.*, 986 F. Supp. 2d 487, 509 (S.D.N.Y. 2013). As noted above, Item 303 also requires an issuer to disclose to what extent, the particular known trend, event, or uncertainty might reasonably be expected to materially impact future revenues. *See Litwin*, 634 F.3d at 718-19; 1989 Release, at *3. No such disclosure appears anywhere in the Offering Documents. The "generalized and indefinite" nature of the foregoing disclosures left investors reading the Offering Documents with no means of assessing how the decreased levels of trading activity, particularly in cryptocurrencies, observed in Q22021 and the first month of Q32021 might impact future revenue. *See Facebook*, 986 F. Supp. 2d at 511-12. Moreover, as noted above, KPIs, including MAU, were declining, not growing, which was not disclosed.

No investor reading the Offering Documents had any way of knowing (i) the magnitude of the meme stock event's impact on Q12021 results; or (ii) that the end of the meme stock event in February 2021, along with the erosion of Robinhood's customer base due to service and security issues, had sent its PFOF from equities trading plummeting to a five-quarter low; or (iii) that trading volumes in equities had

continued to slide in July 2021; or (iv) that these events were likely to have a material adverse impact on future periods including Q32021, the quarter in which the IPO occurred. Likewise, although an investor might have anticipated a decline in cryptocurrency trading volume on Robinhood's platform (and revenue from Transaction Rebates) given the statements in the Offering Documents, without knowing that Robinhood's dependence on cryptocurrency trading, and Dogecoin in particular, had increased exponentially in Q22021, an investor did not have any reason to anticipate a decline in cryptocurrency trading volume of the magnitude experienced by Robinhood in the two months prior to the IPO or the material impact that continuing decline was reasonably likely to have on Robinhood's Q32021 revenue, especially in light of the simultaneous collapse in PFOF from equities trading.

In view of the foregoing, the SAC plausibly alleges that Robinhood's numerous declining financial indicators were omissions of fact required to be disclosed under Item 303. *See Oxford Asset Mgmt.*, 297 F.3d at 1182 (Sudden and significant decline in sales of new drug after several quarters of booming sales would be "the type of situation Item 303 . . . was designed to address."); *Sundaram v. Freshworks Inc.*, No. 22-cv-06750, 2023 WL 6390622, at *7-8 (N.D. Cal. Sept. 28, 2023) (Item 303 disclosure violation adequately alleged when there were declines of 10%, 1%, and 20% in three growth metrics that had been highlighted in a positive

way in the offering documents); *Franchi*, 633 F. Supp. 3d at 1065-67 (allegations of "sudden downward trend[s]" in three financial metrics in quarter in which IPO occurred were sufficient to plead a material omission under Item 303); *Facebook*, 986 F. Supp. 2d at 512 (duty to disclose under Item 303 material negative impact to revenue evident in internal projections prepared 10 days before offering); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) (Item 303 required disclosure of known declining sales trend that occurred in the same quarter as the offering).

In dismissing Plaintiffs' disclosure claim under Item 303, the District Court erroneously held that the inquiry under Item 303 was "akin to the inquiry under Section 11 generally" and applied its "extraordinary" departure standard in holding that Plaintiffs had not alleged an Item 303 violation. 1-ER-24. As explained above, however, Item 303 "specifies its own standard for disclosure—*i.e.*, reasonably likely to have a material effect." *Nvidia*, 768 F.3d at 1055; *see also Silverstrand*, 707 F.3d at 105. "The question is not whether the [omitted facts] comported with past experiences but rather whether [they], in the context in which they occurred, created uncertainties or risks that [Robinhood] needed to disclose under Item[] 303." *Id.*; *see also Panther Partners*, 681 F.3d at 122 ("Item 303's disclosure obligations, like

materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or quantitative inquiries.").[16]

Here, disclosure of the omitted facts, which signaled important shifts in Robinhood's business and financial prospects, was required by Item 303 to give investors "an opportunity to look at the company through the eyes of management," so that they could "assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future." 1989 Release, at *3.

#### 6. Defendants Failed to Disclose Material Factors that Made an Investment in Robinhood and the IPO Risky as Required by Item 105 of Regulation S-K

An actionable §11 omission also arises when a registration statement fails to comply with Item 105 of SEC Regulation S-K. *Silverstrand*, 707 F.3d at 102. Item 105 requires disclosure of "the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105(a). An issuer violates Item 105 when, as here, its risk disclosures present risks as contingent when they have already come to fruition. *See Mingbo Cai v. Switch, Inc.*, No. 2:18-cv-01471, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) ("[S]pecific risks arising

[16] Thus, the District Court's holding that the decline in MAU and AUC from June to July were not required to be disclosed simply because the amounts in July 2021 were "an increase . . . compared to the first quarter of 2021" (1-ER-20), is inconsistent with the standard for disclosure under Item 303.

from [issuer's] new sales strategy . . . along with its potential effects on revenue" was "precisely the type of risk that [I]tem 503 requires issuers of securities to disclose.").[17]

In addition, the SAC alleges that the Offering Documents failed to comply with Item 105 by failing to disclose that at the time of the Offering, Robinhood's revenues had become far more volatile than they had been historically, due to their dependence on Transaction Rebates from speculative trading in cryptocurrencies, primarily Dogecoin, rather than transaction-based revenue from traditional trading in equities and options. 3-ER-516-17, ¶132. As noted above (*see* Section V(A)(4), *supra*), Robinhood's dependence on cryptocurrency trading and Dogecoin in particular to generate transaction-based revenue had increased exponentially in the months prior to the IPO due to the decline in equities and options trading revenue and the Dogecoin rally.

