**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| VINOD SODHA; AMEE SODHA, | No. 24-1036 |
| *Plaintiffs - Appellants*, | D.C. No. 3:21-cv-09767-EMC |
| v. | |
| PHILIP GOLUBOWSKI, individually and on behalf of all others similarly situated, | OPINION |
| *Appellee*, | |
| ROBINHOOD MARKETS, INC.; BAIJU BHATT; JAN HAMMER; VLADIMIR TENEV; JASON WARNICK; PAULA LOOP; SCOTT SANDELL; ROBERT ZOELLICK; GOLDMAN SACHS & CO. LLC; J.P. MORGAN SECURITIES LLC; BARCLAYS CAPITAL, INC.; WELLS FARGO SECURITIES, LLC; MIZUHO SECURITIES USA LLC; KEYBANC CAPITAL MARKETS INC.; PIPER SANDLER & CO.; ROSENBLATT SECURITIES INC.; BMO CAPITAL MARKETS CORP.; BTIG, LLC; SANTANDER INVESTMENT | |

2          SODHA V. GOLUBOWSKI

SECURITIES INC.; ACADEMY
SECURITIES, INC.; LOOP
CAPITAL MARKETS LLC;
SAMUEL A. RAMIREZ &
COMPANY, INC.  SIEBERT,
CISNEROS, SHANK & CO., L.L.C.,

            *Defendants - Appellees*.

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted January 15, 2025
Pasadena, California

Filed August 29, 2025

Before: JOHNNIE B. RAWLINSON and MILAN D.
SMITH, JR., Circuit Judges, and JED S. RAKOFF, District
Judge.[*]

Opinion by Judge Milan D. Smith, Jr.;
Partial Dissent and Partial Concurrence by Judge Johnnie
B. Rawlinson

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the
Southern District of New York, sitting by designation.

## SUMMARY[**]

### Securities Law

The panel affirmed in part and vacated in part the district court's dismissal of an action under Sections 11, 12, and 15 of the Securities Act of 1933 against Robinhood Markets, Inc., an online brokerage firm, several of its officers and directors, and the entities that underwrote Robinhood's initial public offering.

During the first few months of 2021, Robinhood's business became increasingly focused on trades in "meme stocks" and Dogecoin, and its performance plummeted when those trades largely ceased. In July 2021, Robinhood conducted an initial public offering for which it prepared a registration statement. The registration statement contained only limited information about Robinhood's performance during the second quarter of 2021. After the initial public offering, Robinhood reported financial results from that second quarter, and its stock price dropped. Plaintiffs alleged that the registration statement omitted material information under both the "required to be stated" prong of Section 11, which prohibits "an omission in contravention of an affirmative legal disclosure obligation," and the "misleading" prong of Section 11, which prohibits "an omission of information that is necessary to prevent existing disclosures from being misleading."

Vacating in part, the panel held that the district court applied the wrong legal standards in evaluating plaintiffs'

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

two legal theories that relied on (1) Section 11's "misleading" prong and (2) Section 11's "required to be stated" prong and Item 303 of Regulation S-K. As to the first theory, agreeing with the Second Circuit, the panel held that Sections 11 and 12 create a duty to disclose all material information in cases like this one, where the omissions challenged by plaintiffs involved the relationship between a prior statement concerning a particular time period and an event subsequent to that time period. Accordingly, Robinhood was required to disclose "material" interim information. Disagreeing with the First Circuit, the panel held that the "extreme departure" test, requiring intra-quarter disclosures only when the interim results reflect an extreme departure from historical results, is not the law of this circuit. The panel remanded for the district court to ascertain whether plaintiffs adequately alleged that the omitted information was material and thus adequately alleged that Robinhood had a duty to disclose that information.

As to plaintiffs' second theory, the panel held that Item 303 requires a registrant to disclose known trends, demands, commitments, events, or uncertainties that are reasonably likely to cause a material change in the company's financial condition or results of operations. The panel held that the district court erred in analyzing the Item 303 theory because Item 303's disclosure obligations are not limited to sufficiently persistent "trends," Item 303 requires quantification of the disclosed uncertainties to the extent reasonably practicable, and Item 303 imposes a different standard for disclosures than Section 11's "misleading" prong. The panel vacated the district court's conclusion that Item 303 did not require disclosure of the interim results at issue, and remanded for further consideration.

The panel affirmed the district court's dismissal of plaintiffs' third theory, which relied on Section 11's "required to be stated" prong and Item 105 of Regulation S-K.  The panel held that Item 105, which requires registrants to provide a discussion of the material factors that make an investment in the registrant or offering speculative or risky, did not require defendants to provide a breakdown of Robinhood's revenue sources during the second quarter of 2021.

Dissenting in part and concurring in part, Judge Rawlinson agreed with the majority that the district court properly analyzed and denied plaintiffs' claim based on a failure to comply with the disclosure requirements as set forth in Item 105 of Regulation S-K.  Disagreeing with and dissenting from the balance of the majority opinion, Judge Rawlinson wrote that Section 11 and Item 303 do not hold registrants to the same standard applied to financial statements under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  Rather, under *Morris v. Newman (In re convergent Techs. Sec. Litig.)*, 948 F.2d 507 (9th Cir. 1991), registration statements accompanying initial public offerings are analyzed by considering the statements that were made, any disclaimers accompanying those statements, and the information available to the market.  This court's precedent cautions against reliance on subsequent events to establish the existence of misleading statements.  Judge Rawlinson wrote that, fairly read in light of the disclaimers and the information existing in the market of investors, the statements in Robinhood's prospectus were not misleading.  Under amended Item 303, Robinhood was afforded flexibility in providing interim disclosures based on its assessment of the business cycle.

## COUNSEL

Deborah Clark-Weintraub (argued), Emilie B. Kokmanian, and Thomas L. Laughlin IV, Scott & Scott Attorneys at Law LLP, New York, New York; Hal Cunningham and John T. Jasnoch, Scott & Scott Attorneys at Law LLP, San Diego, California; for Plaintiffs-Appellants.

Kevin Orsini (argued), Antony L. Ryan, and Brittany L. Sukiennik, Cravath Swaine & Moore LLP, New York, New York; Elizabeth A. Kim and Mark R. Conrad, Conrad Metlitzky Kane LLP, San Francisco, California; Richard Jacobsen and Jennifer Keighley, Orrick Herrington & Sutcliffe LLP, New York, New York; Alexander K. Talarides and James N. Kramer, Orrick Herrington & Sutcliffe LLP, San Francisco, California; for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Robinhood Markets, Inc. (Robinhood) is an online brokerage firm that profits by matching retail investors with market makers. During the first few months of 2021, Robinhood's business became increasingly focused on trades in "meme stocks" and Dogecoin, and its performance plummeted when those trades largely ceased. In July 2021, Robinhood conducted an initial public offering (IPO). It prepared a registration statement, which included financial data and key performance indicators from the first quarter of 2021 and warned of several risks that might affect Robinhood in the future. However, the registration statement contained only limited information about Robinhood's performance during the second quarter of 2021, which had ended shortly before the IPO. After the IPO, Robinhood reported financial results from that second quarter, and its stock price dropped.

Plaintiffs, who seek to represent a class of Robinhood investors, sued Robinhood, several of its officers and directors, and the entities that underwrote Robinhood's IPO (Defendants). Plaintiffs brought claims pursuant to Sections 11, 12, and 15 of the Securities Act of 1933. *See* 15 U.S.C. §§ 77k, 77*l*, 77o. Each of those claims requires Plaintiffs to prevail on at least one of their underlying legal theories, one of which relies on Section 11's "misleading" prong, one of which relies on Item 303 of Regulation S-K, and one of which relies on Item 105 of the same regulation. *See* 17 C.F.R. §§ 229.105, 229.303. The district court dismissed Plaintiffs' claims, finding that none of their three theories obligated Defendants to disclose the omitted information.

We hold that the district court applied the wrong legal standard in evaluating Section 11's "misleading" prong and Item 303, so we vacate the district court's order and remand so it can apply the correct standard as to those theories. We affirm the district court's dismissal of the Item 105 theory.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Robinhood's Business

Robinhood is an online broker that targets retail investors, many of whom are first-time investors. Its "core product offering" is its retail investing platform, which allows customers to trade "U.S. listed stocks and Exchange Traded Funds . . . , as well as related options and American [Depository] Receipts . . . and . . . cryptocurrencies." Robinhood also offers debit cards and a paid subscription service that provides customers with "enhanced instant access to deposits, professional research, [certain] market data and, upon approval, access to margin investing."

Robinhood does not charge fees to customers when they execute trades. Instead, it uses a "payment for order flow" (PFOF) model.[1] Robinhood routes customers' orders to market makers, and those market makers pay Robinhood for the ability to serve its customers. This transaction-based revenue constituted 75% of Robinhood's revenue during 2020 and 80.5% of its revenue during the first quarter of 2021.

### II.    The Meme Stock Event and Dogecoin

During 2020, over 90% of Robinhood's transaction-based revenue came from conventional trading in stocks and

---

[1] In the cryptocurrency context, these fees are called "transaction rebates" instead.

options.  In January 2021, however, the "meme stock event" occurred, and retail investors purchased vast numbers of shares in GameStop, AMC Entertainment, and other companies.  Retail investors sought to drive up these companies' stock prices to force hedge funds holding short positions in these stocks to buy back the shares at a high price.  Many retail investors used Robinhood for their trades.  However, on January 28, 2021, Robinhood limited trading in GameStop shares and increased margin requirements, angering some of its users.  By early February, the prices of GameStop and other "meme stocks" fell from their January highs; trading volume on Robinhood also decreased.

Between January and April 2021, the cryptocurrency Dogecoin skyrocketed in value.  As before, many investors used Robinhood to make their trades.  However, Dogecoin's price plummeted in late April and continued to decline between May and July.

During the second quarter of 2021, Robinhood's revenue from equity and options trading declined.  Transaction-based revenue from these two categories was down 34.5% from the previous quarter.  Transaction-based revenue for the second quarter of 2021 was also slightly below the corresponding quantity from the last quarter of 2020.  The decline in transaction-based revenue from options was gentler, at 16.8% from the previous quarter, but the decline from equities was steeper, at 61% from the previous quarter.  Robinhood's revenue from equities was lower than in every previous quarter since the first quarter of 2020.  Equity trading volume in July 2021 was also one-third less than in June 2021, and 15% below the monthly average for the second quarter of 2021.

There was a similar decline in Robinhood's cryptocurrency revenue. Although this revenue surged during the second quarter of 2021, 62% of cryptocurrency trades on Robinhood during this period were in Dogecoin. Thus, when the value of Dogecoin fell sharply, cryptocurrency trading on Robinhood fell 76% between May 2021 and June 2021. There was a further 56.67% decline between June and July 2021. These declines were steeper than the industry-wide average, which was 40% in June 2021 and 31.5% in July 2021.

Robinhood's Key Performance Indicators (KPIs) generally declined during this period. Its Monthly Active Users (MAU) declined between May 2021 and July 2021. There was an 11.62% decline between May and June, and an additional 8.45% decline between June and July. Its Average Revenue Per User (ARPU) declined almost 20% between the first and second quarters of 2021. In the third quarter, this metric declined 42% from the prior quarter (or 52.5% since the first quarter of 2021). Robinhood's Assets Under Custody (AUC) declined slightly between April and May, increased between May and June, and declined again between June and July, finishing below the Assets Under Custody for the previous three months. Robinhood's Net Cumulative Funded Accounts (NCFA) were flat during this period.

## III.    **Robinhood's Registration Statement**

On July 1, 2021, Robinhood filed a draft registration statement with the SEC, seeking to sell shares to the public. On July 27, it filed its final amendment to the registration statement. The SEC declared the registration statement effective the next day. On July 30, Defendants priced the shares at $38 and filed the final prospectus.

## A. Statements About Robinhood's Revenue

The offering documents indicated that, between the last quarter of 2019 and the last quarter of 2020, Robinhood's transaction-based revenue increased from approximately $43 million to $235 million. During the same period, its total net revenue increased from approximately $72 million to $318 million. During the first quarter of 2021, transaction-based revenue increased to $420 million and total net revenue to $522 million. The offering documents attributed this revenue growth to user interest:

> Transaction-based revenues have generally increased sequentially in each of the periods presented, other than the fourth quarter of 2019, due to growth in our user base which resulted in higher trading volume on a per-user basis. In the first half of 2020, we saw a significant increase in the number of new accounts opened by first-time investors, as a result of increased interest in personal finance and investing, low interest rates and a positive market environment, especially in the U.S. equity markets. Throughout the remainder of 2020 and the first quarter of 2021, we maintained substantial growth in our user base, retention, engagement and trading activity metrics, as well as gains and periodic all-time highs achieved by the equity markets.

The offering documents contained similar, but more specific, statements addressing two of the quarters prior to

the IPO.  The registration statement noted the increase in
user interest during the last quarter of 2020:

> Transaction-based revenue increased by
> $549.3 million, or 322%, for the year ended
> December 31, 2020, compared to the year
> prior.  The increase was driven by a 143%
> increase in Net Cumulative Funded
> Accounts, which resulted in higher daily
> average revenue trades . . . in options,
> equities and cryptocurrencies. . . . Increased
> interest in personal finance and investing,
> low interest rates and a positive market
> environment, especially in the U.S. equities
> markets, encouraged an unprecedented
> number of first-time retail investors to
> become our users and begin trading on our
> platform.  We have seen substantial growth
> in our user base, retention, engagement and
> trading activity metrics, as well as continued
> gains and periodic all-time highs achieved by
> the equity markets.

The offering documents also addressed the first quarter of
2021:

> Transaction-based revenues increased by
> $324.8 million, or 340%, for the three months
> ended March 31, 2021, compared to the year
> prior.  The increase was driven by a 151%
> increase in Net Cumulative Funded
> Accounts, which resulted in higher daily
> average revenue trades in options, equities,
> and cryptocurrencies. . . . Increased interest

> in personal finance and investing, and several
> high-profile securities and cryptocurrencies,
> encouraged an unprecedented number of
> first-time retail investors to become our users
> and begin trading on our platform. We have
> seen substantial growth in our user base,
> engagement and trading activity metrics.

Although the offering documents did not provide final
results for the second quarter of 2021 or the beginning of the
third quarter of 2021, Robinhood said its expectations for
those periods were in line with the previous statements:

> For the three months ended June 30, 2021, we
> expect to report revenue of between $546
> million and $574 million, as compared to
> $244 million for the three months ended June
> 30, 2020, representing an increase of 129% at
> the midpoint of the range. The expected
> increase in revenue is primarily driven by a
> 130% increase in Net Cumulative Funded
> Accounts and increased trading activity
> related to options and cryptocurrencies, and
> relatively flat equities trading activity,
> relative to the three months ended June 30,
> 2020. . . . Trading activity was particularly
> high during the first two months of the 2021
> period, returning to levels more in line with
> prior periods during the last few weeks of the
> quarter ended June 30, 2021, and remained at
> similar levels into the early part of the third
> quarter. We expect our revenue for the three
> months ending September 30, 2021 to be
> lower, as compared to the three months ended

> June 30, 2021, as a result of decreased levels
> of trading activity relative to the record highs
> in    trading    activity,    particularly    in
> cryptocurrencies, during the three months
> ended    June    30,    2021,    and    expected
> seasonality.

The offering documents included the disclaimer that
Robinhood "experienced strong growth in new customers
during the first six months of 2021," and that Robinhood did
"not know whether, over the long term, cohorts comprised
of these new customers will have the same characteristics as
our prior cohorts." Thus, Robinhood explained, "[t]o the
extent these new customers do not grow their cumulative net
deposits or trading frequency on our platform to the same
extent as new customers that joined in prior periods, [its]
ability to expand and grow [its] relationship with these
customers will be impacted."

The offering documents also detailed the portions of
Robinhood's transaction-based revenue attributable to trades
in options, equities, and cryptocurrencies, for the three-
month periods ending in December 2019, March 2020,
December 2020, and March 2021.