Although it acknowledged that Robinhood had ***not*** provided its usual breakdown of its revenue by trading activity for Q22021, which would have shown this, the District Court nevertheless held as a matter of law that there was no violation of Item 105. 1-ER-28-32. In this regard, the District Court pointed to the Offering Documents' disclosures of a breakdown of Robinhood's ***Q12021*** revenue "showing

[17] Item 503 has since been recodified as Item 105. FAST Act Modernization and Simplification of Regulation S-K, Release No. 33-10618, 2019 WL 1437180, at *1 (Apr. 2, 2019).

an increase in revenue from cryptocurrency trading" and that "cryptocurrency transaction revenue [in Q12021] was accounting for an increased portion of [Robinhood's] total revenue, and particularly, that Dogecoin was a large percentage of that increase" as "putting investors on notice" that Robinhood's "business had shifted toward cryptocurrency trading—and even more acutely—to Dogecoin trading in particular." 1-ER-30-31. However, "warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*, No. 99 Civ. 12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001); *see also Silverstrand*, 707 F.3d at 103 (The "discussion of risk factors ... should explain how the risk affects the ... securities being offered[]") (ellipses in original and internal quotation mark removed). As Judge Milton Pollack famously instructed, disclosures of risk provide "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). Here, given the massive increase in Robinhood's dependence on cryptocurrency trading as a source of transaction-based revenue in Q22021, the Offering Documents' disclosures with respect to Q12021 results were stale and insufficient to satisfy Item 105's mandate to disclose "the material risks to an investment in the issuer's

securities" and "explain how the risk affects the ... securities being offered." *Silverstrand*, 707 F.3d at 103; *see also Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18 Civ. 9848, 2020 WL 5757628, at *7 (S.D.N.Y. Sept. 27, 2020) ("[T]he inquiry can be boiled down to whether the Offering Documents were accurate and sufficiently candid."). In Q22021, more than half of Robinhood's transaction-based revenue, 52%, was attributable to cryptocurrency trading, up from 21% in Q12021, and 62% of cryptocurrency transaction-based revenue in Q22021 was attributable to Dogecoin, up from 34% in Q12021. 2-ER-236; 3-ER-472-73.

### B. Plaintiffs Have Pled a Control Person Claim Under §15 of the 1933 Act

The District Court dismissed Plaintiffs' §15 claim on the grounds that the SAC failed to allege an underlying primary violation of the 1933 Act. 1-ER-33. A valid underlying claim having been stated, however, dismissal of the §15 claim was erroneous.

## IX. CONCLUSION

For the foregoing reasons, the District Court's judgment should be reversed.

Dated: May 15, 2024

Respectfully submitted,

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**

*/s/ Deborah Clark-Weintraub*
Deborah Clark-Weintraub
Thomas L. Laughlin, IV
Emilie B. Kokmanian

The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 233-6444
Fax: (212) 233-6334

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
John T. Jasnoch
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-0508

*Counsel for Appellants Vinod Sodha and Amee Sodha*

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel.: (310) 301-3335
Fax: (310) 388-0192

*Additional Counsel for Appellants Vinod Sodha and Amee Sodha*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 24-1036

The undersigned attorney or self-represented party states the following:

- [x] I am unaware of any related cases currently pending in this court.
- [ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.
- [ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Deborah Clark-Weintraub **Date** 5/15/2024

*(use "*s/[typed name]*" to sign electronically-filed documents)*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-1036

I am the attorney or self-represented party.

**This brief contains** 13,331 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated ______.
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Deborah Clark-Weintraub **Date** 5/15/2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

ADDENDUM

# ADDENDUM TABLE OF CONTENTS

15 U.S.C. §77k(a) ………………………………………………………….. A1

15 U.S.C. §77l(a)(2) ……………………………………………………….. A2

15 U.S.C §77o(a) ………………………………………………………….. A3

17 C.F.R. §229.105(a) …………………………………………………….... A4

17 C.F.R. §229.303(a), (b)(2)(ii) ……………………………………………….. A5

15 U.S.C. §77k(a)

§77k. Civil Liabilities on Account of False Registration Statement

(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue –

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

* * *

(5) every underwriter with respect to such security.

15 U.S.C. §77l(a)

§77l. Civil Liabilities Arising in Connection with Prospectuses and Communications

(b) IN GENERAL – Any person who –

* * *

(2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. §77o

§77o. Liability of Controlling Persons

(a) CONTROLLING PERSONS – Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

17 C.F.R. §229.105

§229.105 (Item 105) Risk Factors.

(a) Where appropriate, provide under the caption "Risk Factors" a discussion of the material factors that make an investment in the registrant or offering speculative or risky . . .

(b) Concisely explain how each risk affects the registrant or the securities being offered.

17 C.F.R. §229.303

§229.303 (Item 303) Management's Discussion and Analysis of Financial Condition and Results of Operations.

(a) Objective. The objective of the discussion and analysis is to provide material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources. The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations. The discussion and analysis must be of the financial statements and other statistical data that the registrant believes will enhance a reader's understanding of the registrant's financial condition, cash flows and other changes in financial condition and results of operations. A discussion and analysis that meets the requirements of this paragraph (a) is expected to better allow investors to view the registrant from management's perspective.

(b) Full fiscal years. The discussion of financial condition, changes in financial condition and results of operations must provide information as specified in paragraphs (b)(1) through (3) of this section and such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations[.]

* * *

(2) Results of Operations.

* * *

(ii) Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.