## B. Statements About Robinhood's Key Performance Indicators

The offering documents included tables and graphs
showing that Robinhood's Net Cumulative Funded
Accounts, Monthly Active Users, Assets Under Custody,
and Average Revenues Per User had been increasing yearly
since 2017. Between December 31, 2017, and March 31,
2021, its Net Cumulative Funded Accounts increased from
1.9 million to 18.0 million; its Monthly Active Users

increased from 1.8 million to 17.7 million; its Assets Under Custody rose from $4.5 billion to $80.9 billion; and its Average Revenues Per User grew from $37 to $137.  They also estimated that these metrics would continue to increase in the second quarter of 2021.  However, Plaintiffs object to the following portion of the registration statement, which addresses Robinhood's performance in the second quarter of 2021, as misleading:

> For the three months ended June 30, 2021, we expect to report Net Cumulative Funded Accounts of 22.5 million, as compared to 9.8 million for the three months ended June 30, 2020, representing an increase of 130%.  For the month ended June 30, 2021, we expect to report MAU of 21.3 million, as compared to 10.2 million for the month ended June 30, 2020, representing an increase of 109%.  As of June 30, 2021, we expect to report AUC of $102 billion, as compared to $33 billion as of June 30, 2020, representing an increase of 205%.    The   increase   in   these   Key Performance Metrics resulted primarily from an increase in new users joining our platform, driven by general market interest trading.  We anticipate the rate of growth in these Key Performance Metrics will be lower for the period   ended   September   30,   2021,   as compared to the three months ended June 30, 2021, due to the exceptionally strong interest in trading, particularly in cryptocurrencies, we experienced in the three months ended

June 30, 2021 and seasonally in overall trading activities.

## C. Statements About Risks Robinhood Faced

The offering documents included a warning that Robinhood "may not continue to grow on pace with historical rates." Robinhood offered many reasons why continued growth might not occur:

> We have grown rapidly over the last few years, and therefore our recent revenue growth rate and financial performance should not be considered indicative of our future performance. In particular, since March 2020, we have experienced a significant increase in revenue, MAU, AUC and Net Cumulative Funded Accounts. . . . In addition, for the three months ended March 31, 2021, during which we experienced high trading volume and account sign-ups as well as high market volatility, particularly in certain market sectors, our revenue was $522.2 million, as compared to $127.6 million for the three months ended March 31, 2020, and on March 31, 2021, we had Net Cumulative Funded Accounts of 18.0 million, as compared to 7.2 million on March 31, 2020, representing growth of 309% and 151%, respectively. The circumstances that have accelerated the growth of our business may not continue in the future, and we expect the growth rates in revenue, MAU, AUC and Net Cumulative Funded Accounts to decline

in future periods, and such declines could be significant. You should not rely on our revenue or key business metrics for any previous quarterly or annual period as any indication of our revenue, revenue growth, key business metrics or key business metrics growth in future periods. In particular, our revenue growth rate has fluctuated in prior periods. Our revenue growth rate is likely to decline in future periods as the size of our business grows and as we achieve higher market adoption rates. We may also experience declines in our revenue growth rate as a result of a number of factors, including slowing demand for our platform, insufficient growth in the number of customers that utilize our platform, increasing competition, a decrease in the growth of our overall market, our failure to continue to capitalize on growth opportunities, including as a result of our inability to scale to meet such growth, an insufficient number of market makers or the unwillingness or inability of our existing market makers to execute our customers' trade orders as order volumes increase, increasing regulatory costs, increasing capital requirements imposed by regulators and [others], as well as cash deposit and collateral requirements under the rules of [various entities], economic conditions that reduce

> financial activity and the maturation of our
> business, among others.

Elsewhere, Robinhood repeated its warning that
performance during the third quarter of 2021 would be
lower:

> Trading activity was particularly high during
> the first two months of the 2021 period,
> returning to levels more in line with prior
> periods during the last few weeks of the
> quarter ended June 30, 2021, and remained at
> similar levels into the early part of the third
> quarter.
>
> . . . .
>
> . . . We anticipate the rate of growth in these
> Key Performance Metrics will be lower for
> the period ended September 30, 2021, as
> compared to the three months ended June 30,
> 2021, due to the exceptionally strong interest
> in trading, particularly in cryptocurrencies,
> we experienced in the three months ended
> June 30, 2021 and seasonality in overall
> trading activities.

Plaintiffs contend that the following statements about
economic changes that could reduce Robinhood's
performance were misleading:

> Our business and reputation may be harmed
> by changes in business, economic or political
> conditions that impact global financial
> markets, or by a systemic market event.

As a financial services company, our business, results of operations and reputation are directly affected by elements beyond our control, such as economic and political conditions, changes in the volatility in financial markets (including volatility as a result of the COVID-19 pandemic), significant increases in the volatility or trading volume of particular securities or cryptocurrencies, broad trends in business and finance, changes in volume of securities or cryptocurrencies trading generally, changes in the markets in which such transactions occur and changes in how such transactions are processed. These elements can arise suddenly and the full impact of such conditions can remain uncertain. A prolonged weakness in equity markets, such as a slowdown causing reduction in trading volume in securities, derivatives or cryptocurrency markets, may result in reduced revenues and would have an adverse effect on our business, financial condition and results of operations.

. . . .

In addition, a prolonged weakness in the U.S. equity markets or in specific cryptocurrencies or equity securities or a general economic downturn could cause our customers to incur

> losses, which in turn could cause our brand
> and reputation to suffer.

Plaintiffs further object to the statements in the offering documents made about the effect cryptocurrency prices and volumes could have on Robinhood's business:

> The prices of cryptocurrencies are extremely
> volatile. Fluctuations in the price of various
> cryptocurrencies may cause uncertainty in
> the market and could negatively impact
> trading volumes of cryptocurrencies, which
> would adversely affect the success of
> [Robinhood's] business, financial condition
> and results of operations.
>
> . . . .
>
> The cryptocurrency markets are volatile, and
> changes in the prices and/or trading volume
> of cryptocurrencies may adversely impact
> [Robinhood's] growth strategy and business.
> In addition, while we have observed a
> positive trend in the total market
> capitalization of cryptocurrency assets
> historically, driven by increased adoption of
> cryptocurrency trading by both retail and
> institutional investors as well as continued
> growth of various non-investing use cases,
> historical trends are not indicative of future
> adoption, and it is possible that the adoption
> of cryptocurrencies may slow, take longer to
> develop or never be broadly adopted, which

would negatively impact our business, financial conditions and results of operations.

Finally, Plaintiffs object to the following statements about Dogecoin:

> A substantial portion of the recent growth in our net revenues earned from cryptocurrency transactions is attributable to transactions in Dogecoin. If demand for transactions in Dogecoin declines and is not replaced by new demand for other cryptocurrencies available for trading on our platform, our business, financial condition and results of operations could be adversely affected.

> For the three months ended March 31, 2021, 17% of our total revenue was derived from transaction-based revenues earned from cryptocurrency transactions, compared to 4% for the three months . . . ended December 31, 2020. While we currently support a portfolio of seven cryptocurrencies for trading, for the three months ended March 31, 2021, 34% of our cryptocurrency transaction-based revenue was attributable to transactions in Dogecoin, as compared to 4% for the three months ended December 31, 2020. As such, in addition to the factors impacting the broader cryptoeconomy described elsewhere in this section, [Robinhood's] business may be adversely affected, and growth in our net revenue earned from cryptocurrency transactions may slow or decline, if the

> markets for Dogecoin deteriorate or if the
> price of Dogecoin declines, including as a
> result of factors such as negative perceptions
> of Dogecoin or the increased availability of
> Dogecoin on other cryptocurrency trading
> platforms.

## IV.     Robinhood's Post-IPO Performance

On October 26, 2021, Robinhood reported its financial results for the third quarter of 2021. Compared to its second-quarter results, its Monthly Active Users declined 11%, its Average Revenue Per User declined 42%, its Assets Under Custody declined approximately 7%, its total net revenue declined 35%, its transaction-based revenue declined approximately 41%, its transaction rebates from cryptocurrency trading declined 78%, its PFOF revenue from equity trading declined 61%, and its PFOF revenue from options trading declined 16.7%. Robinhood warned that its fourth-quarter revenue would likely be even lower. Analysts and reporters characterized these results negatively. Robinhood's stock price also fell by about 10%.

Robinhood also attracted negative attention the next month after a hacker obtained customers' personal information and a service outage prevented customers from accessing their accounts. The company's stock price further declined as criticism over the revenue decline, cyberattack, and disruption continued to mount. Robinhood's results from the fourth quarter of 2021, which were published on January 27, 2022, reflected a further decline in revenue and Key Performance Indicators. Analysts again reacted negatively, and Robinhood's stock price continued to drop.

## V.   Procedural History

The initial complaint in this case was filed on December 17, 2021.  Lead plaintiffs and lead counsel were appointed on March 24, 2022.  Thereafter, Plaintiffs filed a First Amended Complaint (FAC) on June 20, 2022.  Defendants moved to dismiss the FAC on August 18, 2022.  On February 10, 2023, the district court granted that motion but permitted Plaintiffs to amend their pleadings.  Plaintiffs thereafter filed a Second Amended Complaint (SAC) on March 13, 2023, which is the operative pleading in this appeal.  The SAC asserted claims for violations of Sections 11, 12(a), and 15.  Defendants again moved to dismiss on May 12, 2023.

The district court granted Defendants' motion, this time with prejudice.  The district court found that Defendants were not liable pursuant to Sections 11, 12(a), or 15 for failing to disclose the pre-IPO declines in KPIs and certain sources of revenue.  The district court also found that no Securities Act claim could lie against Defendants for failing to disclose the increased percentage of Robinhood's revenue attributable to "fad trading."  Plaintiffs now appeal.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.

"We review dismissals for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) de novo and may affirm on any ground supported by the record." *Hansen v. Musk*, 122 F.4th 1162, 1168 (9th Cir. 2024) (quoting *Saloojas, Inc. v. Aetna Health of Cal., Inc.*, 80 F.4th 1011, 1014 (9th Cir. 2023)).  In doing so, we "accept[] the allegations in the complaint as true and view[] them in the light most favorable to the plaintiff." *Adams v. Cnty. of Sacramento*, 116 F.4th 1004, 1008 (9th Cir. 2024) (quoting

*Galanti v. Nev. Dep't of Corr.*, 65 F.4th 1152, 1154 (9th Cir. 2023)).

## DISCUSSION

Plaintiffs' three claims, which arise pursuant to Sections 11, 12, and 15 of the Securities Act of 1933, can be analyzed together. *See* 15 U.S.C. §§ 77k, 77*l*, 77o. Neither side suggests any difference between the Section 11 and 12 claims, and both sides focus on the former statute. We follow the same approach in this opinion. Likewise, Section 15 penalizes persons who control a company that violates Sections 11 and 12. *See* 15 U.S.C. § 77o(a). "[S]ection 15 . . . require[s] [an] underlying primary violation[] of the securities laws." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). Indeed, both sides agree that the Section 15 claim rises or falls with the others.

Section 11 penalizes the Defendants "[i]n case any part of the[ir] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading[.]" 15 U.S.C. § 77k(a). Plaintiffs do not allege that any part of the registration statement is untrue, only that it omits certain material facts. Section 11's "omissions" clause contains two prongs, the "required to be stated" prong, which prohibits "an omission in contravention of an affirmative legal disclosure obligation," and the "misleading" prong, which prohibits "an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

Here, Plaintiffs raise three theories. The first arises under the "misleading" prong. The second and third arise

under the "required to be stated" prong.  Specifically, Plaintiffs rely on the affirmative disclosure obligations in Items 303 and 105 of Regulation S-K.  *See* 17 C.F.R. §§ 229.105, 229.303.  We address each theory in turn.

## I.  Section 11's "Misleading" Prong

Plaintiffs argue that "[t]he applicable standard for whether information is required to be disclosed under §§ 11(a) and 12(a)(2) . . . is simply the standard for materiality[.]"  In other words, Plaintiffs argue that Defendants had a duty to disclose whenever there is "a substantial likelihood that disclosure of the omitted information would have been viewed by a reasonable investor as having significantly altered the total mix of information available."  The district court did not hold that Defendants had a duty to disclose all material information. Instead, the district court required Plaintiffs to allege that "disclosure of [the omitted] information [wa]s 'necessary to make the statements made [in the registration statement], in light of the circumstances under which they were made, not misleading." *Golubowski v. Robinhood Mkts., Inc.*, No. 21-cv-09767, 2024 WL 269507, at *7 (N.D. Cal. Jan. 24, 2024) (quoting *Retail Wholesale & Dep't Store Union Loc. 388 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017)).  In applying this standard, the district court explained that "inclusion of . . . out-of-quarter or intra-quarterly reports" was "only rendered necessary to the extent that they reflect[ed] declines so extraordinary as to be unusual and indicative of larger future trends when viewed in context of the company's historical data." *Id.*  The district court's decision was consistent with First Circuit precedent, which requires intra-quarter disclosures only when the

interim results reflect an "extreme departure" from historical results.**[2]**

As we explain, Sections 11 and 12 create a duty to disclose all material information in cases like this one.  We also explain why, even if the duty to disclose did not coalesce with materiality, the "extreme departure" test is not the law of this circuit.

## A. Duty to Disclose and Materiality

Our cases have drawn a theoretical distinction between materiality and the duty to disclose.  Accordingly, we have explained that "[t]he materiality of information is different from the issue of whether a statement is false or misleading." *In re Rigel Pharms.*, 697 F.3d at 880 n.8.  We have also recognized that "not all adverse events would be material and, more importantly, . . . not all material adverse events would have to be disclosed." *Id.*  "[A]s long as the omissions do not make the actual statements misleading," disclosure is not required "even if the company discloses some [related information] and even if investors would consider the omitted information significant."  *Id.*; *see also Retail Wholesale*, 845 F.3d at 1278 (finding "no duty to disclose" where the "failures to speak did not 'affirmatively create an

---

[2] The district court used both "extraordinary" and "extreme" to describe the degree of decline necessary to make the registration statement misleading without disclosure of the interim results. *See, e.g.*, 2024 WL 269507, at *8.  We primarily use the term "extreme" because the leading First Circuit case in this area uses that term, *see Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996), *abrogated on other grounds by* 15 U.S.C. § 78u-4(b)(2), and because several district courts in our circuit have relied on *Shaw*, *see, e.g.*, *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1023 n.31 (S.D. Cal. 2011).  However, neither party argues that there is any difference between these phrases, and we discern none.

impression of a state of affairs that differs in a material way from the one that actually exists'" (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002))).**[3]**

However, we agree with the Second Circuit that this "distinction has meaning only in certain contexts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). On the one hand, "where the issue is whether an individual's relationship to information imposed upon him a duty to disclose, the inquiry as to his duty is quite distinct from the inquiry as to the information's materiality." *Id.* "On the other hand, where the disclosure duty arises from the combination of a prior statement and a subsequent event, which, if not disclosed, renders the prior statement false or misleading, the inquiries as to duty and materiality

---

[3] *Rigel* and *Retail Wholesale* involved Rule 10b-5, which was promulgated pursuant to Section 10(b) of the Securities Exchange Act of 1934 rather than Section 11 of the Securities Act of 1933, but this distinction does not change our analysis. Section 11 does punish certain "pure omissions," *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264–65 (2024), because unlike Rule 10b-5, its "omissions clause also applies when an issuer fails to make mandated disclosures—those 'required to be stated'—in a registration statement," *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 n.3 (2015). But focusing on the "misleading" prong of the omissions clause, the relevant language is nearly identical in Rule 10b-5 and Section 11. *Compare* 17 C.F.R. § 240.10b-5(b) (imposing liability on those who "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading") *with* 15 U.S.C. § 77k(a) (imposing liability on those whose registration statements "omitted to state a material fact . . . necessary to make the statements therein not misleading"). Indeed, *Rigel* held that a Section 11 claim was not viable "[f]or the same reasons [as] . . . the section 10(b) claim[.]" 697 F.3d at 886. These cases apply with full force here.

coalesce." *Id.* Like the Second Circuit, we find it "difficult to imagine a circumstance where [a] prior statement would not be rendered misleading" in light of an undisclosed event if the "undisclosed information is material." *Id.* at 267–68.

Here, all the omissions challenged by Plaintiffs involve the relationship between a prior statement concerning a particular time period and an event subsequent to that time period.[4] Specifically, Plaintiffs allege that Robinhood did not disclose that several financial metrics and key performance indicators declined after the end of the last reported fiscal quarter. Thus, there was a statement related to a particular time period (*i.e.*, the disclosure of the results from the last reported fiscal quarter), followed by an undisclosed event (*i.e.*, the decline in Robinhood's performance) that took place after that period. Plaintiffs also allege that Robinhood's decision to disclose some positive interim results but omit other negative interim results, even though those negative results were provided in prior quarters, was misleading. Because Plaintiffs' contention relies in part on the distinction between the previous quarter's results and the interim results, it also involves the relationship between a prior statement and a subsequent event. Finally, Plaintiffs allege that Robinhood warned of certain future risks but did not state that those risks had

---

[4] To be sure, "Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud." *In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994). Thus, Plaintiffs cannot fault Robinhood's IPO disclosures for omitting events that took place after the IPO. *See id.* But that is not their theory here. Instead, Plaintiffs argue Robinhood should have disclosed events taking place during the partially completed fiscal quarter before the IPO. *Worlds of Wonder* does not bar claims against a registrant that knew about a material event before the IPO but chose not to disclose it.

already come to fruition. Again, Plaintiffs' theory concerns a prior time period (*i.e.*, the time period during which Robinhood suffered from the risks that had allegedly come to fruition) and some subsequent event (*i.e.*, the later time period during which the risks falsely portrayed as contingent actually came to pass). This case therefore does not require us to draw a distinction between materiality and the duty to disclose. Accordingly, Robinhood was required to disclose "material" interim information.

Robinhood claims we have rejected such a duty, but its primary Ninth Circuit authority does not support it. As we have explained, registrants have no duty to disclose interim sales when they "lag[] behind [the issuer's] internal projections." *In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994). A registrant that discloses the difference between interim results and internal projections necessarily discloses those projections. But "actually disclos[ing] [an] internal business plan" exposes a registrant to claims "that no basis existed for such a prediction." *Id.* *Worlds of Wonder* did not require registrants to make disclosures that would invite charges of speculation. *See id.* This case is different because Plaintiffs allege that Robinhood's interim results lagged behind its last reported results. Their claim does not rely on plans or projections. If Robinhood had disclosed the difference between its interim results and last reported results, then it would have revealed its results but it would not have speculated about the future.

Our other cases addressing the disclosure of interim results respect this distinction. Robinhood relies on *In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993), but it is distinguishable because it addressed "forecasts" rather than actual results. Robinhood also relies on *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507 (9th

Cir.), *as amended on denial of reh'g* (Dec. 6, 1991), but the portion it cites only concerns "internal projections," which the registrant had no duty to disclose. 948 F.2d at 516. As in *Worlds of Wonder*, that fact mattered: *Convergent* noted that "[t]here [was] no evidence . . . that the [undisclosed] estimates were made with such reasonable certainty even to *allow* them to be disclosed to the public." *Id.* Here, because Robinhood omitted its actual results, not any estimates, these cases do not support its position.**[5]**

## B. The Extreme Departure Test

The First Circuit has rejected a general duty to "disclose [even] material information concerning [the registrant's] performance in the quarter in progress." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1203 (1st Cir. 1996), *abrogated on other grounds by* 15 U.S.C. § 78u-4(b)(2). However, the First Circuit has held that if an "issuer is in possession of nonpublic information indicating that the quarter in progress at the time of the public offering will be an *extreme departure* from the range of results which could be anticipated based on currently available information, it is consistent with the basic statutory policies favoring

---

[5] Robinhood does not cite *In re Stac Elecs. Secs. Litig.*, 89 F.3d 1399 (9th Cir. 1996), but that case's gloss on *Convergent* also cuts against Robinhood's position. Among other things, *Stac* recognized the key "difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay." 89 F.3d at 1406 (quoting *Convergent*, 948 F.2d at 515). No registrant would have to disclose that its product development timeline might fall short of its estimates, but a registrant might have to disclose existing problems. *See id.* Here, Plaintiffs fault Robinhood's prospectus for omitting problems which occurred after the last quarterly financial statement but before the prospectus. That is nothing like the "contingen[t]" future event omitted in *Stac*. *See id.* at 1406–07.

disclosure to require inclusion of that information in the registration statement." *Id.* at 1210 (emphasis added). *Shaw* rejected "any bright-line rule that an issuer engaging in a public offering is obligated to disclose interim operating results for the quarter in progress whenever it perceives a possibility that the quarter's results may disappoint the market." *Id.* For one thing, "[t]here is always some risk that the quarter in progress at the time of an investment will turn out for the issuer to be worse than anticipated." *Id.* "The market takes this risk of variability into account in evaluating the company's prospects based on the available facts concerning the issuer's past historical performance, its current financial condition, present trends and future uncertainties." *Id.*

By contrast, the Second Circuit holds that "the long-standing test for assessing the materiality of an omission of interim financial information" is the same as the test for the "duty to disclose such information." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36 (2d Cir. 2017). That test is whether "a reasonable investor would view the omission as significantly altering the total mix of information made available." *Id.* (cleaned up) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)). The Second Circuit expressly declined to adopt the First Circuit's "extreme departure" test. *Id.*

We have previously "decline[d] to pass on the validity of an 'extreme departure' threshold in this circuit." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). Because that question is now squarely presented, we find the Second Circuit's reasons for rejecting *Shaw*'s "extreme departure" test persuasive, and we hold that the *Shaw* test is not the law of this circuit. Instead, the proper test for the duty to disclose is the test for materiality.

First, as *Stadnick* noted, "courts are familiar" with the "classic materiality standard in the omission context[.]" 861 F.3d at 37. The extreme departure test is far less administrable. Indeed, we have "counsel[ed] the need for caution in glossing the [relevant text] with further enigmatic language such as 'extreme departure' or 'dramatic decrease'" because "[s]hort phrases can not fully capture the richness of the concepts behind the standards" and "short phrases may obfuscate rather than clarify the standards." *Steckman*, 143 F.3d at 1298 n.1. By following the Second Circuit's lead and collapsing the duty to disclose into materiality, we make the securities law in this circuit clearer and more predictable.

Second, the *Shaw* test "leaves too many open questions, such as: the degree of change necessary for an 'extreme departure'; which metrics courts should look to in assessing whether such a departure has occurred; and the precise role of the familiar 'objectively reasonable investor' in assessing whether a departure is extreme." *Stadnick*, 861 F.3d at 37–38. The First Circuit has never proposed satisfactory answers to these questions, and neither have these parties or any of the district courts following the First Circuit's lead.

Third, the *Shaw* test "can be analytically counterproductive" in leading courts to focus on a small number of metrics that are not "fair indicators" of the registrant's performance. *Stadnick*, 861 F.3d at 38. Indeed, that is exactly what the district court did here. It proceeded indicator by indicator and evaluated whether each constituted a sufficient departure to create a duty to disclose. A more holistic approach, focusing on the "total mix of information" available to investors, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (internal quotation marks omitted), is the appropriate standard.

In view of the foregoing, we hold that the district court applied the incorrect legal standard to Plaintiffs' theory pursuant to Section 11's "misleading" prong. We therefore vacate that portion of the district court's opinion and remand. On remand, the district court shall ascertain whether Plaintiffs adequately alleged that the omitted information was material. If they did, then they have adequately alleged that Robinhood had a duty to disclose the omitted information. We express no view on how Plaintiffs' claims would fare under that legal standard.**[6]**

## II.    Item 303

Plaintiffs allege that Item 303 of Regulation S-K required disclosure of the interim results.

Item 303 requires the registrant to provide a "discussion and analysis" capturing the registrant's "financial condition and results of operations." 17 C.F.R. § 229.303(a). Plaintiffs' Item 303 theory is based on 17 C.F.R. § 229.303(b)(2)(ii). **[7]**   Pursuant to that provision, the

---

[6] Among other things, we do not decide which omissions, if any, Plaintiffs adequately alleged to be material. Our opinion also has nothing to say about any element of Plaintiffs' claims—or any defense available to Robinhood—other than materiality and the duty to disclose. We hold only that the district court applied the wrong legal standard to those issues and remand so it may apply the correct one. Finally, because this case comes to us at the pleading stage, we do not decide whether Plaintiffs have proven any element of their claims. We have only considered their allegations.

[7] On its face, that provision—and the others in the same paragraph— apply to "[f]ull fiscal years." 17 C.F.R. § 229.303(b). There is a separate paragraph that applies to "[i]nterim periods." *Id.* § 229.303(c). But even in interim periods, "[t]he discussion and analysis must include a discussion of material changes in those items specifically listed in [the full fiscal year] paragraph" of Item 303. *Id.* That is why even Robinhood

registrant must "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Also, "[i]f the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed." *Id.*

For Item 303 to impose a duty to disclose, there must be "a trend, demand, commitment, event or uncertainty [that] is known." *Steckman*, 143 F.3d at 1297. Assuming that requirement is satisfied, we follow a two-step analysis. First, we assess whether "the known trend, demand, commitment, event or uncertainty [is] likely to come to fruition[.]" *Id.* (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835 (May 18, 1989), Fed. Sec. L. Rep. (CCH) ¶ 72,436, at 62,843, 1989 WL 1092885, at *6 (1989 Release)). Second, "[i]f management cannot make that determination," then we "must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition." *Id.* (quoting same). "Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur." *Id.* (emphases omitted) (quoting same).

---

says that 17 C.F.R. § 229.303(b)(2)(ii) is cross-referenced in the interim periods paragraph and is "relevant here." We agree.

The district court rejected Plaintiffs' argument that Item 303 required Defendants to disclose the facts identified in the SAC. 2024 WL 269507, at *13–14. Specifically, the district court concluded that "[a] 'trend' under Item 303" must "accurately reflect[] persistent conditions of the particular registrant's business environment," found that Defendants had made disclosures that "further put investors on notice of the possibility of downward trends," and concluded that "the inquiry to discern if a 'trend' exists warranting disclosure Item 303 is akin to the inquiry under Section 11 generally." *Id.*

The district court erred in analyzing the Item 303 theory because Item 303's disclosure obligations are not limited to sufficiently persistent "trends," Item 303 requires quantification of the disclosed uncertainties to the extent reasonably practicable, and Item 303 imposes a different standard for disclosure than Section 11's "misleading" prong.

### A. Item 303 and Trends

As already noted, Item 303 only requires disclosure of certain "trends," "uncertainties," and "events." *See* 17 C.F.R. § 229.303(b)(2)(ii). "As regards trends, . . . this element . . . require[s] an assessment of whether an observed pattern accurately reflects persistent conditions of the particular registrant's business environment." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1191 (11th Cir. 2002). "It may be that a particular pattern is, for example, of such short duration that it will not support any conclusions about the registrant's business environment." *Id.*; *see also Trend*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/trend

(last visited Feb. 5, 2025) (defining "trend" as "the general direction of changes or developments").

On this point, several district courts have held a "trend" cannot be a "pattern of two months" or fewer. *See, e.g.*, *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 276 n.15 (S.D.N.Y. 2021) ("[A]s a matter of law, patterns lasting less than two months do not constitute 'trends' that would trigger disclosure obligations under Item 303."). Other courts, however, have not treated this as "a settled rule" and have determined that whether a pattern constitutes a "trend" is a more fact-specific inquiry. *Sundaram v. Freshworks, Inc.*, No. 22-cv-06750-, 2023 WL 6390622, at *7 (N.D. Cal. Sept. 28, 2023).

The latter view is more persuasive. For one thing, "Item 303's disclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or quantitative inquiries." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012). [8]  A bright-line two-month rule would contravene that principle. Also, other securities regulations set precise rules for the timing of disclosures. *See, e.g.*, 17 C.F.R. §§ 210.3-12(g), 249.308a(a). Because Item 303 contains no such rules, we will not read them in. As a practical matter, few business patterns shorter than two months will be "trends." But some short patterns may "support . . . conclusions about the registrant's business environment." *Jaharis*, 297 F.3d at 1191. For example, the

---

[8] Although this Second Circuit decision does not bind us, we find its reasoning persuasive. As *Panther Partners* notes, the Supreme Court has cautioned against imposing "bright-line" and "categorical" rules in the securities context. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39–40 (2011).

fallout from economic crises—like those unleashed by the COVID pandemic or the 2008 collapse of the real estate market—may have persistent effects on some businesses that are recognizable after less than two months. Thus, the two-month rule is overly restrictive. More critically, neither Defendants nor the cases adopting a two-month rule explain why the text, structure, purpose, or history of the relevant regulation require that rule. *See, e.g.*, *Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 546 (S.D.N.Y. 2017).

To be sure, not every set of interim financial results is a trend. The cases adopting the two-month rule are correct that there is "no general 'obligation to disclose the results of a quarter in progress.'" *Id.* (quoting *Arfa v. Mecox Lane Ltd.*, No. 10-cv-9053, 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir. 2012)). But holding that *some* patterns less than two months long can be trends for purposes of Item 303 would not impose an "unworkable and potentially misleading . . . system of instantaneous disclosure out [of] the normal reporting periods," *see In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010) (alteration in original) (quoting *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001)), for at least four reasons. First, Item 303 only requires disclosure of "known" developments. 17 C.F.R. § 229.303(b)(2)(ii). When changes are too recent to have come to management's attention, they need not be disclosed. Second, Item 303 only requires disclosure of developments that are "reasonably likely" to reflect changes to the registrant's business, rather than statistical noise in the registrant's performance. *Id.* Third, interim financial developments may not be material. Item 303 "is primarily concerned with developments that render the registrant's [previously] reported results less indicative of the

registrant's future prospects[.]" *Jaharis*, 297 F.3d at 1191; *accord* 17 C.F.R. § 229.303(a) ("The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."). Fourth, not every material change will be persistent, important, or unusual enough to be a "trend."

Even so, Item 303 covers more than just trends. The relevant portion of Regulation S-K also indicates that certain "events" and "uncertainties" must be disclosed.[9] 17 C.F.R. § 229.303(b)(2)(ii). Unlike "trends," "uncertainties" and "events" are not restricted to patterns with some minimum duration. Neither term suggests persistence over time. *See, e.g.*, *Uncertainty*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/uncertainty (last visited Feb. 5, 2025) (defining "uncertainty" as "a situation in which something is not known, or something that is not known or certain"). Indeed, "events" generally occur at a specific point in time, rather than over an extended period. *See, e.g.*, *Event*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/event (last visited Feb. 5, 2025) (defining "event" as "anything that happens, especially something important or unusual").

Here, Plaintiffs alleged that Robinhood's "dramatically lower PFOF from equities trading, cratering trading volume

---

[9] Among our cases, even those that primarily discuss "trends" have cited with approval the statement that "[r]equired disclosure [can be] based on currently known trends, events and uncertainties" alike. *See, e.g.*, *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1297 (9th Cir. 1998) (emphasis omitted) (quoting 1989 Release at *4).

in equities and cryptocurrency, and declining KPIs" constitute "events, trends *and* uncertainties." However, although the district court analyzed whether these developments constituted trends, it never addressed whether they were events or uncertainties. *See Golubowski*, 2024 WL 269507, at \*13–14. The district court erred in focusing exclusively on the "trends" prong of Item 303.

## B. Item 303 and Quantification

Plaintiffs argue that, even once a trend is disclosed, its effects must be "quantified to the extent reasonably practicable[.]" The language Plaintiffs rely on comes from one of the examples in the 1989 Release,[10] which does not

---

[10] We agree with the 1989 Release's reasoning. Also, Plaintiffs rely on the 1989 Release, and Robinhood offers us no reason not to. Moreover, our cases have cited the 1989 Release with approval. *See, e.g.*, *Steckman*, 143 F.3d at 1297. We therefore employ it here.

To be sure, the SEC has issued more recent guidance. *See* Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, Securities Act Release No. 10890 (Nov. 19, 2020), 2020 WL 7013369 (November 2020 Release); Commission Guidance on Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 33-10751 (Jan. 30, 2020), 2020 WL 1313719 (Jan. 30, 2020) (January 2020 Release). But these new releases do not grapple with the quantification issue—or any of the other issues presented here. *See* November 2020 Release at \*10–40; *see generally* January 2020 Release.

For example, although the SEC amended Item 303 "to allow for flexibility in comparisons of interim periods," it did so by "allow[ing] registrants to compare their most recently completed quarter to either the corresponding quarter of the prior year [as the rule previously required] . . . or to the immediately preceding quarter" at their option. November 2020 Release at \*63. Plaintiffs do not accuse Robinhood of comparing their most recently completed quarter to the incorrect previous quarter.

say expressly that the registrant must always quantify (to the extent reasonably practicable) the effects they disclose. *See* 1989 Release, at *6 (requiring quantification "to the extent reasonably practicable" in an illustration involving Superfund cleanup costs). However, Defendants do not deny that quantification is required; they contend only that "granular detail" is not required.

The regulation's text supports Plaintiffs. Registrants must "[d]escribe" certain trends or uncertainties "reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Even when a "particular known trend, event, or uncertainty" is disclosed, "whether, and *to what extent*" that trend, event, or uncertainty will affect the registrant may be "key information" that "should . . . [be] disclosed." *See Panther Partners*, 681 F.3d at 121 (emphasis added) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718–19 (2d Cir. 2011)). Indeed, disclosing trends that might affect registrants but not disclosing any information about the extent of those effects would be of little use.

---

Thus, the November 2020 Release's added flexibility does not help Robinhood.

As another example, the SEC has suggested that performance indicators which do not "present[] the pulse of the business" might not be material and so their omission might not be actionable. January 2020 Release, at *1 (quoting Proposed Amendments to Annual Report Form; Integration of Securities Act Disclosure Systems, Securities Act Release No. 33-6176, 45 Fed. Reg. 5972, 5979–80 (Jan. 15, 1980)). Here, however, the district court will decide on remand whether Robinhood's omissions were material. Thus, we need not decide which indicators present Robinhood's pulse.

Thus, when a trend must be disclosed pursuant to Item 303, its effects must be quantified to the extent reasonably practicable.  However, there will be cases where no quantification is reasonably practicable.  Moreover, any duty to quantify an effect does not necessarily require granular information about that effect.  *See* 1989 Release, at *6 (requiring, in the example Plaintiffs rely on, disclosure of "*aggregate* potential . . . costs" (emphasis added)).

### C.  Item 303 and Section 11's "Misleading" Prong

The district court held that "the inquiry to discern if a 'trend' exists warranting disclosure under Item 303 is akin to the inquiry under Section 11 generally in determining whether out-of-quarter disclosures were extraordinary enough to require disclosure." *Golubowski*, 2024 WL 269507, at *13.  The district court concluded that, as it explained while discussing the balance of the Section 11 claim, "the complained-of omissions were not so persistent as to require disclosure." *Id.*  This analysis is mistaken.  Section 11's "misleading" prong and Item 303 use substantially different standards.  Although there is some overlap, the district court erred in failing to address the key differences.

We have recognized that Item 303 "specifies its own standard for disclosure—*i.e.*, reasonably likely to have a material effect" and requires more disclosure than the materiality test typically used in securities law. *In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046, 1055 (9th Cir. 2014) (quoting 1989 Release, at *6 n.27).  That materiality test requires a "substantial likelihood" that the disclosure would have been considered significant by a reasonable investor. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S.

438, 449 (1976)); *see also Worlds of Wonder*, 35 F.3d at 1413 n.2 (applying this materiality test to a Section 11 claim). By contrast, Item 303 requires only that it be "reasonably likely" that the relevant event will occur. *See In re NVIDIA*, 768 F.3d at 1055 (contrasting the materiality standard with the standard for Item 303).

Because Item 303 imposes a broader duty of disclosure than Section 11's "misleading" prong, the "extreme departure" test is especially inapplicable here. Thus, the district court's determination that Robinhood's problems were not "historically extraordinary," 2024 WL 269507, at *14, is not a basis for rejecting Plaintiffs' Item 303 theory.

For the foregoing reasons, we vacate the district court's conclusion that Item 303 does not require disclosure of the interim results at issue and remand for further consideration of that theory in a manner consistent with this opinion. As before, we express no view on how Plaintiffs' claims would fare under the correct legal standard.[11]

### III.   Item 105

In addition to the omission of the interim results, Plaintiffs object to Defendants' failure to provide a breakdown of Robinhood's revenue sources during the second quarter of 2021. Plaintiffs contend that Item 105 of Regulation S-K required disclosure of this information. However, the district court correctly rejected Plaintiffs'

---

[11] Among other things, we express no view on whether Plaintiffs have alleged that Robinhood had sufficient knowledge of any trend, event, or uncertainty; whether the meme stock event was sufficiently persistent to qualify as a trend; and whether quantification of the meme stock event would be reasonably practicable here.

argument that Item 105 required Defendants to disclose these facts.  2024 WL 269507, at *14–18.

Item 105 requires registrants to "provide . . . a discussion of the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105(a).  Registrants must also "[c]oncisely explain how each risk affects the registrant or the securities being offered." *Id.* § 229.105(b).

Plaintiffs first argue that "[a]n issuer violates Item 105 when . . . its risk disclosures present risks as contingent when they have already come to fruition."  Plaintiffs rely on *Mingbo Cai v. Switch, Inc.*, No. 2:18-cv-01471, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019), but even if *Mingbo Cai* were binding, it held only that the plaintiffs' Item 105 theory was viable because there was no "language in the registration statement that indicates the specific risks arising from [the registrant's] new sales strategy."  In other words, *Mingbo Cai* addressed the disclosure's specificity, not whether it was contingent.

In addition, the text of Item 105 only requires disclosure of factors making an investment "speculative or risky."  17 C.F.R. § 229.105(a).  What makes an investment "speculative or risky" is that it may lose value in the future.[12] If Defendants failed to adequately disclose past events but

---

[12] *See, e.g.*, *Risky*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/risky (last visited Dec. 9, 2024) (defining "risky" as "involving the possibility that something bad might happen or that something will fail or lose money"); *Speculative*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/speculative (last visited Dec. 9, 2024) (defining "speculative" as "based on a guess and not on information").

sufficiently disclosed those future risks, they would have adequately disclosed the factors making the investment speculative or risky and would not have violated Item 105. To be sure, presenting past harms as contingent future risks may be misleading, and may be actionable under Section 11's "misleading" prong. However, mischaracterizing a past harm as a future risk cannot, standing alone, violate Item 105.

Plaintiffs' other Item 105 argument is that Defendants failed to disclose that "Robinhood's revenues had become far more volatile than they had been historically, due to their dependence on [t]ransaction [r]ebates from speculative trading in cryptocurrencies, primarily Dogecoin, rather than transaction-based revenue from traditional trading in equities and options."

Defendants did disclose this risk. They explained that "[t]he prices of cryptocurrencies are extremely volatile" and that "changes in the prices and/or trading volume of cryptocurrencies may adversely impact [Robinhood's] growth strategy and business." Defendants also disclosed the change in Robinhood's revenue. Defendants noted that "[a] substantial portion of the recent growth in [Robinhood's] net revenues earned from cryptocurrency transactions is attributable to transactions in Dogecoin." They explained that "in addition to the factors impacting the broader cryptoeconomy . . . [Robinhood's] business may be adversely affected . . . if the markets for Dogecoin deteriorate or if the price of Dogecoin declines[.]" They also disclosed that "[i]f demand for transactions in Dogecoin declines and is not replaced by new demand for other cryptocurrencies available for trading on [the] platform, [Robinhood's] business, financial conditions, and results of operations could be adversely affected." Defendants even

quantified the effect of Dogecoin on their business during
the first quarter of 2021:

> For the three months ended March 31, 2021,
> 17% of our total revenue was derived from
> transaction-based revenues earned from
> cryptocurrency transactions, compared to 4%
> for the three months . . . ended December 31,
> 2020. While we currently support a portfolio
> of seven cryptocurrencies for trading, for the
> three months ended March 31, 2021, 34% of
> our cryptocurrency transaction-based
> revenue was attributable to transactions in
> Dogecoin, as compared to 4% for the three
> months ended December 31, 2020.

Plaintiffs respond that Defendants should have disclosed
the equivalent statistics for the second quarter of 2021. This
is unpersuasive. Plaintiffs have offered good reasons to
believe that Item 303 requires registrants to quantify the
items they are disclosing. But there is no comparable
argument for Item 105. Indeed, a quantification requirement
makes much less sense in the Item 105 context. Registrants
can more readily quantify existing trends, uncertainties, and
events than future risk factors.[13] On its face, Item 105 only
requires registrants to "concisely explain" how the risks they
are disclosing may affect them. Defendants disclosed a

---

[13] We do not decide whether Item 105 requires quantification in some
circumstances. Because Plaintiffs do not explain why Item 105 requires
quantification here, we decide only that Item 105 does not ordinarily
require registrants to quantify future business risks, which would often
be impossible.

concise explanation of the potential effects of cryptocurrency volatility.

This is especially true because Robinhood disclosed that it "experienced strong growth in new customers during the first six months of 2021," but did "not know whether, over the long term, cohorts comprised of these new customers will have the same characteristics as . . . prior cohorts." As a result, Defendants disclosed, and investors knew, that no matter which stocks had the attention of "meme stock" investors at the time of the registration statement, demand for Robinhood's services could plummet if those investors' interests changed.

Also, the second quarter of 2021 ended less than one month before Robinhood's registration statement was filed. Even if Defendants were required to break down the fraction of their revenue attributable to Dogecoin, it is hard to fault Defendants for providing the data from the previous quarter. Plaintiffs' briefing does not cite any allegations that the further statistics they seek were available for disclosure.

Because we discern no error in the district court's analysis of this theory, we affirm.

## CONCLUSION

Because the district court applied the wrong legal standards to Section 11's "misleading" prong and the Item 303 theory, we vacate the district court's opinion in relevant part and remand so it may re-evaluate those theories under the correct standards. However, we affirm the district court's rejection of the Item 105 theory.

**AFFIRMED in part, VACATED in part, and REMANDED.**

Each side shall bear its own costs on appeal.

Rawlinson, Circuit Judge, dissenting in part and concurring in part:

I agree with the majority that the district court properly analyzed and denied Plaintiffs' claim based on a failure to comply with the disclosure requirements as set forth in Item 105 of Regulation S-K. However, I disagree with and dissent from the balance of the majority opinion.

## I. **Disclosures Generally**

At the outset, it is worth repeating the disclosures that *were* made by Robinhood Markets, Inc. (Robinhood) in the registration documents accompanying its initial public offering (IPO), as acknowledged by the majority.

### **Revenue Growth Generally**

> Transaction-based revenues have generally increased sequentially in each of the periods presented, other than the fourth quarter of 2019, due to growth in our user base which resulted in higher trading volume on a per-user basis. In the first half of 2020, we saw a significant increase in the number of new accounts opened by first-time investors, as a result of increased interest in personal finance and investing, low interest rates and a positive market environment, especially in the U.S. equity markets. Throughout the remainder of 2020 and the first quarter of 2021, we maintained substantial growth in

our user base, retention, engagement and trading activity metrics, as well as gains and periodic all-time highs achieved by the equity markets.

*Majority Opinion*, pp. 11.

### **Revenue Growth - Last Quarter 2020**

Transaction-based revenue increased by $549.3 million, or 322%, for the year ended December 31, 2020, compared to the year prior. The increase was driven by a 143% increase in Net Cumulative Funded Accounts, which resulted in higher daily average revenue trades . . . in options, equities and cryptocurrencies. Our daily average revenue trades for options, equities and cryptocurrencies increased from 0.2 million to 0.6 million, an increase of 306%, 0.6 million to 2.2 million, an increase of 274%, and less than 0.1 million to 0.1 million, an increase of 175%. Increased interest in personal finance and investing, low interest rates and a positive market environment, especially in the U.S. equities markets, encouraged an unprecedented number of first-time retail investors to become our users and begin trading on our platform. We have seen substantial growth in our user base, retention, engagement and trading activity metrics, as well as continued gains and periodic all-time highs achieved by the equity markets.

### Revenue Growth - First Quarter 2021

Transaction-based revenues increased by $324.8 million, or 340%, for the three months ended March 31, 2021, compared to the year prior. The increase was driven by a 151% increase in Net Cumulative Funded Accounts, which resulted in higher daily average revenue trades in options, equities, and cryptocurrencies. Our daily average revenue trades for the quarter for options, equities and cryptocurrencies increased from 0.4 million to 1.1 million, an increase of 188%, 1.3 million to 5.1 million, an increase of 291%, and 0.1 million to 1.4 million, an increase of 1,375%. Increased interest in personal finance and investing, and several high-profile securities and cryptocurrencies, encouraged an unprecedented number of first-time retail investors to become our users and begin trading on our platform. We have seen substantial growth in our user base, engagement and trading activity metrics.

### Expectations - Second Quarter 2021 and Third Quarter 2021

For the three months ended June 30, 2021, we expect to report revenue of between $546 million and $574 million, as compared to $244 million for the three months ended June 30, 2020, representing an increase of 129% at the midpoint of the range. The expected increase in revenue is primarily driven by a

130% increase in Net Cumulative Funded Accounts and increased trading activity related to options and cryptocurrencies, and relatively flat equities trading activity, relative to the three months ended June 30, 2020. We also saw increases in the 2021 period in margin and stock lending activity as well as an increase in Robinhood Gold subscribers. Trading activity was particularly high during the first two months of the 2021 period, returning to levels more in line with prior periods during the last few weeks of the quarter ended June 30, 2021, and remained at similar levels into the early part of the third quarter. *We expect our revenue for the three months ending September 30, 2021 to be lower, as compared to the three months ended June 30, 2021, as a result of decreased levels of trading activity relative to the record highs in trading activity, particularly in cryptocurrencies, during the three months ended June 30, 2021, and expected seasonality.*

Emphasis added.

For the three months ended June 30, 2021, we expect to report operating expenses of between $486 million and $536 million, as compared to $186 million for the three months ended June 30, 2020, representing an increase of 174% at the midpoint of this range. The expected increase in operating expenses is primarily driven by an increase in

total headcount of approximately 190%, as well as an increase in cloud infrastructure to support increased activity on the platform and an increase in the Robinhood Referral Program as a result of significant user growth. We also saw an increase in legal settlements and reserves related to the settlement of NYDFS Matter, an increase in Fraudulent Deposit Transactions, and chargebacks related to our cash management offering for the three months ended June 30, 2021. Upon effectiveness of our IPO, we expect to recognize a one-time cumulative share-based compensation expense of approximately $1 billion related to [Restricted Stock Units] for which the time-based vesting condition was satisfied or partially satisfied as of the date of this offering and for which the performance condition was satisfied in this offering, which expense we expect to incur during the quarter in which the offering occurs.

For the three months ended June 30, 2021, we expect to report net loss of between $487 million and $537 million, as compared to net income of $58 million for the three months ended June 30, 2020. The net loss is primarily driven by the factors mentioned above as well as the change in fair value of convertible notes and warrant liability of $528 million (assuming an initial public offering price of $40.00, which is the mid-point of the estimated offering price range set

forth on the cover page of this prospectus), which was market-to-market as of the end of the three months ended June 30, 2021.

For the three months ended June 30, 2021, we expect to report Net Cumulative Funded Accounts of 22.5 million, as compared to 9.8 million for the three months ended June 30, 2020, representing an increase of 130%. For the month ended June 30, 2021, we expect to report [Monthly Active Users] of 21.3 million, as compared to 10.2 million for the month ended June 30, 2020, representing an increase of 109%. As of June 30, 2021, we expect to report [Assets Under Custody] of $102 billion, as compared to $33 billion as of June 30, 2020, representing an increase of 205%, The increase in these Key Performance Metrics resulted primarily from an increase in new users joining our platform, driven by general market interest trading. We anticipate the rate of growth in these Key Performance Metrics will be lower for the period ended September 30, 2021, as compared to the three months ended June 30, 2021, due to the exceptionally strong interest in trading, particularly in cryptocurrencies, we experienced in the three months ended June 30, 2021 and seasonality in overall trading activities.

For the three months ended June 30, 2021, we expect to report Adjusted [Earnings Before Interest, Taxes, Depreciation and Amortization] of between $59 million and

$103 million, as compared to $63 million for the three months ended June 30, 2020, representing an increase of approximately 29% at the midpoint of this range. The expected increase in Adjusted EBITDA was primarily due to revenue increases outpacing increases in operating expenses for the three months ended June 30, 2021.

## DISCLAIMER

We experienced strong growth in new customers during the first six months of 2021. *We do not know whether, over the long term, cohorts comprised of these new customers will have the same characteristics as our prior cohorts. To the extent these new customers do not grow their cumulative net deposits or trading frequency on our platform to the same extent as new customers that joined in prior periods, our ability to expand and grow our relationship with these customers will be impacted.*

Emphasis added.

### Statements of Future Risks

**We may not continue to grow on pace with historical rates.**

We have grown rapidly over the last few years, and therefore our recent revenue growth rate and financial performance should not be considered indicative of our future

performance. In particular, since March 2020, we have experienced a significant increase in revenue, MAU, AUC and Net Cumulative Funded Accounts. For example, for the years ended 2019 and 2020, our revenue was $277.5 million and $958.8 million, respectively, representing annual growth of 245%. In addition, for the three months ended March 31, 2021, during which we experienced high trading volume and account sign-ups as well as high market volatility, particularly in certain market sectors, our revenue was $522.2 million, as compared to $127.6 million for the three months ended March 31, 2020, and, on March 31, 2021, we had Net Cumulative Funded Accounts of 18.0 million, as compared to 7.2 million on March 31, 2020, representing growth of 309% and 151%, respectively. *The circumstances that have accelerated the growth of our business may not continue in the future, and we expect the growth rates in revenue, MAU, AUC and Net Cumulative Funded Accounts to decline in future periods, and such declines could be significant. You should not rely on our revenue or key business metrics for any previous quarterly or annual period as any indication of our revenue, revenue growth, key business metrics or key business metrics growth in future periods. In particular, our revenue growth rate has fluctuated in prior periods. Our revenue growth rate is likely to*

*decline in future periods as the size of our business grows and as we achieve higher market adoption rates. We may also experience declines in our revenue growth rate as a result of a number of factors, including slowing demand for our platform, insufficient growth in the number of customers that utilize our platform, increasing competition, a decrease in the growth of our overall market, our failure to continue to capitalize on growth opportunities, including as a result of our inability to scale to meet such growth, an insufficient number of market makers or the unwillingness or inability of our existing market makers to execute our customers' trade orders as order volumes increase, increasing regulatory costs, increasing capital requirements* imposed by regulators and [self-regulatory organizations,] as well as cash deposit and collateral requirements under the rules of [the Depository Trust Company, National Securities Clearing Corporation, and the Options Clearing Corporation],* economic conditions that reduce financial activity and the maturation of our business, among others. If our revenue growth rate declines, investors' perceptions of our business and the trading price of our Class A common stock could be adversely affected.*

Emphasis added.

**Our results of operations and other operating metrics may fluctuate from quarter to quarter, which makes these metrics difficult to predict.**

> *Our results of operations are heavily reliant on the level of trading activity on our platform and net deposits. In the past, our results of operations and other operating metrics have fluctuated from quarter to quarter, including due to movements and trends in the underlying markets, changes in general economic conditions and fluctuations in trading levels, each of which is outside our control and will continue to be outside of our control. Additionally, our limited operating history makes it difficult to forecast our future results. As a result, period-to-period comparisons of our results of operations may not be meaningful, and our past results of operations should not be relied on as indicators of future performance. Further, we are subject to additional risks and uncertainties that are frequently encountered by companies in rapidly evolving markets. Our financial condition and results of operations in any given quarter can be influenced by numerous factors, many of which we are unable to predict or are outside of our control, which could include:*

> *the continued market acceptance of our products and services;

*our ability to retain existing customers and attract new customers;

*our continued development and improvement of our products and services, including our intellectual proprietary technology and customer support functions;

*the timing and success of new product and service introductions by us or our competitors, or other changes in the competitive landscape of our market;

*increases in marketing, sales and other operating expenses that we may incur to grow and expand our operations and to remain competitive;

*the timing and amount of non-cash expenses, such as stock-based compensation and asset impairment;

*the success of our expansion into new markets, products and services, such as cryptocurrency trading, fractional shares trading or our Cash Management product;

*decreased trading in global markets or decreased demand for financial services products generally;

*continued growth in the adoption and use of cryptocurrencies and the public perception thereof;

*system disruptions, outages and other performance problems or interruptions on our platform, or breaches of security or privacy;

*disputes with our customers, adverse litigation and regulatory judgments, enforcement actions, settlements or other related costs and the public perception thereof;

*fraudulent, unlawful or otherwise inappropriate customer behavior, such as when customers initiate deposits into their accounts, make trades on our platform using a short-term extension of credit from us and then repatriate or reverse the deposits, resulting in a loss to us of the credited amount (which we refer to as "Fraudulent Deposit Transactions");

*changes in the legislative or regulatory environment, scope or focus of regulatory investigations and inquiries, or interpretations of regulatory requirements;

*our development of any unique features or services that may be the subject of regulatory criticism or form the basis for regulatory enforcement action, including regulatory actions to prohibit certain practices or features;

*the overall tax rate for our business, which may be affected by any changes to our valuation allowance, domestic deferred tax assets, and the effects of changes in our business;

*changes in tax laws or judicial or regulatory interpretations of tax laws, which are

recorded in the period such laws are enacted or interpretations are issued, and may significantly affect the effective tax rate of that period;

*changes in accounting standards, policies, guidance, interpretations or principles;

*changes in requirements imposed on us by regulators or by our counterparties, including net capital requirements imposed by the SEC and [Financial Industry Regulatory Authority] and cash deposit and collateral requirements imposed by the DTC, NSCC and OCC;

*volatility in the overall market which could, among other things, impact demand for our services, the magnitude of our cash deposit and collateral requirements and our growth strategy and business more generally; and

*general economic conditions in either domestic or international markets, including the impact of the ongoing COVID-19 pandemic.

Emphasis added.

**Our business and reputation may be harmed by changes in business, economic or political conditions that impact global financial markets, or by a systemic market event.**

As a financial services company, our business, results of operations and reputation are directly affected by elements beyond our

control, such as economic and political conditions, changes in the volatility in financial markets (including volatility as a result of the COVID-19 pandemic), significant increases in the volatility or trading volume of particular securities or cryptocurrencies, broad trends in business and finance, changes in volume of securities or cryptocurrencies trading generally, changes in the markets in which such transactions occur and changes in how such transactions are processed. These elements can arise suddenly and the full impact of such conditions can remain uncertain. A prolonged weakness in equity markets, such as a slowdown causing reduction in trading volume in securities, derivatives or cryptocurrency markets, may result in reduced revenues and would have an adverse effect on our business, financial condition and results of operations. *Significant downturns in the securities markets, cryptocurrencies or in general economic and political conditions may also cause individuals to be reluctant to make their own investment decisions and thus decrease the demand for our products and services and could also result in our customers reducing their engagement with our platform.*

In addition, a prolonged weakness in the U.S. equity markets or in specific cryptocurrencies or equity securities or a general economic downturn could cause our customers to incur

losses, which in turn could cause our brand and reputation to suffer. . . .

Emphasis added.

Robinhood made the following specific disclosures about cryptocurrency in general and Dogecoin in particular:

> **The prices of cryptocurrencies are extremely volatile. Fluctuations in the price of various cryptocurrencies may cause uncertainty in the market and could negatively impact trading volumes of cryptocurrencies, which would adversely affect the success of [Robinhood's] business, financial condition and results of operations.**
>
> The cryptocurrency markets are volatile, and *changes in the prices and/or trading volume of cryptocurrencies may adversely impact [Robinhood's] growth strategy and business. In addition, while we have observed a positive trend in the total market capitalization of cryptocurrency assets historically, driven by increased adoption of cryptocurrency trading by both retail and institutional investors as well as continued growth of various non-investing use cases, historical trends are not indicative of future adoption*, **and** *it is possible that the adoption of cryptocurrencies may slow, take longer to develop or never be broadly adopted, which would negatively impact our business,*

> *financial    conditions    and    results    of operations*.

Bolding and Emphasis added.

. . .

> ***A substantial portion of the recent growth in our net revenues earned from cryptocurrency transactions is attributable to transactions in Dogecoin. If demand for transactions in Dogecoin declines and is not replaced by new demand for other cryptocurrencies available for trading on our platform, our business, financial condition and results of operations could be adversely affected.***

> For the three months ended March 31, 2021, 17% of our total revenue was derived from transaction-based revenues earned from cryptocurrency transactions, compared to 4% for the three months year ended December 31, 2020. While we currently support a portfolio of seven cryptocurrencies for trading, for the three months ended March 31, 2021, 34% of our cryptocurrency transaction-based revenue was attributable to transactions in Dogecoin, as compared to 4% for the three months ended December 31, 2020. As such, in addition to the factors impacting the broader cryptoeconomy described elsewhere in this section, [Robinhood's] business *may* be adversely affected, and growth in our net revenue earned from cryptocurrency transactions *may*

*slow or decline, if* the markets for Dogecoin deteriorate or *if* the price of Dogecoin declines, including as a result of factors such as negative perceptions of Dogecoin or the increased availability of Dogecoin on other cryptocurrency trading platforms.

*Majority Opinion*, pp. 21-22 (emphasis and bolding in the original).

Despite these extensive disclosures and warnings, the majority agrees with Plaintiffs' assertion that Robinhood failed to meet the requirements of Section 11 of the Securities Act of 1933 (15 U.S.C. § 77k) and Item 303 of Regulation S-K.

Section 11 of the Securities Act of 1933 provides:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may, either at law or in equity, in any court of competent jurisdiction, sue . . .

15 U.S.C. § 77k(a).

Item 303 of Regulation S-K provides in pertinent part:

(a) Objective. The objective of the discussion and analysis [of financial condition and results of operations] is to provide material information relevant to an

assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources. The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations. . . .

17 C.F.R. § 229.303(a).

Item 303 requires discussion of "Liquidity and capital resources, [R]esults of operations [and] Critical accounting estimates." *Id.* at § 229.303(b)(1)-(3).

In discussing liquidity, the registrant must analyze its "ability to generate and obtain adequate amounts of cash to meet its requirements." *Id.* at § 229.303(b)(1). This discussion is to encompass "material cash requirements from known contractual and other obligations." *Id.* The registrant is required to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." *Id.* at § 229.303(b).

In addressing results of operations, the registrant is expected to "[d]escribe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations . . .", and "any known trend or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenue or income from continuing operations." *Id.* at § 229.303(b)(1)(i)-(ii).

Plaintiffs assert that Robinhood "fail[ed] to disclose the ongoing significant declines in [Payment For Order Flow] from equities and options trading, equities and cryptocurrency trading volumes, and [Key Performance Indicators]. But this assertion seeks to hold Robinhood to the same standard applied to required financial statements. Tellingly, Plaintiffs rely on precedent from this circuit interpreting the requirements of Section 10(b) of the Securities Exchange Act of 1934, and 17 C.F.R. § 240.10b-5 (Rule 10b-5), rather than Section 11, namely *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, 845 F.3d 1268 (9th Cir. 2017). Importantly, the requirements of Rule 10b-5 do not apply to Item 303 claims. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998), in which we criticized reliance on cases decided under Section 10(b) for "Item 303 claims brought under Section 12(a)(2)."

For statements accompanying IPOs, we have emphasized that our consideration of the statements made is not done in a vacuum. Rather, we analyze the offering statements by considering the statements that were made, any disclaimers accompanying those statements, and the information available to the market. *See Morris v. Newman*

*(In re Convergent Techs. Sec. Litig.)*, 948 F.2d 507, 512, 515 (9th Cir. 1991), *as amended*.

In *Convergent Technologies*, stock purchasers brought a class action against Convergent, some of its officers and directors, the underwriters, and another corporation (collectively, Defendants) with the class consisting of "all those who bought Convergent stock between a March 17, 1983 public stock offering, and February 17, 1984, the day after Convergent disclosed negative information to a group of stock analysts." *Id.* at 508-09. The complaint principally alleged misrepresentations of "the growth in demand for Convergent's existing line of computer workstation products." *Id.* at 509. According to the complaint, Convergent "concealed . . . severe production and profitability problems with two product lines under development." *Id.*

The challenged statements related to three Convergent products: 1) the AWS/IWS workstation, 2) the Next GENeration (NGEN) workstation, and 3) the Workslate Product Line. AWS/IWS and NGEN were computer workstations sold to original equipment manufacturers rather than to the public. In contrast, the Workslate Product Line was essentially a "portable laptop computer" to be sold directly to the public rather than to original equipment manufactures. *Id.* at 510-11.

### **The AWS/IWS Workstation**

Convergent began shipping the IWS in early 1981, and subsequently developed the AWS, a lower cost version of the IWS. *See id.* at 509.

In September, 1981, Convergent entered into an agreement with Burroughs, an original equipment

manufacturer, which required Burroughs to purchase 10,000 AWS/IWS workstations by the end of 1983. However, in July, 1982, "Convergent agreed to reduce prices on its AWS/IWS workstations by 30% in return for [a] firm commitment" from Burroughs "to buy 30,000 units in 1983." Convergent never disclosed the 30,000 unit commitment to the public. *Id.* (internal quotation marks omitted).

By March, 1983, the beginning of the class period, Burroughs had purchased more than the 10,000 workstations provided for in the original agreement. *See id.* Shortly thereafter, Burroughs informed Convergent that it would purchase 17,500 AWS workstations in addition to all the NGENs Convergent produced. Burroughs and Convergent incorporated these commitments into an amendment in September, 1983. *See id.*

In the latter part of July, 1983, Convergent concluded that sales growth for the AWS/IWS workstations would slow for the balance of the year. On August 5, 1983, Convergent issued the following press release:

> Net sales for the third quarter of 1983 will be approximately equal to Convergent's net sales for the second quarter because of customer anticipation of Convergent's next generation of products, which are expected to be available for volume shipments in the first half of calendar 1984. Fourth quarter revenues cannot be predicted with certainty, but could be below third quarter revenues. Because of price reduction on existing products and start-up costs associated with three new product lines, the Company

> anticipates that until volume shipments of its
> new products begin there will be a decrease
> in gross profit margin, and may be a
> substantial decrease in net income.

*Id.* at 510 (alterations omitted).

### **The NGEN Product Line**

In 1982, Convergent began to finalize development plans for the NGEN workstation. Convergent anticipated that the NGEN product would cost approximately half the cost of the AWS/IWS with significant improvements in performance. However, in early 1983, Convergent became aware of serious problems with the NGEN line relating to pricing and costs. *See id.*

In its Prospectus issued on March 17, 1983, Convergence stated its intent to introduce the NGEN product line. The Prospectus represented that "[v]olume shipments . . . are planned for 1984; consequently, they are not expected to have a significant impact on 1983 revenues." *Id.* The Prospectus also cautioned that [w]hile the Company believes that the technical risks in the development of these products are well controlled, the product cost objectives are very aggressive, and there is no assurance that they can be achieved." *Id.*

In its Prospectus dated August 30, 1983, Convergent repeated the admonition of "no assurance that the aggressive cost objective for these products can be achieved." *Id.* The August Prospectus did not disclose the more detailed cost analyses that were circulated internally after the Prospectus was issued. These analyses "reflected that Convergent had made progress in its cost reduction battle, but had not yet attained positive gross margins for most NGEN

configurations." *Id.* at 510-11.   Although Convergent continued its improvement efforts throughout the second half of 1983, Convergent did not achieve its projected gross margins until the first half of 1984. *See id.* at 511.

### The Workslate Product Line

In March of 1983, Convergent had not yet finalized the form of the Workslate Product, developed its marketing strategy, or fashioned a prototype.  In its March Prospectus, Convergent disclosed *some* of the risks that it anticipated with the Workslate Product Line.  Convergent warned that the product would require "complex" development, including the incorporation of "proprietary technology." *Id.* Therefore, introduction of the product could "be subject to delay, which [could] adversely impact the Company's ability to market these products." *Id.*  Convergent also warned that: "[t]here can be no assurance that [Convergent] will successfully complete the development of its new products, or that it will be successful in manufacturing the new products in high volume or marketing the products in the face of intense competition." *Id.*  These risks were repeated in the August Prospectus and more risks were added, including that the product "required the implementation of advanced manufacturing processes and the development and management of retail distribution channels," neither of which were within Convergent's experience.  *Id.* (internal quotation marks omitted).

The problems encountered with the manufacturing and distribution of the Workslate Product continued to increase throughout 1983.  By early December of that year, the management at Convergent became aware that the company would be unable to manufacture the Workslate Product in the projected volumes. *See id.*

In February, 1984, "Convergent revealed at a meeting of analysts that it would attempt to raise prices" for the Workslate Product, that the Workslate Product was being sold at a price below the cost of production, and that the product had been prematurely released, and required a redesign. *Id.* Over the next two days, Convergent stock fell 17%. *See id.*

The Plaintiffs challenged the disclosures for each of these three product lines.

### AWS/IWS Product Line Challenge

The Plaintiffs challenged the statements made in the March 17 Prospectus addressing the AWS/IWS Product Line. The Plaintiffs delineated the following two statements as misleading:

> [1]. Burroughs Corporation accounted for approximately 48% of the total revenue of the Company in 1982. While the level of the Company's future revenues from sales to Burroughs cannot be predicted with any certainty, the Company believes that Burroughs may continue to account for a similar percentage of revenue in 1983.
>
> [2]. In view of the Company's anticipated orders of its existing products, the Company believes it will be required to increase inventories, to carry increased levels of receivables and to acquire additional capital equipment.

*Id.* at 512.

The Plaintiffs conceded that the statements made were true, but maintained that they "did not reveal the entire picture." *Id.* Specifically, the Plaintiffs asserted that the statements were misleading because "they (1) implied growth would continue at the torrid pace Convergent had set in the past, and (2) failed to reveal that Burroughs had decreased its orders for 1983. *Id.* at 513 (internal quotation marks omitted).

We rejected the Plaintiffs' contentions. Addressing the "implied growth" argument, we concluded that the "challenged statements do not imply any comparison between the rate of past and future growth. They simply report past performance and assert *specific limited predictions for the future*." *Id.* (emphasis added). We noted that "the market clearly understood that Convergent could not maintain the growth it had enjoyed in the past." *Id.* We observed that "an omission is materially misleading only if the information has not already entered the market." *Id.* Indeed, "[i]f the market has become aware of the allegedly concealed information, the facts allegedly omitted . . . would already be reflected in the stock's price." *Id.* (citation and internal quotation marks omitted). We noted that "[a]s a general matter, investors know of the risk of obsolescence posed by older products forced to compete with more advanced rivals." *Id.* (citation omitted). And in the case of Convergent, "[t]he market clearly knew demand for the AWS/IWS workstation would decrease as Convergent began to make NGEN available to its customers." *Id.*

We specifically discussed the fact that "securities analysts knew that NGEN posed just such a risk to sales of the AWS/IWS workstation." During February, 1983, securities analysts reported the "major product transition on the horizon, and . . . in anticipation of the next generation

of products, it is possible that major new customers may defer taking delivery of current products in favor of the new line." *Id.* (citation, alteration and internal quotation marks omitted). Similar reports were produced after the March Prospectus. *See id.* Considering the "more than 60 analysts reports and articles in the trade and financial press discussing Convergent's prospects for 1983," we concluded that "[t]here can be no doubt that the market was aware AWS/IWS demand would not increase at the same rate it had in the past." *Id.* Accordingly, the challenged statements were not misleading as to implied growth. *See id.*

Addressing the "decreased orders" alleged misrepresentation, we observed that there was actually no decrease in orders from Burroughs. *Id.* at 513-14. The Plaintiffs unjustifiably relied on a non-binding "agreement to purchase" 30,000 units rather than an "actual purchase order" for 17,500 units to calculate the asserted decrease. *Id.* at 514. We determined that there was no misleading failure to disclose a decrease in the number of orders from Burroughs. Rather, the Plaintiffs "mischaracterize[d] the 17,500 purchase commitment [in the purchase order] as a decrease in existing orders. [But] [t]he 30,000 figure [relied upon by the Plaintiffs] never was a commitment to buy. Instead, [t]he 17,500 figure which *was* such a commitment, amounted to nearly a 100% increase over Burroughs' previous purchase commitment." *Id.* (emphasis in the original).

The Plaintiffs also referenced a May 18 report to shareholders to bolster their argument regarding failure to disclose "decreased orders." *Id.* The challenged statement read: "Our growth in the first quarter of 1983 was the result of increases in shipments to our large [original equipment manufacturer] customers." *Id.* The Plaintiffs characterized

this statement as misleading investors "by implying that Convergent expected the upward first quarter trend to continue throughout the year." *Id.* We "reject[ed] this contention," noting that "[a]lthough *in its annual Form 10-K filing a company must discuss factors that would cause reported financial information not to be necessarily indicative of future financial operating results, no such obligation exists in the quarterly report at issue here. Id.* (citation and internal quotation marks omitted) (emphasis added).

Finally, the Plaintiffs relied on an August 5 press release to support its "decreased orders" contention. The press release stated:

> Net sales for the third quarter of 1983 will be approximately equal to its net sales for the second quarter because of customer anticipation of deliveries of its new generation of products, which are expected to be available for volume shipments in the first half of calendar 1984. Fourth quarter revenues cannot be predicted with certainty, but could be below third quarter revenues. Because of price reduction on existing products and startup costs associated with three new product lines, the Company anticipates that until volume shipment of its new products begins there will be a decrease in gross profit margin, and may be a substantial decrease in net income.

*Id.* (alteration omitted).

The Plaintiffs characterized this press release as "misstat[ing] the demand for Convergent's AWS/IWS workstation because Convergent knew at the time that third and fourth quarter revenues for 1983 would actually decline, not just remain flat." *Id.* We rejected this argument from the Plaintiffs as well. We determined that the Plaintiffs "made no such showing" of Convergent's asserted knowledge. *Id.* Rather, "Convergent's revenues for the second half of 1983 were pretty much what the August press release predicted." *Id.* For the third quarter, "rather than being merely flat" revenues declined when compared to the second quarter, "but only by approximately 10%." *Id.* And, for the fourth quarter, revenues were actually higher than for the second and third quarters. Thus, we concluded, "while Convergent was somewhat optimistic regarding the third quarter, it actually *underestimated* fourth quarter revenues." *Id.* (emphasis in the original). Such a showing was inconsistent with knowledge of declining revenues. *See id.*

## Challenges to Disclosures Regarding NGEN Profitability

The Plaintiffs contended that Convergent misled investors by failing to disclose "certain cost and production problems regarding Convergent's NGEN product line." *Id.* at 515. The Plaintiffs contended that because of the undisclosed cost and production problems, "Convergent sold some configurations of the NGEN workstation at a negative gross margin through 1983 and into the beginning of 1984." *Id.* Convergence countered that it "adequately disclosed the NGEN cost problems in the March Prospectus" in the following language from the March Prospectus:

> The Company anticipates NGEN will be both significantly more powerful and less expensive than existing workstation

> products. While the Company believes that the technical risks in the development of these products are well controlled, the product cost objectives are very aggressive and there is no assurance that they can be achieved.

*Id.* (alterations omitted).

We agreed that this cautionary language in the March Prospectus adequately disclosed to potential investors the risk associated with the release of this new product. We concluded that "*[c]learly*, Convergent's disclosures warned investors that problems with attaining internal cost objectives could impact the ultimate profitability of NGEN." *Id.* (emphasis added). The Plaintiffs nevertheless insisted that this disclosure "did not sufficiently warn investors as to the particularized risks then known by Convergent, or the magnitude of those risks." *Id.* But we disagreed, making a distinction between "knowing that any product-in-development may run into a few snags, and knowing that a particular product *has already developed problems so significant as to require months of delay*." *Id.* (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989)) (emphasis added).

We went on to delineate how the March Prospectus "virtually overflow[ed] with Convergent's repeated emphasis of *significant risk factors*," including: 1) the undertaking of "substantial development, manufacturing and marketing risks;" 2) the lack of any assurance that Convergent would "successfully complete the development of its new products or . . . be successful in manufacturing the new products in high volume or marketing the products in the face of intense competition;" 3) the lack of available

components from sole or limited sources having "a temporary adverse [e]ffect on the Company by delaying shipments;" and 4) a lack of assurance that the "aggressive" product cost objectives could be achieved. *Id.* (emphasis added).

We also observed that Convergent continued during the class period to warn of the risks associated with the development and production of NGEN. In the August Prospectus, Convergent disclosed that "[t]he risks involved with NGEN relate to the completion of the new products in accordance with their technical specifications, the availability of advanced components critical to high volume production of the new products and the achievement of product cost objectives." *Id.* at 515-16 (alterations omitted).

The August Prospectus also cautioned that "[a]s a result of the[] risks" of the NGEN development, "the new product areas may not contribute to revenues within the time periods the Company anticipates." *Id.* at 516. In addition, Convergent reiterated the lack of "assurance that the aggressive cost objectives for these products can be achieved, nor is there assurance of the availability of necessary quantities of disk drives or the advanced microprocessors necessary to permit timely production of these products." *Id.* Finally, Convergent disclosed that "NGEN's microprocessor, which [had] only been manufactured in limited quantities [was] being allocated by its sole source manufacturer." *Id.* In light of these copious disclosures, we concluded that "[n]o investor, in the face of these substantive disclosures, could reasonably conclude that Convergent had surmounted all obstacles in NGEN's path." *Id.*

SODHA V. GOLUBOWSKI                                      77

### Challenge to Workslate Disclosures

Similar to their challenge to the NGEN disclosures, the Plaintiffs asserted that Convergent's risk disclosures for the Workslate Product "were too general and were misleading given the known delays and mechanization problems that existed with Workslate." *Id.* We rejected the Plaintiffs' assertion, observing that the prospectuses issued in March and August "provided more than generalized statements of risk." *Id.* We referenced the following warnings that could affect production:   1) "the implementation of advanced manufacturing processes and the development and management of retail distribution channels;" 2) "the timely availability of several advanced components . . .; 3) the implementation of . . . advanced manufacturing processes;" 4) "the development and management . . . of retail channels of distribution, an area in which [Convergent] [had] no prior experience;" 5) the potential "inability of . . . vendors to supply the [advanced technology components] in adequate quantities;" and  6) "unanticipated problems" in the "manufacturing processes" that "have not been widely used in the United States." *Id.*

*Convergent Technologies* is a compelling prototype for analysis of the issues raised in the case before us. The majority gives short shrift to this precedent, dismissing it as addressing only "internal projections." *Majority Opinion*, p. 30. But the analysis in *Convergent Technologies* specifically provides the framework for assessing "alleged misleading statements and omissions" writ large. *Convergent Techs.*, 948 F.2d at 509. There is simply no meaningful distinction between challenges predicated on internal projections and those predicated on "last reported results." *Majority Opinion*, p. 29.

## I.   <u>Internal Projections</u>

We have held that "issuers need not reveal all internal projections," because "[c]ompanies generate numerous estimates internally, and they may reveal the projection they think best while withholding others, as long as the projection revealed had a reasonable basis." *Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)*, 627 F.3d 376, 391 (9th Cir. 2010) (citations omitted). In *Convergent Technologies*, we recognized this principle, observing that "Convergent had at its disposal more detailed internal NGEN projections. But Convergent was not obliged to disclose these internal projections." *Id.*

However, we went well beyond an analysis of internal projections to determine that Convergent's disclosures comported with the securities laws. For example, we rejected the plaintiffs' contentions that the prospectus "misled the market by overstating the demand for Convergent's AWS/IWS workstation" because Convergent's statements "were true," *id.* at 512 (footnote reference omitted). We also rejected the contention that Convergent's report to its shareholders was misleading. *See id.* at 514. Independent of Convergent's internal projections, we also concluded that "[a]lthough in its annual Form 10–K filing a company must discuss factors that would cause reported financial information not to be necessarily indicative of future financial operating results, no such obligation exist[ed] in the quarterly report at issue." *Id.* (citation omitted).

Notably, we have not limited the analysis in *Convergent Technologies* to internal projections. In *Anderson v. Clow (In re Stac Elec. Sec. Litig.)*, 89 F.3d 1399, 1406 (9th Cir. 1996), we recognized that, when discussing internal

SODHA V. GOLUBOWSKI 79

projections in *Convergent Technologies*, we distinguished Convergent's disclosures "from [a] Fifth Circuit case . . ., noting that Convergent's prospectus *virtually overflowed* with risk factors" *and* that Convergent was not obliged to disclose its internal projections because such projections are tentative." (citation, alteration, and internal quotation marks omitted) (emphasis added).

Thus, the majority's minimization of *Convergent Technologies* as relevant only to internal projections is unsupported by our precedent and by the *Convergent Technologies* opinion itself. Rather, our review in *Convergent Technologies* demonstrates that challenges predicated on internal trends, projections, key performance indicators, and last reported results are equally relevant to consideration of "the totality of information available" in evaluating the sufficiency of Robinhood's disclosures. *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 391; *see also Convergent Tech.*, 948 F.2d at 513.

The majority acknowledges that "all the omissions challenged by Plaintiffs involve the relationship between a prior statement concerning a particular time period and an event subsequent to that time period." *Majority Opinion*, p. 28. Plaintiffs specifically alleged that Robinhood failed to disclose "that several financial metrics and key performance indicators declined *after the end of the last reported fiscal quarter*." *Id.* (emphasis added).

As an initial matter, we have not endorsed reliance on subsequent events to establish a misleading statement and/or an omission under Item 303. *See Miller v. Pezzani (In re Worlds of Wonder Securities Litigation)*, 35 F.3d 1407, 1419 (9th Cir. 1994) ("Plaintiffs submit no admissible evidence to show that [Worlds of Wonder's] sales had decreased so

dramatically at the time of the Debenture offering that [Worlds of Wonder's] management could have *known* about, and thus would have had a duty to disclose, the impending collapse of Laser Tag sales. *Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud*.") (citation omitted) (emphasis added).

Nevertheless, without citing any supporting case authority, the majority supports its analysis with the following reasoning: "Because Plaintiffs' contention relies *in part* on the distinction between the previous quarter's results and the interim results, it also involves the relationship between the previous quarter's results and the interim results, *it also involves the relationship between a prior statement and a subsequent event*. *Majority Opinion*, p. 28 (emphasis added). However, this reasoning is not consistent with our precedent cautioning against reliance on subsequent events to establish the existence of misleading statements, *see Worlds of Wonder*, 35 F.3d at 1419. It also ignores our precedent delineating our approach to analyzing offering statements by considering the statements made, disclosures accompanying those statements, and the information available to the market. *See Convergent Techs.*, 948 F.2d at 512, 515; *see also Worlds of Wonder*, 35 F.3d at 1413-14.

More importantly, fairly read in light of the disclaimers and the information existing in the market of investors, the statements in the prospectus were not misleading. *See Convergent Techs.*, 948 F.2d at 515-16; *see also id.* at 516 (observing that "Instruction 7 to Item 303(a) explicitly states that 'forward-looking' information need not be disclosed in Regulation S-K filing") (quoting 17 C.F.R. § 229.303(a) (1990)).

It bears emphasizing that, for offering documents, there are time parameters on financial statements that are required to support the prospectus.  Under 17 C.F.R. § 210.3-12:

> If the financial statements in a filing are as of a date the number of days specified in paragraph (g) of this section or more before the date the filing is expected to become effective, or proposed mailing date in the case of a proxy statement, the financial statements shall be updated, except as specified in the following paragraphs, with a balance sheet as of an interim date within the number of days specified in paragraph (g) of this section and with statements of comprehensive income and cash flows for the interim period between *the end of the most recent fiscal year and the date of the interim balance sheet provided and for the corresponding period of the preceding fiscal year.*  Such interim financial statements may be unaudited and need not be presented in greater detail than is required by § 210.10-01.    Notwithstanding the above requirements, the most recent interim financial statements shall be at least as current as the most recent financial statements filed with the Commission on Form 10–Q.

17 C.F.R. § 210.3-12(a) (emphasis added).   17 C.F.R. § 210.3-12(g) provides that "[f]or purposes of paragraph (a) of this section, the number of days shall be: (I) 130 days for large accelerated filers and accelerated filers (as defined in § 240.12b–2 of this chapter); and (II) 135 days for all other

registrants." 17 C.F.R. § 210.3-12(g)(1). Additionally, 17 C.F.R. § 249.308a states that:

> (a) Form 10-Q shall be used for quarterly reports under section 13 or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)), required to be filed pursuant to § 240.13a–13 or § 240.15d–13 of this chapter. A quarterly report on this form pursuant to § 240.13a–13 or § 240.15d–13 of this chapter shall be filed within the following period after the end of the first three fiscal quarters of each fiscal year, but no quarterly report need be filed for the fourth quarter of any fiscal year:

> (1) 40 days after the end of the fiscal quarter for large accelerated filers and accelerated filers (as defined in § 240.12b– 2 of this chapter); and

> (2) 45 days after the end of the fiscal quarter for all other registrants.

17 C.F.R. § 249.308a(a).

The import of these regulations is their focus on a period of time rather than a snapshot view, which seriously undermines the majority's unsupported reliance on dictionary definitions to support its snapshot analysis. *See Majority Opinion*, p. 38. In any event, the majority's approach completely elides the crucial consideration that the disclosure required under Item 303 is directed toward a company's *actual knowledge* of "a trend, demand, commitment, event or uncertainty." *Steckman v. Hart*

*Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) (citation omitted) (emphasis added).

The majority relies on Item 303(a) and Item 303(b)(2)(ii) to support its holding that Robinhood may be strictly liable under Section 11 because it did not provide intra-quarterly disclosures of specific key performance indicators that were incomplete. *See Majority Opinion*, pp. 33, 35, 37-39. Prior to its amendment, "[t]he first paragraph of . . . Item 303(a) instruct[ed] registrants to discuss their financial condition, changes in financial condition, and results of operations for full fiscal years," whereas "Item 303(c) [now] provides for interim disclosure requirements." Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, 2020 WL 7013369, at *11-*12 (S.E.C. Nov. 19, 2020) (2020 November Release).[1] "Item 303(a) relating to known trends and uncertainties literally [was] applicable to *full fiscal years*. Item 303(b) relate[d] to interim periods and only provide[d] in this respect that [a registrant] discuss material changes in results of operation from the *end of the last fiscal year* to the *end of the most recent quarter* and for the *corresponding period of the preceding fiscal year*." Harold S. Bloomenthal and Samuel Wolff, 2 Sec. Law Handbook § 28:48 n.2 (2024) (emphases added). Item 303(a), as amended, currently provides an objective for disclosures under Item 303. *See* 17 C.F.R. § 229.303(a). Thus, prior to amendment, Items 303(a) and 303(b)(2)(ii), involved more extensive periods during which a registrant could assess and report a trend or uncertainty.

---

[1] The majority relies on the Management's Discussion and Analysis of Financial Condition, Securities Act Release No. 6835 (May 18, 1989) (1989 Release). *See Majority Opinion*, p. 39 n.10. The S.E.C.'s 2020 November Release provides more recent guidance.

The amended version of Item 303 became effective on February 10, 2021,[2] and includes amended disclosure requirements for interim periods under Item 303(c). Item 303(c) provides:

> If interim period financial statements are included or are required to be included by 17 CFR 210.3 [Article 3 of Regulation S–X], a management's discussion and analysis of the financial condition and results of operations must be provided so as to enable the reader to assess material changes in financial condition and results of operations between the periods specified in paragraphs (c)(1) and (2) of this section. The discussion and analysis must include a discussion of material changes in those items specifically listed in paragraph (b) of this section.
>
> (1) Material changes in financial condition. Discuss any material changes in financial condition from the end of the preceding fiscal year to the date of the most recent interim balance sheet provided. If the interim financial statements include an interim balance sheet as of the corresponding interim date of the preceding fiscal year, any material changes in financial condition from that date to the date of the most recent interim balance sheet provided also must be discussed. If discussions of changes from both the end and the corresponding interim date of the

---

[2] The second amended complaint alleges that Robinhood's registration statement issued for its IPO was "effective July 28, 2021."

preceding fiscal year are required, the discussions may be combined at the discretion of the registrant.

(2) Material changes in results of operations.

(i) Discuss any material changes in the registrant's results of operations with respect to the *most recent fiscal year-to-date period for which a statement of comprehensive income is provided and the corresponding year-to-date period of the preceding fiscal year*.

(ii) Discuss any material changes in the registrant's results of operations with respect to either *the most recent quarter for which a statement of comprehensive income is provided and the corresponding quarter for the preceding fiscal year* or, in the alternative, *the most recent quarter for which a statement of comprehensive income is provided and the immediately preceding sequential quarter*. If the latter immediately preceding sequential quarter is discussed, then provide *in summary form* the financial information for that immediately preceding sequential quarter that is subject of the discussion or identify the registrant's prior filings on EDGAR that present such information. If there is a change in the form of presentation from period to period that forms the basis of comparison from previous periods provided pursuant to this paragraph, the registrant must discuss the reasons for

> changing the basis of comparison and provide both comparisons in the first filing in which the change is made.

17 C.F.R. § 229.303(c) (emphases added).

In the November 2020 Release, the S.E.C. "adopt[ed] amendments to modernize, simplify, and enhance certain financial disclosure requirements in Regulation S-K." 2020 November Release at *1. The S.E.C. amended Item 303(c) with respect to "interim disclosure requirements" to "allow for *more flexibility* in the interim periods compared." *Id.* at *11 (emphasis added). The S.E.C. observed that "[c]urrent Item 303(b) require[d] registrants to provide MD&A disclosure *for interim* periods that enables market participants to assess material changes in financial condition and results of operations *between certain specified periods*." *Id.* at *35 (footnote reference omitted) (emphases added). The S.E.C. "proposed amending current Item 303(b) (to be renumbered as proposed Item 303(c)) to *allow for flexibility in comparisons of interim periods and to simplify the item*." *Id.* at *36 (emphasis added). In ultimately amending Item 303(c), the S.E.C. explained that:

> the *flexibility* provided by these amendments will help registrants provide a more tailored and meaningful analysis that is relevant to *their specific business cycles* while also providing investors with material information to assess *quarterly performance*. Because not all businesses are seasonal, a comparison to the corresponding quarter of the preceding year may not be as meaningful as a comparison to the preceding quarter. Additionally, by requiring registrants not

> only to explain the reasons for a change in comparison from prior periods but also to provide both comparisons when there is such a change, we believe investors will benefit from greater insight into a registrant's decision making and have sufficient disclosure to understand any period-over-period change.

*Id.* (emphases added). "Amended Item 303(c)(2)(I) will continue to require registrants to discuss any material changes in their results of operations between *the most recent year-to-date interim period(s) and the corresponding period(s) of the preceding fiscal year* for which statements of comprehensive income are provided." *Id.* at *37 (emphasis added). "Amended Item 303(c)(2)(ii) . . . require[s] registrants to compare their *most recently completed quarter* to either the *corresponding quarter of the prior year* (as is currently required) or *the immediately preceding quarter*." *Id.* (emphases added). "This more *flexible approach* is intended to allow registrants to provide an analysis that is better tailored to their *business cycles*." *Id.* at *63 (emphasis added). According to the S.E.C., "the amendments . . . provide[d] registrants *flexibility* to choose the interim period presented, which could allow them to provide a more tailored analysis." *Id.* (emphasis added). Notably, there is no mention of post-report metrics. *See id.*

The majority's analysis concluding that Robinhood was compelled to provide additional disclosures within months of its IPO does not take into account the differing temporal requirements for Item 303(b), involving full fiscal years, and Item 303(c), involving interim disclosures for specified periods. This distinction is particularly important in light of

the extensive disclosures that Robinhood did provide in its offering documents versus the intra-quarterly financial information relied on in the complaint for a truncated period of time prior to issuance of the IPO.  As the district court observed,

> Plaintiffs did not allege inaccuracies in the Key Performance Indicators (KPIs) that Robinhood reported.  Plaintiffs alleged that [Robinhood] had access to *intra-quarterly results* that showed a decline in its KPIs *in months* leading up to the company's IPO that were inconsistent with the KPIs reported in the Offering Documents.  However, as a general matter, [Robinhood] had no obligation to disclose *incomplete intra-quarterly results (May to July 2021)* because SEC regulations do not require the disclosure of interim quarterly results.

Under Item 303(c), Robinhood is afforded flexibility in providing interim disclosures based on its assessment of its business cycle, whereas the majority's approach, relying on disclosures for full fiscal years under 17 C.F.R. § 229.303(b)(2)(ii), exposes Robinhood to strict liability under Section 11 for not disclosing certain "incomplete intra-quarterly results" occurring within months of the IPO. This approach is not only inconsistent with Item 303(c), but with our precedent.

In *Steckman*, we explained that, under Item 303(a)(3)(ii),[3] "a disclosure duty exists where a trend, demand, commitment, event or uncertainty is *both* [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation." 143 F.3d at 1296 (citation omitted) (emphasis in the original). "If management determines that fruition of *the trend* is not reasonably likely to occur, no disclosure is required." *Id.* at 1297 (citation and alteration omitted) (emphasis added). We elaborated that "[t]he first element is the showing of a known *adverse trend*." *Id.* (emphasis added). We concluded that the complaint failed to state a claim because it "fail[ed] to allege any facts by which management could reasonably expect that *the known trend* would have a material impact on the company's revenues, sales, etc." *Id.* at 1298 (emphasis added). We opined that "[t]he allegation that [the company] was increasing its accounts receivable in the fourth quarter of 1995 to borrow from sales in the first quarter of 1996 amounts to nothing. Accounts receivable naturally grow

---

[3] When *Steckman* was decided in 1998, 17 C.F.R. § 229.303(a)(3)(ii) provided that, for "full fiscal years," the registrant was required to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. 229.303(a)(3)(ii)(1998). This language is currently found in 17 C.F.R. § 229.303(b)(2)(ii) for "full fiscal years."

over time as a company's sales grow. A 3% difference is too insignificant to show knowledge of an *adverse trend* which could be reasonably expected to have a material impact." *Id.* (emphasis added) (internal quotation marks omitted). Thus, the district court did not err in following our lead and focusing on whether Robinhood failed to disclose a "known trend." *Id.*

Indeed, the second amended complaint alleged trends with respect to Robinhood's key performance indicators.

In addition to the trends alleged, the complaint also made allegations concerning Robinhood's business fundamentals. For example, the complaint alleged that "the Offering Documents misleadingly portrayed a state of affairs at odds with Robinhood's business fundamentals in the months leading to the IPO. In 2021, Robinhood's largest source of revenue was no longer fees from its customers' conventional trading in stocks and options, as it had been previously. Instead, since at least the start of the year, Robinhood's revenue had been driven by speculative, fad-trading in meme stocks and the novelty cryptocurrency Dogecoin." The complaint further alleged that "Robinhood's core fundamentals had changed since the historical periods depicted," and "MAU, ARPU and AUC were declining prior to the IPO."

## II. Key Performance Indicators

The S.E.C. has provided specific guidance for disclosures under Item 303 addressing a company's financial metrics and key performance indicators. The S.E.C. has "noted that for each business, there is a limited set of critical variables which presents the pulse of the business." Commission Guidance on Management's Discussion and Analysis of Financial Condition and Results of Operations,

2020 WL 1313719, at *1 (S.E.C. Jan. 30, 2020) (2020 January Release) (footnote reference omitted).

"[C]ompanies should identify and address those key variables and other qualitative and quantitative factors that are peculiar to and necessary for an understanding and evaluation of the individual company. Such information could constitute key performance indicators and other metrics." *Id.* (footnote reference omitted).

The S.E.C. "would generally expect, based on the facts and circumstances," certain disclosures "to accompany the metric," including "[a] clear definition of the metric and how it is calculated," "[a] statement indicating the reasons why the metric provides useful information to investors," and "[a] statement indicating how management uses the metric in managing or monitoring the performance of the business." *Id.* at 2.

The complaint does not plausibly allege that Robinhood failed to provide these requisite disclosures concerning its key performance indicators. Indeed, Robinhood stated in a "Special Note Regarding Forward-Looking Statements" that its prospectus included "forward-looking statements" encompassing its "expected results of operations and key performance metrics for the period ended June 30, 2021 and for future periods." As previously discussed in minute detail, Robinhood provided a plethora of "forward-looking statements" as well as profuse disclaimers. For example, Robinhood explained that for Monthly Active Users (MAU):

> We define MAU as the number of Monthly Active Users during a specified calendar month. A Monthly Active User is a unique user who makes a debit card transaction,

> transitions between two different screens on
> a mobile device while logged into their
> account or who loads a page in a web
> browser, at any point during the relevant
> month.   A user need not satisfy these
> conditions on a monthly or recurring basis or
> have a Funded Account to be included in
> MAU. . . .We utilize MAU to measure how
> many customers interact with our products
> and services during a given month. MAU
> does not measure the frequency or duration
> of the interaction, but we consider it a useful
> indicator for engagement. Additionally,
> MAUs are positively correlated with, but are
> not indicative of the performance of revenue
> and other key performance indicators.

Robinhood disclosed that, at the end of March, 2021, its
MAU totaled 17.7 million. Sodha's complaint alleges that,
for this single indicator, MAU increased to 24.1 million in
May, representing an increase of approximately 4 million
MAU, but decreased to 19.5 million in July, 2021, still
approximately 2 million more MAU than reported in the
prospectus.[4] In its prospectus, Robinhood estimated that, in
June 30, 2021, its MAU would be 21.3 million. Robinhood
cautioned that:

> For the three months ended June 30, 2021, we
> expect to report revenue of between $546
> million and $574 million, as compared to
> $244 million for the three months ended June

---

[4] In *Convergent Techs.*, we rejected a similar reliance on a purported
interim decrease in orders placed.  *See* 948 F.2d at 513-14.

30, 2020, representing an increase of 129% at the midpoint of this range. The expected increase in revenue is primarily driven by a 130% increase in Net Cumulative Funded Accounts and increased trading activity related to options and cryptocurrencies, and relatively flat equities trading activity, relative to the three months ended June 30, 2020. We also saw increases in the 2021 period in margin and stock lending activity as well as an increase in Robinhood Gold subscribers. Trading activity was particularly high during the first two months of the 2021 period, returning to levels more in line with prior periods during the last few weeks of the quarter ended June 30, 2021, and remained at similar levels into the early part of the third quarter. We expect our revenue for the three months ending September 30, 2021 to be lower, as compared to the three months ended June 30, 2021, as a result of decreased levels of trading activity relative to the record highs in trading activity, *particularly in cryptocurrencies*, during the three months ended June 30, 2021, and expected seasonality. . . .

For the three months ended June 30, 2021, we expect to report Net Cumulative Funded Accounts of 22.5 million, as compared to 9.8 million for the three months ended June 30, 2020, representing an increase of 130%. For the month ended June 30, 2021, we expect to report MAU of 21.3 million, as compared to

10.2 million for the month ended June 30, 2020, representing an increase of 109%. As of June 30, 2021, we expect to report AUC of $102 billion, as compared to $33 billion as of June 30, 2020, representing an increase of 205%. *The increase in these Key Performance Metrics resulted primarily from an increase in new users joining our platform, driven by general market interest trading. We anticipate the rate of growth in these Key Performance Metrics will be lower for the period ended September 30, 2021, as compared to the three months ended June 30, 2021, due to the exceptionally strong interest in trading, particularly in cryptocurrencies, we experienced in the three months ended June 30, 2021 and seasonality in overall trading activities.*

Robinhood further specifically cautioned that:

Our results of operations and other operating metrics may fluctuate from quarter to quarter, which makes these metrics difficult to predict.

Our results of operations are heavily reliant on the level of trading activity on our platform and net deposits. In the past, our results of operations and other operating metrics have fluctuated from quarter to quarter, including due to movements and trends in the underlying markets, changes in general economic conditions and fluctuations

> in trading levels, each of which is outside our
> control and will continue to be outside of our
> control. Additionally, our limited operating
> history makes it difficult to forecast our
> future results. As a result, period-to period
> comparisons of our results of operations may
> not be meaningful, and our past results of
> operations should not be relied on as
> indicators of future performance. Further, we
> are subject to additional risks and
> uncertainties that are frequently encountered
> by companies in rapidly evolving markets.
> Our financial condition and results of
> operations in any given quarter can be
> influenced by numerous factors, many of
> which we are unable to predict or are outside
> of our control . . .

We credited similar disclosures in *Convergent Technologies* as foreclosing a plausible claim under Item 303. *See* 94 F.2d at 515.

### III. <u>Payment For Order Flow</u>

Robinhood specifically disclosed in its prospectus the risks associated with payment for order flow. With respect to Robinhood's revenue model, the prospectus warned that:

> Rather than earning revenue from fixed
> trading commissions which, before
> Robinhood introduced commission free
> trading, had often ranged from $8 to $10 per
> trade, the significant majority of our revenue
> is transaction-based. We earn transaction-
> based revenue from market markers in

exchange for routing our users' equity, option and cryptocurrency trade orders to market makers for execution. With respect to equities and options trading, such fees are known as payment for order flow, or PFOF, and with respect to cryptocurrency trading such fees are known as Transaction Rebates. For the three months ended March 31, 2021, PFOF and Transaction Rebates represented 81% of our total revenues and, as a result, our revenues are currently substantially dependent on these fees. Our transaction-based revenue model could be harmed by decreased levels of trading generally or by industry or regulatory changes that could tighten spreads on transactions.

In addition, PFOF practices have drawn heightened scrutiny from the U.S. Congress, the SEC and other regulatory and legislative authorities. These regulators and authorities may adopt additional regulation relating to, or any bans or limitations on, PFOF practices as a result of such heightened scrutiny or otherwise pursue additional inquiries or investigations relating to PFOF practices. Any such restrictions or bans on our ability to collect PFOF could impact the value of our

Class A common stock offered by this prospectus.

The prospectus elaborated that:

For the year ended December 31, 2020, revenue derived from PFOF and Transaction Rebates represented 75% of our total revenues, and for the three months ended March 31, 2021, represented 81% of our total revenues. Computer-generated buy/sell programs and other technological advances and regulatory changes in the marketplace may continue to tighten spreads on transactions, which could lead to a decrease in our PFOF earned from market makers. Our transaction-based revenue could also be harmed by decreased levels of trading generally.

The prospectus further cautioned that:

any negative publicity surrounding PFOF or Transaction Rebate practices generally, or our implementation of these practices, could harm our brand and reputation. For example, as a result of the January 2021 Trading Restrictions, we faced allegations that our decision to temporarily prevent our customers from purchasing certain specified securities was influenced by our relationship with certain market makers. . . . If our customers begin to disfavor PFOF and Transaction Rebate practices generally or the

> specific market markers with whom we do business due to any negative media attention, they may have an adverse view of our business model and decide to limit or cease the use of our platform. Additionally, some customers may prefer to invest through our competitors that do not engage in PFOF or Transaction Rebate practices or engage in them differently than do we. Any such loss of customer engagement as a result of any negative publicity associated with PFOF and Transaction Rebate practices could have an adverse effect on our business, financial condition and results of operations.

With respect to its key performance indicators, Robinhood provided "material information" that was "necessary in order to make the presentation of the metric, *in light of the circumstances under which it is presented*, not misleading," 2020 January release at \*2 (footnote references omitted) (emphasis added). In addition, as the district court noted, the marketplace was abuzz with talk of Robinhood and its novel approach to investments, including the concomitant risks:

> [Robinhood's] trading events were amongst the biggest news stories of the year. *See, e.g., Year in Review: A Look Back at the Biggest News of 2021*, Wall Street Journal (Dec. 19, 2021); Nicole Lyn Pesce, *Google's 2021 Year in Search: AMC and GME stocks, Dogecoin, stimulus checks and shortages dominated queries*, MarketWatch (Dec. 11, 2021); *Stan Choe, Dogecoin has its day;*

*cryptocurrency is latest 'meme' craze*, AP News (Apr. 20, 2021). And Robinhood included information about the volatility regarding the trading frenzies—including lawsuits filed against Robinhood and congressional inquiries—in its Offering documents. Robinhood also disclosed the existence of bubbles from the meme stock event and information about the Dogecoin event in the Offering Documents. Plaintiffs appear to acknowledge the highly publicized nature of these events in their complaint. Accordingly, a reasonable investor would have been aware of the meme stock and Dogecoin events in early 2021; these events, also disclosed in the Offering Documents, cannot support a securities claim. *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) (explaining that it is axiomatic that there can be no omission claim when the allegedly undisclosed information was in the public domain before the IPO).

Notably, the second amended complaint confirms the well-known volatility of Robinhood's business operations based on widespread public interest and media reports. For example, the second amended complaint alleges that:

In January 2021, shares of GameStop, AMC Entertainment (AMC) and other companies whose shares were heavily shorted, surged on unprecedented volume as retail investors banded together in places like Reddit (under the subreddit r/WallStreetBets), to squeeze

short-sellers who had bet against these companies. By driving up the share prices of these companies, the retail investors hoped to force hedge funds betting against the companies to cover their losses by buying back the shares, thereby increasing their share prices. Single stock options were also a popular choice of retail investors looking to participate in the squeeze, and volumes jumped to previously unseen highs in January 2021. This so-called meme stock event resulted in high volatility and heavy trading volume in the stocks and options in question, and, in the short term, benefited [sic] Robinhood as many of these retail traders flocked to its platform to execute their trades.

The meme stock event began in earnest in mid to late January 2021. At the close of trading on January 25, 2021, GameStop, a struggling video game retailer and one of the most shorted names in the U.S. stock market, had been traded more than any other S&P 500 stock with hundreds of millions of shares changing hands.

The rally gained steam the following day after Elon Musk tweeted Gamestonk!! to his 42 million followers with a link to the WallStreetBets message board. In response, GameStop's stock price, which had begun the year trading around $5, surged again with nearly 200 million shares changing hands.

GameStop shares kept soaring the following day after CNBC reported that hedge fund Melvin Capital had closed out its short position in the company the prior day after taking a huge loss and requiring a cash infusion of nearly $3 billion from outside investors. At the same time, other heavily shorted companies with troubled businesses, including AMC Entertainment and Bed Bath & Beyond, also got caught up in the frenzy. AMC jumped 300% on January 27 alone, with more than one billion shares changing hands in its highest volume day ever. Bed Bath & Beyond's shares rose 43% the same day.

The second amended complaint also alleged that:

as the meme stock phenomenon was abating Dogecoin, one of only seven cryptocurrencies that could be traded on Robinhood's platform, was taking flight.

Although it ended 2020 at less than half a penny, in January 2021, Dogecoin soared more than 800% on heavy volume after gaining cult status on Reddit's WallStreetBets message board. On February 4, 2021, trading in Dogecoin surged again after Elon Musk tweeted about it, sending Dogecoin up more than 50%. By mid-February 2021, Dogecoin had risen more than 950% since the beginning of the year, to more than five cents per coin.

In April, the price of Dogecoin skyrocketed again on heavy trading. On April 14, 2021, Dogecoin surpassed ten cents in value for the first time, as investors geared up for the direct listing of cryptocurrency exchange Coinbase Global. Then, on April 15, 2021, following another Elon Musk tweet, Dogecoin rallied past 25 cents for the first time on heavy volume that knocked out Robinhood's crypto trading systems for several hours. Once trading was restored, Dogecoin kept climbing hitting a then all-time high of 44 cents on April 16, 2021. The high volume of trading, which was up nearly 300%, once again caused Robinhood to experience sporadic crypto order failures and delayed notification for some customers.

Then, on April 28, 2021, Elon Musk tweeted his upcoming appearance on Saturday Night Live (SNL), calling himself Dogefather. In the ten days between April 28 and Elon Musk's May 8, 2021 turn as SNL host, Dogecoin rose from approximately $0.30 to approximately $0.73. However, the price of Dogecoin plummeted during the program after Elon Musk agreed Dogecoin was a hustle. Between May and July, Dogecoin's price sank by 78%, and volume plummeted.

These allegations reflect that Plaintiffs were acutely aware of the volatility of market events impacting Robinhood's business operations, and their losses were not caused by any failure to disclose on the part of Robinhood.

The information and disclosures provided by Robinhood, together with the marketplace information, equal or exceed what we have previously accepted as adequate under Item 303 to preclude liability. *See Convergent Tech.*, 948 F.2d at 512, 515.

## IV. <u>Conclusion</u>

The majority opinion fails to focus on what Robinhood *knew* when the prospectus was issued, and failed to adhere to our precedent interpreting Item 303. Rather, as the majority concedes, it collapses the requirements for interim and annual reports, *see Majority Opinion*, p. 31, and relies on out-of-circuit authority to support its analysis.

As previously noted, the November 2020 SEC guidance focuses on flexibility in interim reports and consideration of "the pulse of the business." November 2020 Release at *1. Nowhere in the majority opinion are these concepts mentioned or incorporated. Rather, the majority relies upon a handful of matrix entries during a limited period to assess the "materiality" of a correct statement based on a fluctuation in the matrix, even if the fluctuation was not known to the company when the prospectus was issued. This approach would subject virtually every company to liability for after-the-fact matrix fluctuations of which the company had no knowledge.

The majority replaces the flexibility afforded by Item 303, as reflected in more recent S.E.C. guidance, with uncertainty, as it "express[es] no view on whether Plaintiffs have alleged that Robinhood had sufficient knowledge of any trend, event, or uncertainty; whether the meme stock event was sufficiently persistent to qualify as a trend; and whether quantification of the meme stock event would be reasonably practicable here." *Majority Opinion* p. 42, n.11.

However, the S.E.C. guidance relied on by the majority, *see id.* p. 39, n.10, mentions known trends or similar language on at least twenty-three occasions. *See* 1989 Release at *3-*6, *9-*10. And as discussed, Robinhood disclosed "known trends" concerning its revenue growth, as well as its expectations for the second quarter 2021 and third quarter 2021. Robinhood also quantified its operating expenses, user growth, net losses, changes in its key performance metrics, spikes in cryptocurrency trading, "significant increase[s] in revenue, MAU, AUC and Net Cumulative Funded Accounts," expectations that "the growth rates in revenue, MAU, AUC and Net Cumulative Funded Accounts [would] decline in future periods, and such declines should be significant," volatility in cryptocurrency prices and Dogecoin demand, and Robinhood's PFOF risks. Under the majority's approach, Robinhood faces potential strict liability under Section 11 based on the majority's failure to apply the appropriate standard, *i.e.* disclosures that Robinhood actually made, and whether those disclosures failed to include a known trend. Instead, the majority "express[es] no view" on these required elements of a claim under Item 303. *Majority Opinion*, p. 42, n.11.

If the majority actually applied the correct analysis from *Convergent Technologies*, it would be compelled under our precedent to conclude that Robinhood's prospectus and associated documents "virtually overflow[ed] with [Robinhood's] repeated emphasis of significant risk factors," and that Robinhood sufficiently disclosed what it knew about any impacts on its operations and key performance metrics from known trends. 948 F.2d at 516.

By ignoring the significant disclosures and quantifications that were made by Robinhood, and declining to apply the standard set forth in our precedent for Item 303

analysis, the majority essentially transforms its opinion into dicta that lends only additional confusion to assessing liability under the securities regulations.   Despite its expansive disclosures, Robinhood is left not only with the majority's indecisive analysis, but also with this perplexing guidance:

> when a trend must be disclosed pursuant to Item 303, its effects must be quantified to the extent reasonably practicable.   However, there will be cases where no quantification is reasonably practicable.   Moreover, any duty to quantify an effect does not necessarily require granular information about that effect.

*Majority Opinion*, p. 41.   The majority attempts to clarify this language, *see id.*, by referencing a thirty-six-year-old hypothetical provided by the S.E.C. in 1989:

> *Facts*: A registrant has been correctly designated a [potentially responsible party] by the EPA with respect to cleanup of hazardous waste at three sites.   No statutory defenses are available.   The registrant is in the process of preliminary investigations of the sites to determine the nature of its potential liability and the amount of remedial costs necessary to clean up the sites.   Other [potentially responsible parties] also have been designated, but the ability to obtain contribution is unclear, as is the extent of insurance coverage, if any.   Management is unable to determine that a material effect on

future financial condition or results of operations is not reasonably likely to occur.

Based upon the facts of this hypothetical base, MD&A disclosure of the effects of the [potentially responsible party] status, quantified to the extent reasonably practicable, would be required. For MD&A purposes, aggregate potential cleanup costs must be considered in light of the joint and several liability to which a [potentially responsible party] is subject. Facts regarding whether insurance coverage may be contested, and whether and to what extent potential sources of contribution or indemnification constitute reliable sources of recovery may be factored into the determination of whether a material future effect is not reasonably likely to occur.

1989 Release at *6 (footnote reference omitted). The S.E.C.'s hypothetical involving consideration of hazardous waste cleanup costs has absolutely no relevance to the majority's discarding of Robinhood's extensive disclosures concerning the extreme volatility of its trading platform. In the hypothetical, the company is able to consider its "aggregate potential cleanup costs" based on "the joint and several liability to which a [potentially responsible party] is subject." *Id.* Under this rationale, Robinhood would be required to quantify the "effects" of "trends" resulting from uncontrollable market events, *Majority Opinion*, p. 40, even though Robinhood already quantified its operating expenses, user growth, net losses, changes in its key performance metrics, spikes in cryptocurrency trading, "significant

increase[s] in revenue, MAU, AUC and Net Cumulative Funded Accounts," expectations that "the growth rates in revenue, MAU, AUC and Net Cumulative Funded Accounts [would] decline in future periods, and such declines should be significant," volatility in cryptocurrency prices and Dogecoin demand, and Robinhood's PFOF risks. Robinhood's disclosures, replete with quantifications, coupled with widespread market and public knowledge of the risks faced by Robinhood as a result of meme stock, cryptocurrency, and Dogecoin trading, far exceeded the requirements of the S.E.C.'s hypothetical involving consideration of "aggregate potential [cleanup] costs" during the course of hazardous waste litigation. *Id.* In light of Robinhood's significant disclosures regarding the panoply of risks it faced, there is simply no basis under our precedent for this litigation to proceed.

I cannot agree in good conscience that this approach conforms to our precedent, or to the expressed intent of the SEC to provide flexibility to the prospectus issuer and "to simplify compliance efforts for registrants." 2020 November Release at *1. I respectfully dissent.[5]

---

[5] Because our precedent dictates the outcome of this case, there is no need to address the "extreme departure" standard applied by the district court. *See Steckman*, 143 F.3d at 1298. But I do not agree with the majority's conclusion that the term "extreme departure" is "far less administrable" as "enigmatic language" that "leaves too many open questions." *Majority Opinion*, pp. 32. Indeed, the securities laws and resulting litigation are often governed by the application of an extreme departure standard. For example, we have articulated that, under Section 10-b of the Securities Exchange Act, a plaintiff may allege "deliberate recklessness" due to "an extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Schueneman v. Arena Pharms., Inc*., 840 F.3d

698, 704-05 (9th Cir. 2016) (citations and alteration omitted) (emphases in the original). We apply this requirement in securities cases under the Private Securities Ligation Reform Act although it is "not an easy standard to comply with" as "it was not intended to be." *Id.* (citation omitted). We could similarly define an extreme departure standard here. This approach is much closer to the intent of the statute than collapsing the analysis for interim reports and annual reports into one mushy "materiality" standard. *See* November 2020 Release at *11.